

**Office of the Attorney General**
**LEONARDO M. RAPADAS**
Attorney General of Guam
**ROBERT M. WEINBERG**
Assistant Attorney General
287 West O'Brien Drive
Hagåtña, Guam 96910    USA
(671) 475-3324    (671) 472-2493 (Fax)
rweinberg@guamattorneygeneral.com
**Attorneys for all defendants**

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **ARNOLD DAVIS**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**GOVERNMENT OF GUAM; GUAM ELECTION COMMISSION; ALICE M. TAIJERON; MARTHA C. RUTH; JOSEPH F. MESA; JOHNNY P. TAITANO; JOSHUA F. TENORIO; DONALD I. WEAKLEY**; and **LEONARDO M. RAPADAS**, in his official capacity as Attorney General of Guam,<br><br>Defendants. | Civil Case No. 11-00035<br><br>**MOTION TO DISMISS** |

Pursuant to Fed.R.Civ.P., Rules 12(b)(1) and 12(b)(6), the Attorney General of Guam, **LEONARDO M. RAPADAS**, moves to dismiss the above-styled matter in its entirety on the grounds that it fails to present a justiciable case or controversy.

### Introduction

"Native Inhabitants of Guam" are defined as "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Organic Act of Guam and descendants of

those persons." 1 GCA § 2102; *see also* 3 GCA § 21001(e). The Guam Legislature has established a "Guam Decolonization Registry" for the "purposes of registering and recording the names of the Native Inhabitants of Guam." 3 GCA § 21001(d). The law further provides, "Any person who willfully causes, procures or allows that person, or any person, to be registered with the Guam Decolonization Registry, while knowing that the person, or other person, is not entitled to register with the Guam Decolonization Registry, shall be guilty of perjury as a misdemeanor." 3 GCA § 21009.

Plaintiff Arnold Davis is a white, non-Chamorro, male, United States citizen, and resident of Guam who has voted in past Guam general elections and who does not meet the statutory definition of "Native Inhabitants of Guam." *Complaint* ¶¶ 1, 7, 20. He seeks a declaratory judgment and injunctive relief enjoining the criminal provisions of 3 GCA § 21001(d) and to enjoin a future "Political Status Plebiscite" in which only "Native Inhabitants of Guam" are eligible to register and vote as provided by 1 GCA § 2110.

**Plebiscite Date and Voting Ballot.**

(a) The Guam Election Commission shall conduct a 'Political Status Plebiscite', at which the following question, which shall be printed in both English and Chamorro, shall be asked of the eligible voters:

In recognition of your right to self-determination, which of the following political status options do you favor? (Mark ONLY ONE):

1. Independence ( )
2. Free Association with the United States of America ( )
3. Statehood ( ).

**Persons eligible to vote shall include those persons designated as Native Inhabitants of Guam, as defined within this Chapter of the Guam Code Annotated**, who are eighteen (18) years of age or older on the date of the 'Political Status Plebiscite' and are registered voters on Guam.

> The 'Political Status Plebiscite' mandated in Subsection (a) of this Section shall be held on a date of the General Election at which seventy percent (70%) of eligible voters, pursuant to this Chapter, have been registered as determined by the Guam Election Commission.

1 GCA § 2110 (emphasis added).[1]

Defendants are the members of the Guam Election Commission and the Attorney General of Guam, all sued in their official capacities. Mr. Davis alleges that he has attempted to register for the plebiscite but because he is not a "Native Inhabitant of Guam," he has been turned away. *Complaint* ¶ 21. He contends that the provisions of 1 GCA § 2110 limiting the political status plebiscite to "Native Inhabitants of Guam" violate Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973; his right to equal protection under the 5th, 14th and 15th amendments to the United States Constitution; and "various provision of the Organic Act currently codified at §§ 1421b(m), 1421b(n) and 1421b(u)." *Complaint* ¶¶ 29, 33, 39.[2]

Mr. Davis' complaint begins with a misreading of applicable law.

---

[1] Public Law 27-106:VI:23 (Sept. 30, 2004), amended the date of election from a date certain stated by P.L. 25-148:7, which was November 7, 2000, "unless the Guam Election Commission determines that it won't be adequately prepared to hold the Plebiscite on that date" to "a date of the General Election at which seventy percent (70%) of eligible voters, pursuant to this Chapter, have been registered as determined by the Guam Election Commission." There is no indication in the law by what census data or other criteria 70% of eligible voters is to be determined, nor any suggestion that the 70% threshold of eligible voters, however calculated, is close to being met.

[2] "Guam's 'Bill of Rights' is patterned after, but not identical to, the federal Bill of Rights. For example, in § 1421b there is no equivalent to the Second Amendment, Fifth Amendment grand jury indictment guarantee, or the Sixth and Seventh Amendment rights to a trial by jury. Furthermore, Guam's 'Bill of Rights' contains provisions not found in the federal Bill of Rights. *See*, *e.g.*, § 1421(n) (proscribing discrimination on the basis of race, language, or religion); § 1421b(q) (prohibiting employment of children under the age of fourteen years in any occupation injurious to health); § 1421(r) (requiring compulsory education for all children between the ages of six and sixteen years)." *Guam v. Guerrero*, 290 F.3d 1210, 1214 n. 6 (9th Cir. 2002). In 1968, Congress enacted what is familiarly known as the Mink Amendment, which extended specific constitutional rights to Guam "to the extent that they have not been previously extended" 48 U.S.C. § 1421b(u), including "article I, section 9, clauses 2 and 3; article IV, section 1 and section 2, clause 1; the first to ninth amendments inclusive; the thirteenth amendment; the second sentence of section 1 of the fourteenth amendment; and the fifteenth and nineteenth amendments." *Id.*, 290 F.3d 1214 n. 7.

3

> **Under Guam law, a plebiscite is to be held concerning Guam's future relationship to the United States**. Only "Native Inhabitants of Guam" will be permitted to vote, and only those meeting the statutory definition of that phrase are currently being registered to vote. Plaintiff and all those similarly situated – those who do not meet the definition of Native Inhabitant of Guam – are precluded from registering to vote. Further, unless this Court enjoins defendants from pursuing their current course of action, **plaintiff and all those similarly situated will not be permitted to vote in this crucial election concerning the future of Guam and, indeed, their own future**.

*Complaint* ¶ 1 (emphasis in bold added). When read in context with surrounding provisions of the law,[3] it is clear that Mr. Davis is mistaken as to the legal consequences of the law he is challenging. The challenged statute does not say that its purpose is to hold a plebiscite "concerning *Guam's* future relationship to the United States." Rather, its purpose is to "ascertain the intent of the Native Inhabitants of Guam as to *their* future political relationship with the United States of America" and that once *their* desire is determined, to transmit it to the President and Congress of the United States and Secretary General of the United Nations.

> The general purpose of the Commission on Decolonization shall be **to ascertain the intent of the Native Inhabitants of Guam as to their future political relationship** with the United States of America. **Once the intent of the Native Inhabitants of Guam is ascertained, the Commission shall promptly transmit that desire** to the President and the Congress of the United States of America, and to the Secretary General of the United Nations.

1 GCA § 2105 (emphasis added). Notably, nowhere does the statute suggest that the results of the plebiscite will have the effect, immediate or otherwise, of actually altering Guam's future

---

[3] The Guam Supreme Court has stated when construing enactments from the Guam Legislature, "In looking at the statute's language, the court's task is to determine whether or not the statutory language is 'plain and unambiguous …The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.' " *Aguon v. Gutierrez*, 2002 Guam 14 ¶ 6 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997)); *accord*, *People v. Lau*, 2007 Guam 4 ¶ 14 ("In determining ambiguity, the language of the statute cannot be read in isolation and must be examined within its context.") (citation omitted); *Guerrero v. Santo Thomas*, 2010 Guam 11 ¶ 12 (same).

political relationship with the United States, only that the *desires* of the "Native Inhabitants of Guam" as defined in § 2102 be *transmitted* to the President, Congress and United Nations.

## Standard of Review

> "We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party." *Manzarek*, 519 F.3d at 1031. Although factual allegations are taken as true, we do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). Therefore, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (internal quotation marks and citation omitted); *accord Iqbal*, 129 S.Ct. at 1950.

*Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008); and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009)). "Dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).

## DISCUSSION

> To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision, *Allen v. Wright*, 468 U.S. 737, 750-751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-473, 102 S.Ct. 752, 757-59, 70 L.Ed.2d 700 (1982). Article III denies federal courts the power "to decide questions that cannot affect the rights of litigants in the case before them," *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971), and confines them to resolving " 'real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *Ibid*. (quoting *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)).

*Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990); *accord MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). "Federal courts lack competence to rule definitively on the meaning of state legislation, nor may they adjudicate challenges to state measures absent a showing of actual impact on the challenger." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 48 (1997) (citation omitted). Mr. Davis will be unable to show that he will suffer any legally cognizable "impact" by not being permitted to register and vote in the plebiscite contemplated by the statute he challenges.

**There is No Justiciable Case or Controversy Presented by Mr. Davis' Complaint.**

Forty-six years ago, the district court of Puerto Rico considered a constitutional challenge to an act of the Puerto Rico Legislature related to its future political status wherein "[a] majority vote … in favor of either American Statehood or Independence would authorize the Legislature of Puerto Rico to petition the Congress of the United States for permission to convert the legal status of Puerto Rico to either Statehood or Independence as endorsed by the popular vote. If the majority of the voters indicated that they favor Commonwealth status there presumably would follow a continuation and development of the presently existing Commonwealth status." *Barbosa v. Sanchez Vilella*, 293 F.Supp. 831, 832 (D.P.R. 1967).

> Of far more fundamental importance on the issue of whether a substantial federal constitutional question is raised by this complaint is the concession that, regardless of the degree to which the plebiscite might bind the Puerto Rican Legislature, it concededly does not bind the Congress of the United States. **As a corollary thereto, the legal status, rights or American citizenship of all the residents of Puerto Rico will remain unchanged despite the plebiscite.**
>
> **Since no one's rights or status will be altered by the holding of the imminent plebiscite, this complaint presents no justiciable controversy cognizable by this court**, much less a substantial Constitutional question cognizable by a three-judge district court.

6

> The thrust of the complaint seems to be that plaintiffs in some undisclosed manner will be deprived of rights secured by the United States Constitution, treaties and laws. **This simply is not and cannot be so. The holding of the plebiscite will in no way change the juridical or political status of the plaintiffs or anyone else in Puerto Rico. Prior to the alteration of the status or rights of any person in Puerto Rico whatever change is later voted by the Puerto Rican Legislature must also be concurred in by the Congress of the United States**. Nothing in Act No. 1, as amended purports to bind the Congress. The most that it purports to do is to afford a vehicle for the expression of the will of the People, which may or may not bind the Commonwealth Legislature.

*Barbosa*, 293 F.Supp. 833-34 (emphasis added). "And this is so even assuming *arguendo* that a plebiscite is the equivalent of an election in its fullest sense. Technically, the interest of these plaintiffs in the plebiscite is purely personal rather than legal, and can be expressed by their corresponding with their own states' particular senators or representatives in Congress, who in turn can bring plaintiffs' views to the attention of Congress just as the results of the plebiscite would advise Congress of the views of those who vote in it." *Sola v. Sanchez Vilella*, 270 F.Supp. 459, 464 (D.P.R. 1967) (denying motion for three-judge court); *see also, id.* ("[Plaintiffs] fail to show how or in what manner the plebiscite, which is no more than an official poll of the individual desires of the citizens and residents of the Commonwealth of Puerto Rico participating therein as to their future political status, violates Constitutional principles.").

Although there were no claims of race-based discrimination presented in that case, the analysis is the same when considering Mr. Davis' claim of injury here because regardless of the outcome of any future plebiscite held in Guam to "ascertain the intent of the Native Inhabitants of Guam as to their future political relationship with the United States of America," 1 GCA § 2105, and even assuming *arguendo* that "Native Inhabitants" is race-based, Mr. Davis' rights as a United States citizen, registered voter, and stakeholder in Guam's future political

7

relationship with the United States remain unaffected by the tabulation and transmission of the "desires" of the "Native Inhabitants of Guam" to the President, Congress, and United Nations.

Twenty years ago, in *New Progressive Party (Partido Nuevo Progresista) v. Hernandez Colon*, 779 F.Supp. 646 (D.P.R. 1991), the district court of Puerto Rico was confronted with constitutional challenges to a referendum to amend Puerto Rico's constitution.

> In December 1966, the Puerto Rico Legislature enacted a law to hold a plebiscite in July 1967 on the political status of the island. The voters in the referendum were to choose one of the three status alternatives for Puerto Rico: commonwealth, statehood, or independence. The results were to be an authorization to the Puerto Rican legislature to petition Congress for a change in status if either statehood or independence won, or to continue with the development of the existing commonwealth status if that alternative won. A group of plaintiffs sued to enjoin the holding of this referendum on a number of constitutional grounds. *Barbosa v. Sanchez Vilella*, 293 F.Supp. 831, 833 (D.P.R. 1967).**The Court held that the plebiscite was nothing more than a vehicle for the people of Puerto Rico to express their will**. *Id*. at 833. **The plebiscite would not change the political status of the island; such a change would have to be agreed to by the United States Congress.** Thus, the plebiscite had no effect on any federally protected rights and the court refused to enjoin it. *Id*. at 833–34.
>
> We think this case is similar. The referendum provided for in Act 85 is a first step to amend the Constitution of Puerto Rico and a petition to the Congress and the President of the United States to respect these rights when action on the future status of Puerto Rico is taken. Act 85, Section 3. **Like the plebiscite in 1967, this referendum is simply an expression of public opinion. Its approval would be nothing more than a request that the federal government respect certain rights.**

*Id.*, 779 F.Supp. 654-55 (emphasis added).[4]

---

[4] Whether under the Constitution or the Voting Rights Act, the result is the same. The Voting Rights Act provides, "The terms 'vote' or 'voting' shall include all action necessary **to make a vote effective** in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast **with respect to candidates for public or party office and propositions for which votes are received in an election**." 42 U.S.C.A. § 1973l(c)(1) (emphasis added). The proposed plebiscite of course does not involve an election "with respect to candidates for public or party office." And insofar as a plebiscite limited to "Native Inhabitant of Guam" applies to a "proposition," it will never become "effective" within the meaning of the Voting

Of course, just like Puerto Rico, Guam is "subject to the plenary power of Congress and has no inherent right to govern itself." *Commonwealth of Northern Mariana Islands v. Atalig*, 723 F.2d 682, 687 (9th Cir.), *cert. denied*, 467 U.S. 1244 (1984).

> Article IV, section 3 of the Constitution gives Congress plenary power over territories of the United States. Guam, as an unincorporated territory, 48 U.S.C. § 1421a (1976), is subject to this plenary power. Congress has the power to legislate directly for Guam, or to establish a government for Guam subject to congressional control. Except as Congress may determine, Guam has no inherent right to govern itself.

*People of the Territory of Guam v. Okada*, 694 F.2d 565, 568 (9th Cir. 1982) (citing *Late Corporation of Latter-Day Saints v. United States*, 136 U.S. 1, 32 (1890); *Agana Bay Development Co. (Hong Kong) v. Supreme Court of Guam*, 529 F.2d 952, 954 (9th Cir.1976); and *First National Bank of Brunswick v. County of Yankton*, 101 U.S. 129, 133 (1880)).[5]

The law mandates only that the *desires* of the "Native Inhabitants of Guam" will be *transmitted* to the President, Congress and the United Nations. What Congress does with that transmission, and it may be nothing, is an entirely separate matter. *See, e.g., Guerrero v. Clinton*, 157 F.3d 1190, 1194 (9th Cir. 1998) ("No matter what it says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone

---

Rights Act because whatever the outcome it "will in no way change the juridical or political status of the plaintiffs or anyone else." *Barbosa*, 293 F.Supp. 833-34. "Its approval would be nothing more than a request that the federal government respect certain rights." *New Progressive Party*, 779 F.Supp. at 654-55.

[5] Article IV, § 3, clause 2 of the Constitution provides, "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state." And the "powers vested in Congress by Const., Art. IV, § 3, cl. 2, to govern Territories are broad." *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 586 n. 16 (1976). *See also Ngiraingas v. Sanchez*, 858 F.2d 1368, 1371 n. 1 (9th Cir. 1988) (quoting Leibowitz, *The Applicability of Federal Law to Guam*, 16 Va.J.Int'l L. 21, 62-63 (1975) ("authority of the Guam government depends entirely upon the will of Congress, and is at all times subject to such alterations as Congress may see fit to adopt"), *aff'd* 495 U.S. 182 (1990).

act upon."). Similarly here, whatever the results, the plebiscite or referendum will in no way affect Mr. Davis' rights. Mr. Davis has failed to present a justiciable case or controversy.

### Even if "Native Inhabitant of Guam" were a "Race-Based" Classification It Does Not Offend the Constitution

In *Rice v. Cayetano*, 941 F.Supp. 1529 (D. Haw. 1996), the district court of Hawaii addressed equal protection and other constitutional challenges to a statute related to "Hawaiian Sovereignty," the stated purpose of which was "to acknowledge and recognize the unique status the native Hawaiian people bear to the State of Hawaii and to the United States and to facilitate the efforts of native Hawaiians to be governed by an indigenous sovereign nation of their own choosing." *Id.*, 941 F.Supp. 1534-35.[6] Denying plaintiffs' motion for a preliminary injunction, the court acknowledged that "there is undoubtedly a racial component to the voter qualifications for the Native Hawaiian Vote," *Id.*, 941 F.Supp. 1541, but ultimately found "that the state's limited interest in polling Native Hawaiians on their views regarding sovereignty is rationally related to, and perhaps even compelling in light of, the state's unique obligation to Native Hawaiians…." *Id.*, 941 F.Supp. 1544. The court noted that "while the Native Hawaiians are not now a federally recognized tribe, they nevertheless have a special relationship with the United States that removes Act 359 from heightened constitutional scrutiny," and determined that the rational basis test was appropriate and found there was no equal protection violation. *Id.*, 941

---

[6] "Act 359 established a Hawaii sovereignty advisory commission to advise the legislature in carrying out the purpose of this Act. The Commission's mandate included advising the legislature on: (1) conducting special elections related to this Act; (2) apportioning voting districts; (3) establishing the eligibility of convention delegates; (4) conducting educational activities for Hawaiian voters, a voter registration drive, and research activities in preparation for the convention; (5) establishing the size and composition of the convention delegation; and (6) establishing the dates for a special election. The advisory commission was also to be responsible for submitting a plan to the 1994 legislature on the qualifications of voters and the conduct of special elections to implement the purposes of Act 359." *Rice*, 941 F.Supp. at 1535 (citations omitted).

10

F.Supp. 1541-42 (citing *Morton v. Mancari*, 417 U.S. 535 (1974) (Native American preferences are rationally related to fulfillment of congressional obligations toward Native Americans)); and *Naliielua v. State*, 795 F.Supp. 1009, 1013 (D. Haw. 1990), *aff'd*, 940 F.2d 1535 (9th Cir.1991)).[7] The United States unquestionably has similar obligations to foster discussions concerning its relationship with those persons otherwise identified as the "Native Inhabitants of Guam," whether race-based or not.[8]

The district court's decision upholding the authority of the State of Hawaii to conduct a referendum for the purpose of "polling Native Hawaiians *on their views* regarding sovereignty" is not to be confused with the Supreme Court's later decision reversing the district court's ruling which upheld limitations on the right to vote in statewide elections for trustees of Office of Hawaiian Affairs to Hawaiians and native Hawaiians. The Supreme Court's decision was expressly limited to the question of the constitutionality of statewide elections.[9]

---

[7] *See also*, *Office of Hawai'an Affairs v. Department of Education*, 951 F.Supp. 1484, 1496 (D. Haw. 1996) ("[The district court opinion in] *Rice* held that the rational basis test should apply to an equal protection challenge to a state-sponsored vote designed only for Native Hawaiians. *Id*. at 1543. The district court applied a rule articulated by the Supreme Court in *Morton v. Mancari*, 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974), that the rational basis test should be applied to federal race-conscious legislation targeted at Native Americans. *Rice* at 1540–41. This rule is 'premised on the historically unique relationship between the federal government and American Indians.' *Id.* Applying that rule, the court in *Rice* found that Native Hawaiians 'have a special relationship with the United States that closely parallels that of the American Indians.' *Id*. at 1542.").

[8] The most recent pronouncement by Congress in the exercise of its Article IV powers demonstrating its intent to foster discussion that may eventually lead to renewed political status negotiations in Guam is found at Section 1 of Public Law 111-244, 121 Stat. 189 (Sept. 30, 2010) (H.R. 3940) ("It is the sense of Congress that **the Secretary of the Interior may provide technical assistance to the Government of Guam** under section 601(a) of the Act entitled 'An Act to authorize appropriations for certain insular areas of the United States, and for other purposes', approved December 24, 1980 (48 U.S.C. 1469d(a)), **for public education regarding political status options** only if the political status options are consistent with the Constitution of the United States.") (emphasis added).

[9] *See, Rice v. Cayetano*, 528 U.S. 495, 510 (2000) ("Rice contested his exclusion from voting in elections for OHA trustees *and from voting in a special election relating to native Hawaiian sovereignty* which was

11

There is a critical distinction between a referendum intended to poll a select group of citizens with respect to their desires, even if arguably race-based,[10] and an election for specific

---

held in August 1996. After the District Court rejected the latter challenge, *see Rice v. Cayetano*, 941 F.Supp. 1529 (1996) (*a decision not before us*), the parties moved for summary judgment on the claim that the Fourteenth and Fifteenth Amendments to the United States Constitution invalidate the law excluding Rice from the OHA trustee elections.") (emphasis added). *See also*, *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004) ("The racial classification of native Hawaiians in *Rice* does not apply to this case. In fact, *Rice* explicitly reaffirmed and distinguished the political, rather than racial, treatment of Indian tribes as explained in *Mancari*. The issue did not concern recognition of quasi-sovereign tribes. Instead, *Rice* concerned elections of the State of Hawaii to which the Fifteenth Amendment applied, and application of *Mancari* to such facts would 'permit a State, by racial classification, to fence out whole classes of its citizens....' 528 U.S. at 522, 120 S.Ct. 1044. In short, at its core, *Rice* concerned the rights of individuals, not the legal relationship between political entities.").

[10] Mr. Davis will doubtless insist that the term "native inhabitants" is race-based because Title 1, Chapter 21 of the Guam Code is titled "Commission on Decolonization for the Implementation and Exercise of Chamorro Self-Determination." *Complaint* ¶ 9. Mr. Davis invites the court to infer from the title that "Native Inhabitants of Guam" is synonymous with the term "Chamorro" which he says "is a racial group that is usually defined by connections to and lineage with the groups of native peoples that inhabited Guam prior to the influx of people from Western Europe and the United States." *Id.* Although the word "Chamorro" was, at one time, part of the Commission's name, *see* P.L. 23-147, section 2104 today provides "There is established a Commission on Decolonization for the Implementation and Exercise of Guam Self-Determination for the Native Inhabitants of Guam," and does not employ the word "Chamorro" in the title of the Commission. Indeed, *other* than in the title, the word "Chamorro" appears in the text of Title 1, Chapter 21 only once. *See* 1 GCA § 2110(a) ("The Guam Election Commission shall conduct a 'Political Status Plebiscite', at which the following question, which shall be printed in both English and *Chamorro*...."). As a matter of law, "Title, division, part, chapter, article and section headings and tables of contents do not in any manner affect the scope, meaning, or intent of the provisions of this Code." 1 GCA § 720. Therefore, the statute's title is not dispositive of its meaning.

Although it is unnecessary to the resolution of the issues presented here, Guam law has an entirely separate definition of the term "Chamorro." *See* 3 GCA § 20001(a) (" '*Chamorro*' shall mean: (1) all inhabitants of the Island of Guam on April 11, 1899, including those temporarily absent from the Island on that date and who were Spanish subjects; *and* (2) all persons born on the Island of Guam *prior* to 1800, and their *descendants*, who resided on Guam on April 11, 1899, including those temporarily absent from the Island on that date, and their descendants; (i) *descendant* means a person who has proceeded by birth, such as a child or grandchild, to the remotest degree, from any *Chamorro* as defined above, and who is considered placed in a line of succession from such ancestor where such succession is by virtue of blood relations.") (emphasis in the original).

Had the Legislature intended to define "Native Inhabitants of Guam" in terms of race as Mr. Davis does, to mean "connections to and lineage with the groups of native peoples that inhabited Guam prior to the influx of people from Western Europe and the United States," it could have simply adopted the definition of Chamorro in 3 GCA § 20001. However, the Guam Legislature intentionally declined to do that when it amended the law that created the Decolonization Commission. *See* P.L. 25-106:2, codified at 3 GCA

offices that wield the authority of the state.[11] And there is ample legal authority for such a distinction as applied to territories.

> **Guam remains an unincorporated territory of the United States, 48 U.S.C. § 1421a, subject to the plenary power of Congress.** Congress has the power to legislate directly for Guam or to establish a government for Guam subject to congressional control, and except as Congress may determine, Guam has no inherent right to govern itself. **With the exception of certain "fundamental rights," federal constitutional rights do not automatically apply to unincorporated territories. An act of Congress is required to extend constitutional rights to the inhabitants of unincorporated territories**.

*Guam v. Guerrero*, 290 F.3d 1210, 1214 (9th Cir. 2002) (footnote omitted; emphasis added) (citing *Guam v. Okada*, 694 F.2d 565, 568 (9th Cir. 1982); *Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922); *Dorr v. United States*, 195 U.S. 138, 147 (1904); and *Pugh v. United States*, 212 F.2d 761, 762-63 (9th Cir. 1954)).

It is because of Congress' plenary powers under Article IV that race-based restrictions on the alienation of land that are codified in the United States Code and that would otherwise offend the equal protection clause of the fourteenth amendment have been upheld in the Commonwealth of the Northern Mariana Islands. In *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990), the Ninth Circuit considered a challenge to CNMI's race-based restrictions on the acquisition of permanent and long-term interests in Commonwealth lands. Article XII of the CNMI Covenant, codified at section 805 of 48 U.S.C.A. § 1681, "provides that the sale of a freehold or a leasehold

---

§ 21000 ("Legislative Findings and Intent: In furtherance of Public Law Number 23-147, now codified as Chapter 21 of Title 1 of the Guam Code Annotated, wherein the Commission on Decolonization was established and given the mandate to conduct a plebiscite on the political status wishes of the people of Guam, *I Liheslaturan Guåhan* finds there is a need for a Registry separate and apart from the Chamorro Registry authorized by Public Law Number 23-10, now codified as Chapter 20 of Title 3 of the Guam code Annotated, which will specifically delineate the list of qualified voters for the political status, plebiscite, and intends that this separate Registry *not* be based on race.") (emphasis in the original).

[11] *See, Rice*, 528 U.S. at 522 ("the elections for OHA trustee are elections of the State, not of a separate quasi sovereign, and they are elections to which the Fifteenth Amendment applies").

exceeding forty years, including renewal rights, to a person not of Northern Mariana Islands descent, is void *ab initio*." *Wabol*, 958 F.2d 1452.[12]

The court of appeals first questioned whether the restriction on land alienation in the CNMI was necessarily subject to the equal protection clause of United States Constitution.

> Thus the threshold inquiry, essentially, is the same as that presented in *Atalig*– whether Congress could, under the territories clause, properly exclude the particular provision of the United States Constitution from operation in the Commonwealth. Put another way, did Congress exceed its powers under Article IV, section 3 by insulating section 805 from the reach of the equal protection clause?

*Wabol,* 958 F.2d 1459 (footnotes omitted). The court then answered the question in the negative:

> We think it clear that interposing this constitutional provision would be both impractical and anomalous in this setting. Absent the alienation restriction, the political union would not be possible. Thus, application of the constitutional right could ultimately frustrate the mutual interests that led to the Covenant. It would also hamper the United States' ability to form political alliances and acquire necessary military outposts… **It would truly be anomalous to construe the equal protection clause to force the United States to break its pledge to preserve and protect NMI culture and property. The Bill of Rights was not intended to interfere with the performance of our international obligations. Nor was it intended to operate as a genocide pact for diverse native cultures.** Its bold purpose was to protect minority rights, not to enforce homogeneity…We cannot say that this particular aspect of equality is fundamental in the international sense. It therefore does not apply *ex proprio vigore* to the Commonwealth.

*Id.*, 958 F.2d 1462 (footnotes and citations omitted).

---

[12] A person of Northern Marianas descent is defined as one "who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Mariana Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas decent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth." *Wabol*, 958 F.2d 1452-53.

14

Case 1:11-cv-00035   Document 17   Filed 12/02/11   Page 14 of 16

The obvious point is that Guam's future political status is not set in stone any more now than it was in 1898 when Spain ceded Guam to the United States pursuant to the Treaty of Paris (30 Stat. 1754); in 1950 when Congress passed the Organic Act of Guam and certain persons born in or inhabiting Guam were first made citizens (64 Stat. 384); or in 1968 with the passage of the Mink Amendment. And although it may not be the only way or even the best way, if the United States is to fulfill the "international obligations" that it inherited in 1898 and continues to acknowledge today, there must be some mechanism to begin to catalog the plurality of views on the subject. That is all that the statute challenged by Mr. Davis does.

## CONCLUSION

The Attorney General of Guam respectfully submits that the complaint is due to be dismissed in its entirety on the grounds that plaintiff has failed to present a justiciable case or controversy. Even if "Native Inhabitants of Guam" were deemed a race-based classification, it does not offend the Constitution.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
**LEONARDO M. RAPADAS**, Attorney General

By: _____
 **ROBERT M. WEINBERG**
 Assistant Attorney General

## CERTIFICATE OF SERVICE

   I hereby certify that I have served a copy of the forgoing electronically with the Clerk of Court using the CM/ECF System to the following:

  Mun Su Park, Esq.
  Law Office of Park and Assoc.
  Suite 102, Isla Plaza
  388 South Marine Corps Drive
  Tamuning, GU 96913

  J. Christian Adams, Esq.
  Election Law Center, PLLC
  300 N. Washington St., Suite 405
  Alexandria, VA 22314

  Michael E. Rosman, Esq.
  Center for Individual Rights
  1233 20th St., NW., Suite 300
  Washingtonn, DC 20036

this 2nd day of December, 2011.

            **Office of the Attorney General**

            _____
            **ROBERT M. WEINBERG**
            Assistant Attorney General