MUN SU PARK
LAW OFFICES OF PARK AND ASSOCIATES
Suite 102, Isla Plaza
388 South Marine Corps Drive
Tamuning, GU 96913
Tel:     (671) 647-1200
Fax:     (671) 647-1211
lawyerpark@hotmail.com

J. CHRISTIAN ADAMS
ELECTION LAW CENTER, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel:     (703) 963-8611
Fax:     703-740-1773
adams@electionlawcenter.com

MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington, DC 20036
Tel:     (202) 833-8400
Fax:     (202) 833-8410
Rosman@cir-usa.org

## UNITED STATES DISTRICT COURT
## DISTRICT OF GUAM

-------------------------------------------------------------------------x

| | | |
|---|---|---|
| Arnold Davis, on behalf of himself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | | Civil Case No: 11-00035 |
| | : | |
| v. | | |
| Guam, Guam Election Commission, et al. | | |
| | : | **Opposition and Reply to Motion to Dismiss** |
| Defendants. | : | |

-------------------------------------------------------------------------x

COMES NOW the Plaintiff, Arnold Davis, and files this Opposition and Reply to

Defendant Attorney General Rapados's Motion to Dismiss. (No other defendant has answered or

otherwise responded to the complaint.)   In opposition to the Motion to Dismiss, plaintiff provides

the following points and authorities.

**Facts and Summary of Argument**

As set forth in the Complaint ("Compl."), the allegations of which must be accepted as true

for purposes of this motion, plaintiff Arnold Davis presented himself to the defendants and

attempted to register so he could participate in the Political Status Plebiscite as established by 1

GCA § 2110, (hereafter the "plebiscite").   Compl. ¶ 21.   Plaintiff has an interest in the status of

Guam, and seeks to cast a vote in the plebiscite.   But because he does not have the requisite

ancestral bloodlines to a "native inhabitant," as defined by 1 GCA § 2102 and § 2110, his

registration was denied.   *Id.*   Other United States citizens on Guam lacking the requisite ancestral

bloodlines to a "native inhabitant," or a presence on Guam in 1950, have also been denied voter

registration for the plebiscite, including whites and Asians.   *Id.* ¶¶ 15, 18.   The definition of

"native inhabitants" was intentionally designed to favor Chamorros, a racial group, and disfavor

other racial groups.   *Id.* ¶¶ 9, 15.   This case is brought on behalf of Davis and those similarly

situated pursuant to Rule 23(b)(2).

Plaintiff alleges that his denial of the right to register and to vote in the plebiscite

constitutes an injury in fact and violation of multiple federal laws.   These include Section 2 of the

Voting Rights Act (42 U.S.C. § 1973), 42 U.S.C. § 1971, provisions in the Organic Act of 1950

that ban restrictions on the electoral franchise (48 U.S.C. § 1421b(m)), prohibit racial

discrimination (48 U.S.C. § 1421b(n)), and incorporate the Fifth, Fourteenth and Fifteenth

1

Amendments of the United States Constitution (48 U.S.C. § 1421b(u)).    The Motion to

Dismiss by Defendant Attorney General Rapados (hereinafter "defendant") argues that no case or

controversy exists because the plebiscite is meaningless.    He argues that, because the "legal

consequences" of the plebiscite are merely to "ascertain the intent of the Native Inhabitants of

Guam" and to "transmit" the results, the plebiscite will not have "effect, immediate or otherwise,

of actually altering Guam's future."    Def. Mot. to Dismiss at 4.[1]    In the alternative, defendant

argues racial discrimination in voting is permissible given the purported meaningless character of

the plebiscite and the particular historic and legal circumstances in Guam.    *Id.* at 7-8, 10-14.[2]

Decades of jurisprudence expanding and protecting the right to vote demonstrate plaintiff's

injury in fact and establish that a case or controversy exists.    A case or controversy exists

whenever the government denies a citizen the right to register to vote, or when a voter is barred

from participating in an election run by a government that involves issues relating to that

government, or when the government will take a particular course of action depending on the

---

1    Defendant claims that plaintiff's complaint misconstrues the statutory scheme because it
suggests that the plebiscite concerns Guam's relationship to the United States.    Def. Mot. To
Dismiss at 3-4.    He greatly exaggerates the clarity of the statute.    It is true that the Decolonization
Commission's purpose is to convey the intent of Native Inhabitants of Guam as to their "future
political relationship with the United States."    But the statute is silent as to how the Commission is
to ascertain that intent.    Moreover, the statute authorizing the plebiscite states only that each voter
will be asked to identify which of three "political status options" (s)he favors and says *nothing at
all* about the entity that each voter intends should have that political status.    *Id.* at 2.    In any event,
defendant's interpretation of the statute does not help him much.    It is unconstitutional for
government to solicit and transmit the views of one (and only one) racial group.

2    Anne Perez Hattori, on the effective final business day of filing for this opposition, filed a
motion for leave to file an amicus brief. She says that she asserts arguments not raised by the
defendant, and accordingly, are not addressed in this opposition. The proposed brief
simultaneously claims this action is both premature, as well as late. Further, Hattori never sought
plaintiff's consent to file an amicus brief nor communicated with plaintiff's counsel.    Plaintiff
intends to file an opposition to late filed motion.

2

results of the election.

**Standard of Review**

For this motion, a court "must accept as true all material allegations of the complaint,"

drawing all reasonable inferences from those allegations in plaintiff's favor. *Warth v. Seldin*, 422

U.S. 490, 499 (1975). Furthermore, a court "must assume they will prevail on the merits of their

constitutional claims." *Muir v. Navy Federal Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir.

2008). A plaintiff "must have suffered an 'injury in fact,' an invasion of a legally protected

interest which is . . . concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560 (1992).

*Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004), a case cited by defendant, establishes a

high standard for dismissal for want of a case or controversy. To grant a motion to dismiss, there

can be "no doubt that the non-movant can prove no set of facts to support its claims." *Adams*, 355

F.3d at 1183. Mootness, or a law change, for example, *removed all doubt* in other cases relied on

by defendant. *See eg., Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997).


**Argument**

Defendant's 12(b)(1) motion should be denied because plaintiff has suffered a concrete

and particularized harm. Defendant improperly seeks to move the locus of this dispute away from

the denial of voter registration by the government, or away from the government-run and racially

discriminatory election, and instead toward the character of the government's transmittal of

election results to the United States.

Racial discrimination by a government creates a substantial "stigmatic harm" that

constitutes an injury in fact and establishes a case or controversy here. *United States v. Hays*, 515

3

U.S. 737, 744 (1995) (noting that racial classifications "'threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility'") (*quoting Shaw v. Reno*, 509 U.S. 630, 643 (1993); *Curtis v. Loether*, 415 U.S. 189, 195-95 n.10 (1974) (characterizing race discrimination in housing a "dignitary tort"). The concrete harm of this stigma, and a case or controversy, exists whenever a government acts with a racially discriminatory purpose against a particular plaintiff or class of plaintiffs. This is especially so when the racial discrimination is directed towards voting, a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Moreover, a voting law enacted with a racially discriminatory intent, creates an injury in fact when a person is denied the right to vote under such a law. *Hunter v. Underwood*, 471 U.S. 222 (1985) (denial of voter registration by a facially neutral felon disenfranchisement law enacted with constitutionally impermissible racial motivation created a case or controversy). Here, the intentional denial of constitutional rights to vote free from race discrimination created a case or controversy as soon as the plaintiff was denied registration.

In addition, Congress may create statutory legal rights, the invasion of which can alone constitute a concrete and particularized injury in fact for Article III purposes. *Havens Realty v. Coleman*, 455 U.S. 363, 373 (1982); *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Here, as noted in the argument below, Congress has created multiple statutes that create legal rights to vote free from racial discrimination.

Next, defendant's 12(b)(6) motion should be denied because Guam enjoys no special power to engage in racial discrimination. Defendant's reliance on special powers of Guam to racially discriminate are wholly precluded by *Rice v. Cayetano*, 528 U.S. 495 (2000).

4

# I.       Defendant's 12(b)(1) motion should be denied.

## A.       42 U.S.C. § 1971 creates statutory rights establishing a case or controversy.

Congress established statutory rights under 42 U.S.C. § 1971, violations of which create an "injury in fact" and a case or controversy.   The first statute passed to enforce the protections of the Fifteenth Amendment was the Enforcement Act of 1870.   It was amended by the Civil Rights Act of 1957 and is codified at 42 U.S.C. § 1971.

It states: "All citizens of the United States who are otherwise qualified by law to vote at *any* election by the people in any State, Territory, . . . shall be entitled and allowed to vote at *all* such elections, without distinction of race, color, or previous condition of servitude."   42 U.S.C. § 1971(a)(1) (emphasis added).   Expansive language characterizes § 1971(a)(1).   The plain language extends the statutory right to "all" elections in Guam, and prohibits racial discrimination in "all" elections run by the government, not just some. The plebiscite is a government run election that will determine, at minimum, the content and form of a government action.   The statute thus grants a legal right, the violation of which constitutes an "injury in fact," even if the state asserts the election simply determines the content of a communication to Congress, the President and the United Nations.   "All" and "any" do not permit exceptions.   If plaintiff can vote in "any" election in Guam, he must be allowed to vote in "all" elections free from racial discrimination, otherwise a case or controversy exists under 42 U.S.C. § 1971(a)(1).

A second provision of 42 U.S.C. § 1971 prohibits the creation of separate classes of voters for any reason and establishes a case or controversy based on federal statutory rights.

> No person acting under color of law shall, (A) in determining whether any individual is qualified under State law or laws to vote in *any* election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law

5

or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

42 U.S.C. § 1971(a)(2) (emphasis added). Note the language involves "any" election registration procedures, and makes no mention of the aim, mechanics or weight of the ultimate election.

The plain language of 42 U.S.C. § 1971(a)(2) prohibits two separate systems of voter registration within a jurisdiction.   In "any" election, no "standard, practice or procedure," which would include voting eligibility, may be employed against plaintiff which are "different from" the registration qualifications employed for Chamorros or "native inhabitants" of Guam.   Creating different registration rules, as defendant readily admits occurred here, violates a statutory right and causes an "injury in fact."[3]

**B.    Section 2 of the Voting Rights Act creates statutory rights establishing a case or controversy.**

Congress also established statutory rights under Section 2 of the Voting Rights Act, the violation of which creates a case or controversy.   The plain language of the statute, and decades of jurisprudence expansively interpreting the right to "vote," supports denying defendant's 12(b)(1) motion.   Section 2, as amended, states:

> (a)    No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

> (b)    A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political

---

3 Plaintiff asserts a claim under 42 U.S.C. § 1983 to enforce rights protected by 42 U.S.C. § 1971. *See eg.*, *Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003).

6

> subdivision are not equally open to participation by members of a
> class of citizens protected by subsection (a) in that its members have
> less opportunity than other members of the electorate to participate
> in the political process and to elect representatives of their choice.

42 U.S.C. § 1973. The plain language of Section 2 prohibits any racially discriminatory "voting qualification or prerequisite to voting or standard" in a government run election. 42 U.S.C. § 1973(a). The statute does not qualify or limit this right, or confine its reach to a subset of government run elections based on the ultimate effect of the election. By definition, the plebiscite imposes a "voting qualification" *and* "prerequisite to vote," in a government run registration process for a government run election. The locus of the harm giving rise to a case or controversy is not determined by the ultimate consequence of the election, the "transmittal of results." Instead, under Section 2, the locus of the harm is the denial of voter registration by the government and the use of racially discriminatory voting qualifications and prerequisites.

Defendant seeks to limit the reach of the Voting Rights Act through a flawed statutory construction of Section 2 and 42 U.S.C. § 1973l(c)(1). Def. Mot. to Dismiss at 8, n. 4. For § 1973l(c) does not define the terms "voting" or "vote" in Section 2. Instead, § 1973l(c) only *adds additional* circumstances constituting "voting" or "vote" beyond the plain meaning of the language in Section 2. § 1973l(c) "is directed to extension not to restriction. . . . it does not take any one out who would otherwise be there." *Warner v. Goltra*, 293 U.S. 155, 162-63 (1934) (discussing "shall include" as a matter of statutory construction in Marine Merchant Act.). Of course § 1973l(c) also includes the term "proposition," which would describe the plebiscite.[4]

---

4 Defendant improperly considers the term "effective" as a qualifier to "proposition." Again, actions "necessary to make a vote effective" expands the universe of protected activity under Section 2, it does not limit it. "Effectiveness" is a term of art relating primarily to vote dilution claims and in no way modifies or limits the plain language of "propositions" within the expansive

7

When a government denies a citizen voter registration for any government run election, and racial discrimination is alleged, a violation of statutory rights under Section 2 constitutes an "injury in fact" and creates a case or controversy. Statutory rights protecting against vote denial exist under Section 2, particularly when intentional discrimination is alleged. *See Farrakhan v. Gregoire*, 623 F.3d 990, 993 (9th Cir. 2010). "Section 2 of the Voting Rights Act prohibits *any* voting procedure that results in a denial of the right to vote." *United States v. Blaine County*, 363 F.3d 897, 897 (9th Cir. 2004) (emphasis added). The expansive and powerful reach of Section 2 was intended to "rid the country of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315, (1966). Vote denial in any government run election is not a "hypothetical" injury. It is precisely the sort of government action Section 2 was intended to reach.

The uniform weight of authority requires an expansive statutory interpretation of when restrictions on the statutory right to "vote" trigger a case or controversy. The Supreme Court has mandated that "the [Voting Rights] Act should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (internal quotation marks omitted). "Congress sought to give the Act the broadest possible scope." *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969). "Section 2 broadly prohibits the use of voting rules to abridge exercise of the franchise on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. at 315. "The legislative history of the 1982 amendments further indicates that Congress intended § 2 to apply broadly." *Smith v. Salt River Project Agr. Imp. and Power Dist.*, 109 F.3d 586, 593 (9th Cir. 1997).

Defendant seeks a safe harbor by arguing that the plebiscite is meaningless, that it is

_____

scope of Section 2. Defendant urges a mistaken reading amounting to "effective propositions."

8

essentially no more than a public opinion poll, without effect. Of course if that were true, those advocating for the plebiscite could save the government substantial time, significant expense, and the trouble of this lawsuit by conducting a private opinion poll of Chamorros and publicizing the results.[5] It is precisely the imprimatur of the government conducting the election and transmitting the results as a sovereign to another sovereign that gives the plebiscite results weight. The plebiscite is fatally tainted by illegally discriminatory action, from the denial of the right to participate, through to the government's compilation of results from the racially discriminatory election, through the transmittal of those results to the United Nations, Congress and the President.

Defendant's reasoning would justify state actions which are unquestionably illegal. For example, using defendant's logic, the Alabama legislature could enact a law to ascertain the wishes of certain Alabamans regarding race-based affirmative action in education. Borrowing defendant's argument, Alabama might limit eligibility to register to vote on the proposition to those eligible to attend the University of Alabama in 1831, the year the school was founded, or their descendants. The state might hypothetically justify this date as the moment in time against which all subsequent educational policies should be judged, and those best suited to judge them are the citizens who first approved of and benefited from the university, or their bloodline. Naturally,

---

5 University of Guam Professor Ron McNinch has already conducted a private poll with a sample size of 400 Chamorros. "Political Status Not High on Survey," *Marianas Variety*, July 12, 2011. Expanding the private poll's sample size and publicizing statistically sound results would accomplish the same limited goal which the defendant professes is the limited purpose of the plebiscite, namely ascertaining the wishes of the native inhabitants and transmitting those views to the United States. The existence of state action by GovGuam lends weight and heft to the plebiscite. A transmission of results to Congress by GovGuam likely carries more weight in Washington than a poll by Professor McNinch. Thus, the fatal defect in defendant's reasoning that the plebiscite is without meaning is revealed. A private, lower cost, less constitutionally suspect, alternative exists to accomplish this professed goal, if merely "ascertaining the wishes of native inhabitants" was truly the singular purpose.

9

nearly all the citizens eligible to register for this non-binding election will be of one race, but Alabama could emphasize the statutory silence in that regard. An Alabama government office would register voters eligible for the special election, of course denying some citizens registration. Then Alabama would conduct the election using government resources. After the election, government resources would be used to compile and transmit the results to the federal government. Yet no further action is contemplated by this hypothetical law, and everyone thereafter is free to ignore the results.

Nobody could credibly argue that this hypothetical Alabama law would not offend Section 2 of the Voting Rights Act, the 15th Amendment or 42 U.S.C. § 1971. But defendant employs this same logic to insulate the plebiscite from scrutiny by this court. Therefore, defendants are left to argue that Guam enjoys unique powers allowing it to deny registration, powers which Alabama could not possibly possess. Such reliance is constitutionally incorrect, as discussed in Part II, *infra.*

**C.    The 15th Amendment creates constitutional rights establishing a case or controversy.**

The plain language of the Fifteenth Amendment establishes that a case or controversy existed when the defendant denied plaintiff's right to register to vote and participate in an election, and the denial was based on a statute enacted with a discriminatory racial intent. "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. The Constitution plainly speaks of a "right . . . to vote" without qualification.

> The purpose and command of the Fifteenth Amendment are set forth in language both explicit and comprehensive. . . . The design of the Amendment is to reaffirm the equality of races at the most basic level of the democratic process, the exercise of the voting franchise. A resolve so absolute required language as simple in command as it was comprehensive in reach.

10

*Rice*, 528 U.S. at 495. "Undeniably, the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal, elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "The right to vote can neither be denied outright." *Reynolds*, 377 U.S. at 355. This unbroken line of authority extends to one of the first cases interpreting the reach of the Fifteenth Amendment, *United States v. Reese*, 93 U.S. 214, 218 (1876). "If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be." *Id.*

Furthermore, the Court in *Rice* describes a case or controversy under the Fifteenth Amendment when ancestry classifications nearly identical to the law challenged here are used to limit participation in a government run election. The "ancestral inquiry mandated by the State is forbidden by the Fifteenth Amendment." *Rice*, 528 U.S. at 517.

The Court's opinion in *Guinn v. United States*, 238 U.S. 347 (1915), further supports that a case or controversy exists under the Fifteenth Amendment when a government denies the right to register to vote based on an ancestry classification. The Court struck down Oklahoma's "grandfather clause" that exempted from a literacy test any voter registrant who was a lineal descendant of persons who were entitled to vote in Oklahoma on January 1, 1866. As the defendant does, the Court noted the Oklahoma law "contains no express words of an exclusion from the standard which it establishes of any person on account of race, color, or previous condition of servitude, prohibited by the 15th Amendment." *Id.* at 364. But because eligibility was "based purely upon a period of time before the enactment of the 15th Amendment, and makes that period the controlling and dominant test of the right of suffrage" it had the effect of excluding

11

nearly everyone except whites from participating in elections. *Id.* at 364-65.   Similarly, a case or controversy exists under the Fifteenth Amendment because plaintiff alleges the ancestry standard used to deny his registration was enacted with a racially discriminatory intent.

**D.    The Organic Act creates statutory rights establishing a case or controversy.**

Congress created statutory rights which create an "injury in fact" under the plain language of the Organic Act of 1950.    Nearly all restrictions on the electoral franchise are banned by 48 U.S.C. § 1421b(m).   "No qualification with respect to property, income, political opinion, or any other matter apart from citizenship, civil capacity, and residence shall be imposed upon any voter." "Any voter" expands the reach of the statute.   Moreover, this expansive language would include the plebiscite.   The plebiscite imposes restrictions on the plaintiff that have nothing to do with citizenship, civil capacity, or residence.   Instead, the restrictions impermissibly relate to ancestry, race, or presence on Guam in 1950.   Thus, a case or controversy exists under § 1421b(m).

Racial discrimination and violations of equal protection are broadly prohibited by the language of 48 U.S.C. § 1421b(n).   "No discrimination shall be made in Guam against any person on account of race, language, or religion, nor shall the equal protection of the laws be denied."   48 U.S.C. § 1421b(n).   When plaintiff was denied the right to register for the plebiscite by the government, he suffered a concrete injury attributable to his race, and was denied equal protection by the disparate treatment of different classes of otherwise eligible voters.

**II.    Defendant's 12(b)(6) motion should be denied.**

Guam has no special power, or special circumstance, justifying the racially discriminatory plebiscite election where only some select groups of citizens are permitted to participate.   On this point, defendant relies primarily on the district court in *Rice v. Cayetano*, 941 F. Supp. 1529 (D.

12

Hawaii 1996), an opinion whose reasoning was rejected with sharp sweeping language by the Supreme Court in *Rice v. Cayetano*, 528 U.S. 495 (2000).

The Supreme Court opinion in *Rice* explicitly disallows the reasoning the *Rice* district court used to deny a preliminary injunction, and that the defendant relies upon, to support his 12(b)(6) motion: (a) a special relationship to Native Hawaiians, and, (b) special purpose elections justifying the exclusion of some citizens. Simply, the district court's reasoning in *Rice* on these issues did not survive the Court's opinion, and neither did the safe harbors survive upon which defendant relies.[6]

A.   **No special relationship to Native Inhabitants of Guam gives Guam power to conduct a racially discriminatory election.**

The district court in *Rice* emphasized the facts that (1) in the Hawaiian Homes Commission Act of 1920 ("HHCA"), Congress set aside lands for the benefit of Native Hawaiians and thus had a "special relationship" to Native Hawaiians, and (2) when Hawaii became a state, Congress gave the State those lands and the responsibility of keeping them for the benefit of Native Hawaiians. The district court in *Rice*, 941 F. Supp. at 1541, found "the State's authority to conduct the Native Hawaiian Vote in this case flows from its fiduciary obligations as the administrator of the HHCA and as the trustee of the ceded lands." *Id.* n.14. Moreover, "Congress has clearly indicated that

---

6 Obviously, the *Rice* opinion by the District Court of Hawaii is not binding authority in Guam, while the Supreme Court opinion in *Rice* is. Procedurally, *Rice* came before the district court on plaintiffs' motion for a preliminary injunction. The court, accordingly, had to determine whether plaintiffs were likely to win on the merits, and had to make various factual determinations as a consequence. The plebiscite election was also imminent. Courts are reluctant to enjoin imminent elections and this would weigh heavily against a plaintiff. *See, e.g., Ely v. Klahr*, 403 U.S. 108, 113 (1971); *Southwest Voter Registration Educ. Project v. Shelly*, 344 F.3d 914, 918 (9th Cir. 2003)("federal court cannot lightly interfere with or enjoin a state election.") Here, of course, the court must accept the allegations of the complaint as true and cannot find facts, as defendant would have the court do, to support his legal theory. This court is also relieved from weighing competing equities, unlike the district court in *Rice*.

Case 1:11-cv-00035   Document 21   Filed 01/03/12   Page 14 of 24

the Native Hawaiians have a special relationship with the United States government that closely parallels that of the American Indian." *Id.* at 1542.

The complaint in this action does not allege that Guam does have a special relationship with Native Inhabitants of Guam that justifies a racially discriminatory election. Going outside of the complaint, defendant's motion weakly asserts that "[t]he United States unquestionably has similar obligations to foster discussions concerning its relationship with those persons identified as the 'Native Inhabitants of Guam,' whether race-based or not." Def. Mot. to Dismiss at 11. Defendant then cites a law that makes no mention whatsoever of the phrase "Native Inhabitants of Guam" or says anything about providing assistance so that *some racial group*, constituting only a component of the population of Guam, can discuss *its* political status options. *Id.*, at n.8. He never even asserts that the United States delegated this so-called obligation to Guam (of the kind that the district court in *Rice* relied upon). Moreover, the complaint does not allege (and defendant does not try to show) that Congress has not given any special status to Chamorros akin to the rights of Indian tribes and "an American Indian tribe does not exist as a legal entity unless the federal government decides that it exists." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004).

Defendant's argument for a "special relationship" is further undermined by the Ninth Circuit's rejection of the proposition that GovGuam stands as a trustee of lands for native peoples. *Gov't of Guam v. United States*, 179 F.3d 630, 640 (9th Cir. 1999) (rejecting Guam's argument that "it has a right to control the land [owned by the United States and held back at the time of the Organic Act] as a trustee for the aboriginal inhabitants of Guam").

Even more damaging, the Supreme Court ultimately rejected entirely the "special relationship" justification the *Rice* district court relied upon. Recall, the district court's legal

14

conclusions in *Rice* were based on factual determinations that the HHCA creates a special

relationship regarding the Hawaiian land trust and that restrictions on the franchise in the

plebiscite need only pass rational scrutiny, as in *Morton v. Mancari*, 417 U.S. 535 (1974).   *Rice*,

941 F. Supp. at 1541; *id.* at 1545 n.22 (concluding that plaintiffs were unlikely to win their Voting

Rights Act claim because of *Morton* and the court's conclusion that "Native Hawaiians are not a

suspect classification.").

The Supreme Court rejected this safe harbor completely.   "The State's argument fails for a

more basic reason. Even were we to take the substantial step of finding authority in Congress,

delegated to the State, to treat Hawaiians or native Hawaiians as tribes, Congress may not

authorize a State to create a voting scheme of this sort."   *Rice*, 528 U.S. at 519.   Because of the

HHCA, Hawaii had a *better* argument than Guam does to establish a "special relationship"

justifying otherwise constitutionally defective laws.   Yet the Court in *Rice* rejected any reliance

on a special relationship allowing discriminatory elections.

**B.      The Supreme Court found that racially exclusionary elections are wholly
         impermissible and any reasoning to the contrary is not authoritative.**

Any safe harbor the district court in *Rice* gave to Hawaii's plebiscite, or by extension to

Guam's, did not survive the Supreme Court's ruling.   Favored racial groups cannot be polled in a

government run election, using government resources and excluding other racial groups from

participation.

> Hawaii's argument fails on more essential grounds. The State's
> position rests, in the end, on the demeaning premise that citizens of
> a particular race are somehow more qualified than others to vote on
> certain matters. That reasoning attacks the central meaning of the
> Fifteenth Amendment. The Amendment applies to "any election in
> which public issues are decided or public officials selected." *Terry,*
> 345 U.S., at 468, 73 S.Ct. 809. There is no room under the

Amendment for the concept that the right to vote in a particular election can be allocated based on race. Race cannot qualify some and disqualify others from full participation in our democracy.

*Rice v. Cayetano*, 528 U.S. 495, 523 (2000).   Note further that the Court's language from *Terry v. Adams*, 345 U.S. 461, 468 (1953), rebuts the essence of defendant's argument that the plebiscite has no effect.   "Public issues are decided" in the challenged plebiscite. *Id.*   At a minimum, the public issue to be "decided" is what the form and content will be of the message transmitted by the government of Guam to the President, Congress and the United Nations.   Finally, the Supreme Court also demolished the ancestry canard offered by Hawaii and accepted by the district court in *Rice.*   Ancestry was a proxy for race, just as it is in 1 GCA § 2102 and § 2110.[7]

> In the interpretation of the Reconstruction era civil rights laws we have observed that racial discrimination is that which singles out "identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics. The very object of the statutory definition in question . . . is to treat the early Hawaiians as a distinct people, commanding their own recognition and respect. The State, in enacting the legislation before us, has used ancestry as a racial definition and for a racial purpose. . . .   The ancestral inquiry mandated by the State is forbidden by the Fifteenth Amendment for the further reason that the use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve. The law itself may not become the instrument for generating the prejudice and hostility all too often directed against persons whose particular ancestry is disclosed by their ethnic characteristics and cultural traditions.   Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose

---

7 Of course, for this motion, the complaint's allegation that the definition of Native Inhabitants of Guam was racially-motivated must be accepted as true.   Plaintiff intends to present evidence of a racially discriminatory motive in the plebiscite statutes, including racially charged statements by advocates of the status plebiscite plainly characterizing the plebiscite in racial terms (including by elected officials who voted on the statutes), changes to the statutes subsequent to the ruling in *Rice* in order to camouflage the impermissible racial intent, and statements by plebiscite advocates using racial terms, and racial slurs, to defend the plebiscite or criticize this lawsuit, plaintiff, and any opposition to the law.   Such evidence of racial intent is relevant.   *See generally, Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-67 (1977).

> institutions are founded upon the doctrine of equality. . . . The
> State's electoral restriction enacts a race-based voting qualification.

*Rice*, 528 U.S. at 495. The Court's rough and explicit treatment of district court's reasoning in

*Rice* contradicts the arguments supporting defendant's 12(b)(6) motion.

## C.    A special purpose election may not racially discriminate.

The district court in *Rice* relied on the line of cases which permit exclusionary elections

regarding matters of limited interest or for special purposes. Using this reasoning, it upheld the

Hawaii status plebiscite.   The district court relied on *Ball v. James*, 451 U.S. 355 (1981), where

the Court rejected a Fourteenth Amendment challenge to a water district's restriction on voting to

only landowners affected by the entity.   The district court in *Rice* also relied on *Salyer Land Co. v.*

*Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973), where the Court rejected a similar

Fourteenth Amendment challenge. The district court called the "similarities" between the

plebiscite and these special purpose election cases "unmistakable." 941 F.Supp. at 1545.

But the Supreme Court found the district court very much mistaken.   It held that the

exclusionary Hawaii election law for certain state officials violated the Fifteenth Amendment.

> Hawaii further contends that the limited voting franchise is
> sustainable under a series of cases holding that the rule of one
> person, one vote does not pertain to certain special purpose districts
> such as water or irrigation districts. . . . We would not find those
> cases dispositive in any event, however. The question before us is
> not the one-person, one-vote requirement of the Fourteenth
> Amendment, but the race neutrality command of the Fifteenth
> Amendment. Our special purpose district cases have not suggested
> that compliance with the one-person, one-vote rule of the
> Fourteenth Amendment somehow excuses compliance with the
> Fifteenth Amendment.

*Rice*, 528 U.S. at 495. Simply, the Fifteenth Amendment does not permit a special purpose

election to justify racial discrimination, and the district court's reliance on this reasoning did not

survive the Supreme Court's ruling.

**III.  Authority relating to Puerto Rico and the Commonwealth of Northern Marianas Islands is inapposite to Plaintiff's Motion to Dismiss.**

Three cases from Puerto Rico cited by defendant, *Sola v. Sanchez Vilella*, 270 F.Supp. 459 (D.P.R. 1967), *Barbosa v. Sanchez Vilella*, 293 F.Supp. 831 (D.P.R. 1967), and *New Progressive Party v. Hernandez Colon*, 770 F.Supp. 646 (D.P.R. 1991), are inapposite to the issue of whether a case or controversy exists in this case. [8]   In *Sola*, plaintiffs did not live in Puerto Rico but sought to vote in a status election there. *Sola* is a durational residency requirement case only.   No allegations of racial discrimination were made, and no claims were brought under the Voting Rights Act, 42 U.S.C. § 1971 or the Fifteenth Amendment.   The district court in *Sola* dismissed the case for want of standing because plaintiffs did not live in Puerto Rico.   "Plaintiffs are in no different a position than a citizen and resident of New York . . . who, although owning property in Missouri and having nostalgia for Missouri, cannot meet the citizenship and residential requirement for voting in Missouri." *Sola*, 270 F.Supp. at 464.

Nor is *Barbosa* a vote denial case.   Indeed the plaintiffs were eligible to participate in the Puerto Rican plebiscite, but rather made a general challenge "fired broadside like so much Constitutional canister" to the plebiscite.   *Barbosa*, 293 F.Supp. at 833.   "The thrust of the complaint seems to be that the plaintiffs in some undisclosed manner will be deprived by rights

---

[8]   It is telling that two of the three standing decisions that defendant relies upon are district court decisions from 1967.   Modern standing doctrine has developed dramatically since then. Indeed, the doctrine was largely reshaped by the Supreme Court's 1970 decision in *Association of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150 (1970).   *E.g.*, Cass R. Sunstein, *What's Standing After* Lujan? *Citizen Suits, "Injuries," And Article III*, 91 Mich. L. Rev. 163, 184-85 (1992) (noting the "huge . . . conceptual break" that occurred in *Camp*, "which provides the basic underpinnings for the modern law of standing.").   To the extent that *Sola*, for example, conflated the standing and merits inquiries, its analysis is simply irreconcilable with modern standing law.

18

secured by the United States Constitution." *Id.* Unlike the plaintiffs in *Barbosa*, plaintiff was denied the right to register to vote by the government and participate in a government run election. He has alleged concrete vote denial. Moreover, plaintiff contends that the compilation of the election results and transmission of them by the government to the United States and United Nations is also an essential component of the plebiscite.

Last, *New Progressive Party* supports plaintiff. The district court found that the New Progressive Party had standing to challenge the Puerto Rican plebiscite because it appeared "that the NPP's activities would suffer an injury if the alleged disenfranchisement did take place," *New Progressive Party*, 779 F.Supp. at 651, despite the fact the plebiscite was nonbinding. It also strongly suggested that members of excluded groups (like plaintiff here) would have had standing. *Id.* Defendants use a different section of the decision, where the court addressed plaintiffs' argument that the plebiscite would violate federal law guaranteeing the people of Puerto Rico a republican form of government. The court dismissed that claim (not the vote denial claim) because the plebiscite would not itself change Puerto Rico's form of government. *Id.* at 654-55.

Finally, Guam being subject to the plenary power of Congress strengthens plaintiff's argument that a case or controversy exists. Unlike the Covenant and the Constitution of the Commonwealth of Northern Mariana Islands, the federal civil rights laws applicable to Guam brook no racial classifications or discrimination.[9]

## CONCLUSION

Over the last half century, federal courts have placed primal importance on protecting the right to vote in government sponsored elections, even when passionate and heartfelt justifications

---

[9] *See, e.g.*, N. MAR. I. CONST. art. XII, § 1 and § 4. (allowing race based restriction on land ownership.)

Case 1:11-cv-00035   Document 21   Filed 01/03/12   Page 20 of 24

are employed to limit that right. The Court in *Rice* suggested an alternative better than exclusion:

> When the culture and way of life of a people are all but engulfed by a history beyond their control, their sense of loss may extend down through generations; and their dismay may be shared by many members of the larger community. As the State of Hawaii attempts to address these realities, it must, as always, seek the political consensus that begins with a sense of shared purpose.

*Rice* at 528 U.S. 495, 524.   Plaintiff requests that the Motion to Dismiss be DENIED.


Respectfully submitted,

_____ J. Christian Adams/s/_____
J. Christian Adams
Counsel for Plaintiff

Date: January 3, 2012

MUN SU PARK
LAW OFFICES OF PARK AND ASSOCIATES
Suite 102, Isla Plaza
388 South Marine Corps Drive
Tamuning, GU 96913
Tel:    (671) 647-1200
Fax:    (671) 647-1211
lawyerpark@hotmail.com

J. CHRISTIAN ADAMS
ELECTION LAW CENTER, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel:    (703) 963-8611
Fax:    703-740-1773
adams@electionlawcenter.com

MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington, DC 20036
Tel:    (202) 833-8400
Fax:    (202) 833-8410
Rosman@cir-usa.org

## TABLE OF AUTHORITIES CITED

**Cases**

*Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) ............................................................. 3

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) ....................................... 3

*Ball v. James*, 451 U.S. 355 (1981) .................................................................................. 17

*Barbosa v. Sanchez Vilella*, 293 F.Supp. 831 (D.P.R. 1967) .......................................... 18

*Chisom v. Roemer*, 501 U.S. 380 (1991) ........................................................................... 8

*Ely v. Klahr*, 403 U.S. 108 (1971) ................................................................................... 13

*Gov't of Guam v. United States*, 179 F.3d 630 (9th Cir. 1999) ....................................... 14

*Kahawaiolaa v. Norton*, 386 F.3d 1271 (9th Cir. 2004) .................................................. 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................ 3

*Morton v. Mancari*, 417 U.S. 535 (1974) ....................................................................... 15

*Muir v. Navy Federal Credit Union*, 529 F.3d 1100 (D.C. Cir. 2008) ............................. 3

*New Progressive Party v. Hernandez Colon*, 770 F.Supp. 646 (D.P.R. 1991) .......... 18, 19

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................................................ 11

*Rice v. Cayetano*, 528 U.S. 495 (2000) ..................................................................... passim

*Rice v. Cayetano*, 941 F. Supp. 1529 (D. Hawaii 1996) ............................................ 13, 14

*Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973) .......... 17

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) .............................................................. 6

*Smith v. Salt River Project Agr. Imp. and Power Dist.*, 109 F.3d 586 (9th Cir. 1997) ...... 8

*Sola v. Sanchez Vilella*, 270 F.Supp. 459 (D.P.R. 1967) ................................................. 18

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ........................................................ 8

*Southwest Voter Registration Educ. Project v. Shelly*, 344 F.3d 914 (9th Cir. 2003) ...... 13

*Terry v. Adams*, 345 U.S. 461 (1953) .............................................................................. 16

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004) .......................................... 8

*United States v. Reese*, 93 U.S. 214, 218 (1876) ............................................................. 11

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)
........................................................................................................................................... 16

*Warner v. Goltra,* 293 U.S. 155 (1934) ............................................................................. 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................................... 3

**Statutes**

1 GCA § 2102 ................................................................................................................. 1, 16

1 GCA § 2110 ................................................................................................................. 1, 16

42 U.S.C. § 1971(a)(1) ........................................................................................................ 5

42 U.S.C. § 1971(a)(2) ........................................................................................................ 6

42 U.S.C. § 1973 ............................................................................................................. 1, 7

48 U.S.C. § 1421b(m) ..................................................................................................... 1, 12

48 U.S.C. § 1421b(n) ...................................................................................................... 1, 12

48 U.S.C. § 1421b(u) .......................................................................................................... 2

Hawaiian Homes Commission Act of 1920 ...................................................................... 13

Marine Merchant Act ........................................................................................................... 7

**Other Authorities**

"Political Status Not High on Survey," *Marianas Variety*, July 12, 2011 ........................ 9

**Constitutional Provisions**

N. MAR. I. CONST. art. XII, § 1 and § 4...................................................................................... 19

Case 1:11-cv-00035   Document 21   Filed 01/03/12   Page 23 of 24

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the forgoing Opposition and Reply to Motion to Dismiss on counsel for the Defendants by providing a copy to Robert M. Weinberg, Assistant Attorney General through the Electronic Case Filing System on January 2, 2012, which provides an electronic copy of the same to rweinberg@guamattorneygeneral.com.

_____J. Christian Adams/s/_____
J. Christian Adams
Counsel for Plaintiff
