MUN SU PARK
LAW OFFICES OF PARK AND ASSOCIATES
415 Chalan San Antonio Road
Baltej Pavilion BLD. #205
Tamuning, Guam 96913
Tel:    (671) 647-1200
Fax:    (671) 647-1211
lawyerpark@hotmail.com

J. CHRISTIAN ADAMS
ELECTION LAW CENTER, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel:    (703) 963-8611
adams@electionlawcenter.com

MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington, DC 20036
Tel:    (202) 833-8400
Fax:    (202) 833-8410
Rosman@cir-usa.org

**UNITED STATES DISTRICT COURT**
**DISTRICT OF GUAM**

------------------------------------------------------------------------x

Arnold Davis, on behalf of himself and all others          :
similarly situated,

                                                           :

      Plaintiff,                                      Civil Case No.: 11-00035

                                                           :

      v.

Guam, Guam Election Commission, et al.,

                                                           :

      Defendants.                                     :

------------------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

STANDARD OF REVIEW ................................................................................. 8

I. . Plaintiff Is Entitled To Summary Judgment Because Guam's Restrictions On Registration For, And Voting In, The Plebiscite Violate The Fourteenth Amendment And The Organic Act. . 9

    A. ..Defendants' Restrictions Violate The Fourteenth Amendment Because They Interfere With The Fundamental Right To Vote ............................................................. 9

    B.Defendants' Restrictions Also Violate The Organic Act ............................................ 10

II. Guam's "Native Inhabitant" Classification Distinguishes Among Citizens Based On Their Race. ................................................................................................... 11

III. Guam's Voting Restriction Is Unconstitutional And Violates Federal Statutory Law. ........ 14

    A. Guam's Racial Voting Classification Violates The Fifteenth Amendment. ........... 14

    B. Guam's Voting Restriction Violates The Fourteenth Amendment. ........................ 17

    C. Guam's Racial Discrimination Violates The Voting Rights Act And The Organic Act. ................................................................................................... 19

IV. Congress Has Not Approved Guam's Racially Discriminatory Voting Classification. ...... 21

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ……………………………………....13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 8

*Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002) ...................................................................... 2

*Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir. 1988) ........................................................ 9

*Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320 (1970) ................................................... 1

*Cipriano v. City of Houma*, 395 U.S. 701 (1969) ................................................................. 17, 18

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ............................................. 13, 17, 18

*Davis v. Commonwealth Election Commission*, Case No. 1-14-CV-00002, 2014 U.S. Dist. LEXIS 69723 (D.N.M.I May 20, 2014) .............................................................. 7, 18, 19, 20

*Davis v. Guam*, 785 F.3d 1311 (9th Cir. 2015) ..................................................................... 1, 20

*Dorr v. United States*, 195 U.S. 138 (1904) ............................................................................. 21

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ........................................................................... 17, 18

*Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411 (2013) ..................................................... 17, 19

*Guam v. Guerrero*, 290 F.3d 1210 (9th Cir. 2002) .................................................................. 21

*Guinn v. United States*, 238 U.S. 347 (1915) ......................................................................... 15

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ................................................ 9

*Hussey v. City of Portland*, 64 F.3d 1260 (9th Cir. 1995)……………………….……………14

*Idaho Coalition United For Bears v. Cenarrusa*, 342 F.3d 1073   (9th Cir. 2006)……………….9

*Johnson v. California*, 543 U.S. 499 (2005) ............................................................................ 17

*Lane v. Wilson*, 307 U.S. 268 (1939) ....................................................................................... 15

*Louisiana v. United States,* 380 U.S. 145 (1965) ..................................................................... 15

*Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976).............................................. 9

*Morton v. Mancari*, 417 U.S. 535 (1974) ................................................................................ 13

*Rice v. Cayetano*, 528 U.S. 495 (2000)............................................................................. *passim*

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ...................................................................... 20

*St. Francis Coll. v. Al-Khazraji,*481 U.S. 604 (1987)................................................................. 12

*Terry v. Adams*, 345 U.S. 461 (1953) ...................................................................................... 15

Case 1:11-cv-00035   Document 104   Filed 10/30/15   Page 3 of 29

*United States v. Cruikshank*, 92 U.S. 542 (1875) ....................................................... 14

*United States v. Dogan*, 314 F.2d 767 (5th Cir. 1963) ................................................ 15

*United States v. Raines*, 362 U.S. 17 (1960) ................................................................ 15

*United States v. Reese*, 92 U.S. 214 (1875) ................................................................. 14

*United States v. Windsor*, 133 S. Ct. 2675 (2013) ..................................................... 11

*Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990) ................................................. 22

**Constitutional Provisions**

U.S. Const. art. IV, § 3.................................................................................................... 21

U.S. Const. amend. XIV ........................................................................................ 14, 21

U.S. Const. amend. XV.................................................................................................. 14

**Statutes**

1 Guam Code Ann. § 2105 ............................................................................................... 2

1 Guam Code Ann. § 2109(c) .......................................................................................... 2

1 Guam Code Ann. § 2110 ............................................................................................... 6

1 Guam Code Ann. § 21102(b) ....................................................................................... 6

3 Guam Code Ann. § 3105(b) .......................................................................................... 2

3 Guam Code Ann. § 20007(a) ........................................................................................ 2

3 Guam Code Ann. § 21026(a)(iii) .................................................................................. 2

3 Guam Code Ann. § 20001 ............................................................................................. 4

3 Guam Code Ann. § 21001 ............................................................................................. 4

3 Guam Code Ann. § 21001(c) .................................................................................... 6, 11

3 Guam Code Ann. § 21001(d) ........................................................................................ 6

3 Guam Code Ann. § 21001(e) ........................................................................................ 5

3 Guam Code Ann. § 21002 ............................................................................................. 6

3 Guam Code Ann. § 21002.1 ........................................................................................ 12

3 Guam Code Ann. § 21003 ............................................................................................. 6

3 Guam Code Ann. § 21009 ............................................................................................. 6

21 Guam Code Ann. § 75101(d) ...................................................................................... 5

18 U.S.C. § 611 ............................................................................................................... 10

18 U.S.C. § 1015(f) ........................................................................................................ 10

42 U.S.C. § 1971(a)(2)............................................................................................ 20, 21

48 U.S.C. § 1421b(m) .................................................................................................. 22

48 U.S.C. § 1421b(n) ................................................................................................... 22

48 U.S.C. § 1421b(u) ................................................................................................... 22

52 U.S.C. § 10101 ........................................................................................................ 19

52 U.S.C. § 10301(a) ................................................................................................... 19

52 U.S.C. § 20508(b) ................................................................................................... 10

**Other Authorities**

23d Guam Legislature Committee on Federal and Foreign Affairs, Committee Report on Bill No. 765 ............................................................................................................................... 5

*The Chamorro Perspective* ............................................................................................ 3

Commission on Decolonization, Quarterly Report (Apr. 30, 2009) ................................ 2

Fourteenth Census of the United States:   1920 Census of Guam ................................. 6

Political Status and External Affairs Subcommittee Transition Report ......................... 3

Sally Bach Hurme & Paul S. Appelbaum, *Defining and Assessing Capacity to Vote: The Effect of Mental Impairment on the Rights of Voters*, 28 McGeorge L. Rev. 931 (2007) ..................... 10

**Rule**

Fed. R. Civ. Pro. 56(a) ............................................................................................. 1, 8

COMES NOW the Plaintiff, Arnold Davis, and files this Memorandum in Support of Plaintiff's Motion for Summary Judgment. Mr. Davis hereby respectfully moves this Court for a judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, enjoining the Political Status Plebiscite ("the Plebiscite") required by 1 Guam Code Ann. § 2110, *et seq.*, and declaring that the Plebiscite violates the Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act, and the Organic Act.

## INTRODUCTION

Guam has imposed an explicit racial restriction on the rights of Mr. Davis and all citizens of Guam to register to vote in a taxpayer-funded election involving Guam's relationship with the United States. Under the challenged statute, only "Native Inhabitants of Guam" may register and vote in the Plebiscite. By intentional and acknowledged design, eligible voters are almost exclusively members of a single racial group—the Chamorros—and most citizens outside of that racial group may not register or vote. In reversing this Court's earlier dismissal of the case, the United States Court of Appeals for the Ninth Circuit held that Mr. Davis may challenge the Plebiscite because he alleges that "he's currently being denied equal treatment under Guam law." *Davis v. Guam*, 785 F.3d 1311, 1316 (9th Cir. 2015). This unequal treatment is continuing despite the Ninth Circuit's admonition that "Guam must 'hew to federal constitutional criteria' when determining who is eligible to register" to vote in the Plebiscite. *Id.* at 1315 n.4 (quoting *Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 330 (1970)).

It is clear beyond reasonable dispute that Guam's racially discriminatory limitation on Mr. Davis's voting rights violates the "federal constitutional criteria" discussed by the Ninth Circuit, *Davis*, 785 F.3d at 1315 n.4, including the Fourteenth and Fifth Amendments, as well as multiple civil rights statutes. Mr. Davis—a former U.S. Air Force officer and longtime resident, citizen, taxpayer, and otherwise qualified voter of Guam—was denied the right to register to vote in the Plebiscite *solely* because he does not meet Guam's definition of "Native Inhabitant." That definition, in turn, turns on a particular citizen's ancestry. Yet the Supreme Court and the Ninth Circuit have both held, in materially indistinguishable contexts, that defining a class of citizens by

1

reference to a "defined ancestry and to no others" is simply a "proxy for race." *Rice v. Cayetano*, 528 U.S. 495, 514 (2000); *see also Arakaki v. Hawaii*, 314 F.3d 1091, 1095 (9th Cir. 2002) (same). No more need be said to establish that the denial of Mr. Davis's right to register and ultimately vote constitutes racial discrimination that categorically violates one of his most fundamental rights as a citizen of our democracy. Because this is a pure question of law that must be resolved by the court, rather than through a factual inquiry, and because it can be resolved consistent with governing precedent only in favor of Mr. Davis, summary judgment in Mr. Davis's favor is warranted.

## BACKGROUND

Guam law requires the Guam Election Commission to hold a plebiscite concerning Guam's future relationship with the United States, which would include as options independence, free association, and statehood.[1]  The Plebiscite will be taxpayer-funded and administered by government officials who are paid by taxpayers on Guam.  *See* Commission on Decolonization, Quarterly Report (Apr. 30, 2009); Plaintiff's Concise Statement of Material Facts ("CS") ¶ 10.[2] Guamanian government officials have refused to register any voter for the plebiscite unless the voter is a "Native Inhabitant of Guam"—a term defined under Guamanian law to include persons

---

[1]  1 Guam Code Ann.§ 2105. Although defendants have maintained in this lawsuit that the Plebiscite is designed only to obtain Native Inhabitants of Guam's view of *their* future relationship with the United States, and not Guam's, the legislature that passed the relevant law obviously disagrees.  *See*, *e.g.*, 1 GCA § 2109(c) (purpose of the education outreach program is "to ensure a successful plebiscite relative to *Guam's* political status determination") (emphasis added); 3 GCA § 3104(b) (instructing the Guam Election Commission to create a method of "registering eligible persons to vote on the plebiscite relative to *Guam's* political status . . . in consultation with the Commission on Decolonization for the Implementation and Exercise of *Chamorro* Self-Determination") (first emphasis added); 3 GCA § 3105(b) (same); 3 GCA § 20007(a) (same); 3 GCA § 21007(a) (same).  *See also* 3 GCA § 21026(a)(iii) (one member of the Guam Decolonization Registry Board must have a "strong understanding of the issue of *Guam's* political status or has been extensively involved in the work towards the future exercise of *Guam's* self-determination") (emphasis added).

[2]  The report is available online at http://www.guamlegislature.com/Mess_Comms_30th/Doc.% 2030GL-09-0564%20From%20the%20Commission%20on%20Decolonization%20submitting %20its%20FY%202009%202nd%20Quarter%20financial%20report%20and%20staffing%20 pattern.%20.pdf.

2

of defined ancestry and to exclude nearly every person outside the Chamorro racial group. CS ¶¶ 11-19.

1.      The Commission on Self-Determination was established by the Guamanian legislature to consider different political status options for Guam. *See* Political Status and External Affairs Subcommittee Transition Report at 10, *available at* http://www.guampdn.com/ assets/pdf/M016999926.PDF.   After a series of public meetings, Guam officials conducted a plebiscite in 1982, in which all registered voters of Guam were permitted to vote. *Id.* at 7.   In a run-off election, the majority of voters elected for Guam to become a commonwealth. *Id.*

In response to the election, the Governor of Guam launched an effort in 1983 to develop a Draft Commonwealth Act, which was presented to the United States Senate and House of Representatives. *See* Political Status and External Affairs Subcommittee Transition Report at 7. The Commonwealth Act included a provision that would have limited the right to vote on a final plebiscite concerning Guam's political status to "Chamorros"—defined as "person[s] (or descendant[s] thereof) who [were] in Guam on August 1, 1950 when the Organic Act went into effect." *The Chamorro Perspective* 168 (Political Status Education Coordinating Commission, 1996).[3]

The first hearing on the Commonwealth Act was held in 1989.   Federal officials voiced serious disagreements with provisions of the Commonwealth Act that would have limited the final vote on self-determination to Chamorros. *See* Political Status and External Affairs Subcommittee Transition Report at 8.   The United States Department of Justice, in particular, noted that there would be serious constitutional issues with such a provision. *See id*. at 8, 11.   Negotiations ended shortly thereafter.

---

[3]   The Organic Act declared Guam to be an unincorporated territory and extended United States citizenship to three classes of persons:  (1) Spanish subjects who were inhabitants of the island of Guam on April 11, 1899, and their children born after April 11, 1899; (2) persons born on the island of Guam who resided on Guam on April 11, 1899, and their children born after April 11, 1899; and (3) all persons born on the island of Guam on or after April 11, 1899, subject to the jurisdiction of the United States.   Pub. L. No. 81-630, 64 Stat. 384 (1950).

3

**2.** Not slowed by these constitutional concerns, the Guam legislature enacted a law in 1996 to authorize the creation of a registry of Chamorros. The law—entitled "An Act to Establish the Chamorro Registry"—established a list of "the names of those Chamorro individuals, families, and their descendants who have survived over three hundred years of colonial occupation and who continue to develop as one Chamorro people on their homeland, Guam." Guam Pub. L. No. 23-130 § 1 (1996); CS ¶21.

The Guam legislature drew from Section 4 of the Organic Act to define "Chamorro" to include the first two classes of citizens who derived their citizenship through the Act—that is, "all inhabitants of the Island of Guam on April 11, 1899, including those temporarily absent from the island on that date, who were Spanish subjects," and "all persons born in the island of Guam, who resided in Guam on April 11, 1899, including those temporarily absent from the island on that date." *Id* § 2. The descendants of both groups were also included. *Id.*; *see also* 3 Guam Code Ann. § 18001.

The legislature then adopted "An Act to Create the Commission on Decolonization for the Implementation and Exercise of Chamorro Self-Determination" in an attempt to influence Guam's future political status with the United States. The express purpose of this law was to "end colonial discrimination and address a long-standing injustice [to] a people," and to "recogniz[e] and approv[e] the inalienable right of the Chamorro people to self-determination." Guam Pub. L. No. 23-147 § 1 (1997); CS ¶ 22. In keeping with this exclusionary intent, the legislature included a provision stating that only the "Chamorro people of Guam" could vote in the political status plebiscite. Guam Pub. L. No. 23-147 § 2(b), 10; CS 23-24.

Guam's Committee on Federal and Foreign Affairs issued a series of legislative findings further confirming that the law was intended to limit the right to vote in any plebiscite to Chamorros. These findings include that: (1) "[t]he exercise of Chamorro self-determination should begin as soon as possible"; (2) "[u]nity of the Chamorro people is vital in the implementation and exercise of Chamorro self-determination"; (3) "[t]he Chamorro people must stop the complacency to American Colonialism on Guam"; (4) "[t]he Church has a duty and

4

obligation to help rid Guam of colonialism because colonialism is evil and takes away Chamorro peoplehood"; and (5) the law "provides a timely redress to long injustice suffered by the Chamorro people." 23d Guam Legislature Committee on Federal and Foreign Affairs, Committee Report on Bill No. 765, Committee Findings.

At a public hearing on the bill, the desire to exclude other races from participating in the Plebiscite was emphasized yet again. One witness stated that "real freedom is Chamorro self-determination," and if Chamorros did not have this freedom then "the Chamorro people are doomed." 23d Guam Legislature Committee on Federal and Foreign Affairs, Committee Report on Bill No. 765, Written and Oral Testimony and Input on Bill No. 765. Another speaker suggested that the "Chamorro people should take control" because "the federal government should not be deciding [their] future." *Id*. Similarly, another explained that the bill was needed "to fight for our Chamorro rights, identity, and dignity." *Id*. Yet another person stated that the bill "corrects the mistake that was made by the Government of Guam in allowing non-Chamorros to vote in the last plebiscite in 1982." *Id*.

**3.**     Just a few years afterwards, in *Rice v. Cayetano,* 528 U.S. 495 (2000), the Supreme Court of the United States struck down as unconstitutional a race-based "native Hawaiian" definition similar in its salient features to the definition of Chamorro. A mere 14 days later, the legislature passed Guam Pub. L. No. 25-106 to replace "Chamorro" as the label for the chosen group of eligible voters to "Native Inhabitant of Guam."[4] But while the labels used different wording, the substance of the eligibility criteria did not change. CS ¶ 25.

To the contrary, "Native Inhabitants of Guam" mirrors the definition of "Native Chamorro" in Guam's land trust law. *Compare* 3 Guam Code Ann. § 21001(e) *with* 21 Guam Code Ann. § 75101(d). Like "Native Chamorros" in the real property provision, "Native Inhabitants of Guam" include "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Organic Act of Guam" and their "descendants." Guam Pub. L. No.

---

[4] The Governor refused to sign the bill, and it became law after the Senate approved it on March 30, 2000—just over a month after *Rice* was decided. CS ¶ 25

5

25-106 §§ 2, 7 (codified at 3 Guam Code Ann. § 21001(e), 1 Guam Code Ann. § 2102(b)). "Descendant" is defined, in turn, with respect to "blood relations": "a person who has proceeded by birth, such as a child or grandchild, to the remotest degree, from any 'Native Inhabitant of Guam' . . . and who is considered placed in a line of succession from such ancestor where such succession is by virtue of blood relations." Guam Pub. L. No. 25-106 § 2 (codified at 3 Guam Code Ann. § 21001(c)).

As a practical matter, the "Native Inhabitants" definition excludes essentially all citizens of the United States living on Guam who are wholly, for example, Caucasian, African-American, Korean, Chinese, and Filipino; instead, those eligible to vote in the Plebiscite are comprised almost exclusively of one race—Chamorro.  CS ¶¶ 11-20.

4.  Guam Pub. L. No. 25-106 also authorized the Guam Election Commission to hold a "Political Status Plebiscite" regarding Guam's future political relationship with the United States and to establish a "Guam Decolonization Registry" for purposes of registering those eligible to vote on the plebiscite.  1 Guam Code Ann. § 2110; 3 Guam Code Ann. § 21001(d).

Under this law—the law challenged here—only "Native Inhabitants of Guam" are eligible to register with the Guam Decolonization Registry and thus vote on the plebiscite.  Complaint ¶ 18; Answer ¶ 18.  Any person seeking to register with the Guam Decolonization Registry must submit an affidavit.  Guam Pub. L. No. 25-106 § 2 (codified at 3 Guam Code Ann. § 21002). Ineligible individuals who attempt to register may be guilty of perjury if they know of their ineligibility.  Guam Pub. L. No. 25-106 § 2 (codified at 3 Guam Code Ann. § 21009).

Guam has acknowledged the accuracy of data published by the United States Census Bureau.  CS ¶ 27.  In its first census of Guam, the United States recognized that the Chamorros constitute a distinct racial group.  *See* Fourteenth Census of the United States:  1920 Census of Guam at 3 tbl. 4.  Subsequent Census reports treat Chamorro as a surveyed racial group. CS ¶¶ 11, 14, 18, 20.  Mr. Davis's expert—Dr. Tom Brunell of the University of Texas—has prepared a report summarizing United States Census data that shows that everyone, or nearly everyone, who is a "Native Inhabitant of Guam" is Chamorro, based on 1950 United States Census

6

data, and thus—consistent with its discriminatory purpose—the definition of "Native Inhabitant" creates a voting qualification with overwhelmingly discriminatory results based on race. CS ¶¶ 12-13, 15-19. Guam's "ancestry test is an effective substitute or proxy for race because it excludes nearly all persons whose ancestors were not Chamorro." *Davis v. Commonwealth Election Comm'n*, Case No. 1-14-CV-00002, 2014 U.S. Dist. LEXIS 69723, at *44 (D.N.M.I. May 20, 2014). In *Davis*, the district court used an analogous study of 1950 Census data to establish that, because nearly the entire set of islanders in 1950 was composed of a single race, modern voting qualifications based on that set violate the Fifteenth Amendment as a matter of law. *Id.* In Guam, rather than allow all registered voters to participate in the Plebiscite, Guam excludes those without the preferred ancestors or racial bloodline and bestows the right to vote effectively only on a favored race.[5]

Legislative efforts to expand the right to voice an opinion on Guam's status to all citizens have failed. *See* P.L. 31-92 S. Bill No. 154-31, May 20, 2011 Roundtable on Political Status Bills.[6] Senator Tina Barnes introduced S.B. 151-31 to gauge the views of all citizens regarding status, not merely "native inhabitants." At a hearing on the bill, the legislative record reveals the bill and sponsor faced racially charged attacks and explicit statements characterizing the Plebiscite as a "Chamorro-only" election. Witnesses opposing the Barnes legislation objected to "outside people" voting and to "outsiders" voting "against us on the plebiscite and take over this land." *Id.* Senator Tom Ada responded to these Bill 151 opponents that the Barnes bill (S.B. 151-31) "does say all registered voters can vote . . . even if they're not Chamorro." Other witnesses continued the theme, saying only "native Chamorro . . . should determine the future of our destiny," and praising the "movement toward self-determination and the Chamorro-only vote." P.L. 31-92 S. Bill No. 154-31, May 20, 2011.

---

[5] Consistent with these data, the voter registry is also populated—by virtue of Guamanian law—with practically all those who have registered for racially exclusionary leases from the Chamorro Land Trust. Pub. L. No. 30-102 §§ 2, 3.

[6] The legislative history of S.B. 151 (a bill that was withdrawn) is contained within the legislative history of P.L. 31-92 S. Bill No. 154-31 (a bill that passed).

7

After these attacks, the legislative record contains a series of statements by Senator Barnes accurately characterizing the Plebiscite. "I apologize that wasn't the intent. . . . I support a Chamorro-only vote, and it's up to the people, the Chamorros of Guam as defined by the law that should be able to vote and determine what their determination should be. Again I apologize." Senator Barnes repeatedly voiced her support for "the Chamorro-only vote" and repeatedly characterized the statute challenged here as a "Chamorro-only vote." P.L. 31-92 S. Bill No. 154-31, May 20, 2011. On the next business day after the hearing, Senator Barnes withdrew S.B. 151-31. Withdraw of Bill 151-31. After withdrawing Bill 151, Senator Barnes said she "supports a Chamorro-only vote, but we should hear what everyone who makes Guam home has to say." *Id.* One of the rare times on Guam the Plebiscite is *not* characterized as "Chamorro-only" is in Defendants' pleadings.

The legislative history surrounding S.B. 151-31, particularly the characterization of the Plebiscite by Senators, betrays the attempted linguistic subterfuge of Pub. L. No. 25-106 and its rebranding of a "Chamorro" vote into a "Native Inhabitant" vote just days after *Rice* was decided.

Mr. Davis attempted to register for the Plebiscite but was unable to do so because he did not meet the definition of a "Native Inhabitant of Guam." CS ¶¶ 2-7. Mr. Davis otherwise meets the eligibility criteria: He is over 18 years of age and registered to vote in Guam elections. CS ¶ 1.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

8

"[O]nly disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 250. A facial challenge to the constitutionality of a statute is particularly ripe for resolution by summary judgment. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 505-06 (9th Cir. 1988).

## ARGUMENT

It is clear, as a matter of settled law, that the Plebiscite cannot be sustained against Mr. Davis's challenges under the Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act, and the Organic Act. There is no material factual dispute on these purely legal issues, and thus this Court should grant summary judgment in favor of Mr. Davis.

**I.     Plaintiff Is Entitled To Summary Judgment Because Guam's Restrictions On Registration For, And Voting In, The Plebiscite Violate The Fourteenth Amendment And The Organic Act.**

As shown both above and below, the restriction on registration and voting implemented by defendants is audacious racial discrimination. But this case can be resolved on an even simpler basis. Even if the restriction were not race-based at all, Mr. Davis would still be entitled to summary judgment because the restrictions violate (1) the Fourteenth Amendment's protection of the fundamental right to vote, and (2) the Organic Act's protection of the right to vote, precluding any restriction not based on citizenship, civil capacity, or residence.

**A.     Defendants' Restrictions Violate The Fourteenth Amendment Because They Interfere With The Fundamental Right To Vote.**

"Voting is a fundamental right subject to equal protection guarantees under the Fourteenth Amendment." *Idaho Coalition United For Bears v. Cenarrusa*, 342 F.3d 1073, 1076 (9th Cir. 2006). Distinctions in the exercise of fundamental rights are subject to strict scrutiny. *See Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 & n.3 (1976) (noting that the right to vote is a fundamental right, restrictions on which require the application of strict scrutiny); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) (declaring Virginia's poll tax unconstitutional; "where fundamental rights and liberties are asserted under the Equal Protection

9

Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined").

Application of "strict scrutiny" to the restrictions Defendants have imposed on registration and voting in the Plebiscite is discussed in greater detail in Part III Bf this memorandum. For now, suffice it to note that polling the views of one segment of the population on a public policy question that can affect everyone is the very antithesis of the principles that the Equal Protection Clause embodies and safeguards.

**B.    Defendants' Restrictions Also Violate The Organic Act.**

The Plebiscite also cannot be reconciled with Guam's bill of rights. That bill of rights, which is part of the Organic Act, forbids the imposition of any voter "qualification" other than those of "citizenship, civil capacity, and residence shall be imposed upon any voter." 48 U.S.C. § 1421b(m). The Plebiscite adopts an impermissible voter "qualification" on a basis other than "citizenship, civil capacity, and residence." *Id.*

Qualifications based on "citizenship" are universally understood to mean requiring a registrant to be an American citizen in order to participate in an American election. *See*, *e.g.*, 52 U.S.C. § 20508(b) (prescribing voter registration form that requires attestation of citizenship eligibility); 18 U.S.C. § 1015(f) (criminalizing false claims of citizenship when registering to vote); 18 U.S.C. § 611 (criminalizing voting by noncitizens.).

"Civil capacity" is understood as referring to cognitive impairments that might permit the government to exclude from the franchise otherwise-eligible voters with such impairments. This, too, has no relation to Guam's "Native Inhabitant" qualification. *See generally* Sally Bach Hurme & Paul S. Appelbaum, *Defining and Assessing Capacity to Vote: The Effect of Mental Impairment on the Rights of Voters*, 28 McGeorge L. Rev. 931 (2007); *Missouri Protection and Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007).

"Residency" is also unrelated to the "Native Inhabitant" requirement because it pertains to what someone considers to be their permanent place of abode when registering. *See generally Hill v. Stone*, 421 U.S. 289, 297 (1975) (discussing a voting qualification unrelated to residence).

Plaintiff is qualified to vote as a resident of Guam, does not lack capacity, and is a citizen. CS ¶¶ 1, 7-8. Thus, the definition of "Native Chamorro" has nothing to do with the only bases on which voter qualification can be restricted in Guam.

## II. Guam's "Native Inhabitant" Classification Distinguishes Among Citizens Based On Their Race.

Guam has created a registration and voting qualification based on race. The requisite "careful consideration" of the "'unusual'" classification drawn by the Guam legislature (*United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (citation omitted)) confirms that the "Native Inhabitant" classification was both intended to, and does, distinguish among citizens based on race.

### A. The Supreme Court's decision in *Rice v. Cayetano*, 528 U.S. 495, leaves no doubt

that the "Native Inhabitant" classification is a racial one. Like the "Hawaiian" classification at issue in *Rice*, the "Native Inhabitant of Guam" classification grants the right to vote "to persons of defined ancestry and to no others." *Id.* at 514; *see also* 3 Guam Code Ann. § 21001(c) (defining "Descendent" as "a person who has proceeded by birth . . . and who is considered placed in a line of succession from such ancestor where succession is by virtue of blood relations."). In *Rice*, the Hawaiian legislature defined "Hawaiian" to mean "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." 528 U.S. at 516 (quoting Haw. Rev. Stat. § 10-2). Guam's definition "Native Inhabitant of Guam" also restricts eligibility to descendants from an initial group: "'Native Inhabitants of Guam' shall mean those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Organic Act of Guam"—a group that consisted almost exclusively of Chamorros—"and descendants of those persons." 1 Guam Code Ann. § 2102(b).

Although Hawaii argued that its definition was not a racial classification, "but instead a classification limited to those whose ancestors were in Hawaii at a particular time, regardless of their race," the Supreme Court rejected that argument, explaining that ancestry was "a proxy for

race." *Rice*, 528 U.S. at 514. As the Court observed, "racial discrimination is that which singles out identifiable classes of persons solely because of their ancestry or ethnic characteristics." *Id*. at 515 (alteration and internal quotation marks omitted). "The ancestral inquiry mandated by the State," the Court reasoned, "implicates the same grave concerns as a classification specifying a particular race by name," *i.e.*, "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id*. at 517; *see also St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (concluding that race discrimination means that "identifiable classes of persons . . . are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics"); *Arakaki v. Hawaii*, 314 F.3d 1091, 1095 (9th Cir. 2002) (concluding that the Fifteenth Amendment prohibits an ancestry-based candidate restriction that excludes non-Hawaiians from qualifying as candidates for a state agency's trustee position). Like the classification at issue in *Rice*, the "Native Inhabitant" classification is a proxy for race.

      **B.** Furthermore, the historical context surrounding the plebiscite law aptly demonstrates the law's express "racial purpose and . . . effects." *Rice*, 528 U.S. at 517. Guam has used the "Native Inhabitant" and "Native Chamorro" classifications interchangeably. For example, both the Chamorro land trust law and the plebiscite law use the same definition for "Native Chamorro" and "Native Inhabitant." In fact, the plebiscite law *requires* the Guam Decolonization Commission to automatically register those individuals who have received or who have been approved to receive a Chamorro Land Trust Commission lease. *See* 3 Guam Code Ann. § 21002.1. The legislative findings and comments in support of the first plebiscite bill also confirm that the Chamorro classification is a racial one. Guam Pub. L. No. 23-130 § 1 (1996); *see also Rice*, 528 U.S. at 514-15 (considering similar legislative history to confirm that the Native Hawaiian definition was race-based).

      In prior briefing before this Court, the defendants relied on *Morton v. Mancari*, 417 U.S. 535 (1974), to argue that Guam has a special interest in fostering discussions about its political future among the "Native Inhabitants of Guam," which purportedly exempts the classification from scrutiny. ECF doc. no. 17, at 11. This reliance is patently misplaced. In *Mancari*, the

Supreme Court held that a "special relationship" exists between the United States and federally recognized Indian Tribes by virtue of the Indian Commerce and Treaty Clauses of the Constitution. 417 U.S. at 551-52; *see also id.* at 552 (explaining that if laws "dealing with Indian tribes and reservations" were "deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased"). The Court concluded that the Bureau of Indian Affairs could engage in preferential hiring, in limited part, because the preference was "not directed towards a 'racial' group consisting of 'Indians,'" but rather "only to members of 'federally recognized' tribes." *Id*. at 553 n.24. Importantly, the Court was careful to note that the case was further confined to the authority of the Bureau of Indian Affairs and that the preference was intended to "further Indian self-government." *Id.* at 551-55; *compare id. with Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 at 205 (1995) (refusing to enforce a federal program benefiting "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities"), *and City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 478 (1989) (invalidating a municipal program benefiting "Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts"). On its face, *Mancari* has no application here because the "Native Inhabitant" classification is not a tribal one intended to further Indian self-government.

*Rice* declined Hawaii's invitation to extend *Mancari* to the voting context on the ground that *Mancari* does not permit the government to "fence out whole classes of its citizens from decisionmaking in critical [governmental] affairs." 528 U.S. at 522. In that case, the Court considered whether the State of Hawaii could limit the right to vote in a statewide election for the trustees of the Office of Hawaiian Affairs (OHA) to "Hawaiians"—a group defined with respect to certain ancestral ties. *Id.* at 499-500. Hawaii argued that its voting qualification was valid because the results of the trustee election disproportionally affected "Hawaiians" compared to other residents of Hawaii, as OHA administered programs designed to benefit "Hawaiians" only. The Court rejected that position, reasoning that it rested "on the demeaning premise that citizens of a particular race are somehow more qualified than others to vote on certain matters." *Id*. at 523. Hawaii's reasoning, the Court held, "attack[ed] the central meaning of the Fifteenth Amendment"

because "[a]ll citizens, regardless of race, have an interest" in the political process, even if the policies "will affect some groups more than others." *Id.* Defendants' earlier arguments attempt to resurrect the "demeaning premise" rejected in *Rice* and cannot be squared with *Rice's* holding that a racial voting qualification is a *per se* violation of the Fifteenth Amendment.[7]

## III. Guam's Voting Restriction Is Unconstitutional And Violates Federal Statutory Law.

The plebiscite law is a clear violation of the Fifteenth Amendment, U.S. Const. amend. XV § 1, and also contravenes the Fourteenth Amendment's Equal Protection Clause, U.S. Const. amend. XIV § 1, and federal statutory law.

### A. Guam's Racial Voting Classification Violates The Fifteenth Amendment.

The Fifteenth Amendment's command is absolute, and allows for no exceptions: "The right of citizens of the United States to vote shall not be denied or abridged . . . on account of race." U.S. Const. amend. XV, § 1.[8] Thus, in *United States v. Reese*, the Supreme Court declared that the Fifteenth Amendment grants all citizens a constitutional "exemption from discrimination in the exercise of the elective franchise on account of race." 92 U.S. 214, 218 (1875); *see also United States v. Cruikshank*, 92 U.S. 542, 555-56 (1875) ("[E]xemption from discrimination in the exercise of [the right to vote] on account of race" is "a necessary attribute of national citizenship."). The reach of the Fifteenth Amendment is broad and applies to any election held "to determine public governmental policies." *Terry v. Adams*, 345 U.S. 461, 467 (1953) (op. of Black, J.); *see also Hussey v. City of Portland*, 64 F.3d 1260 at 1263-64 (9th Cir. 1995) (applying the Fifteenth Amendment to any election intended to elicit the "official expressions of an elector's will").

---

[7] A bloodline test very similar to the challenged classification here violated the Fifteenth Amendment even when (unlike here) "the clause employs factors (birthplace, domicile, and citizenship) which on the surface are not racial, its purpose is to define who fully belongs to a group identified by ethnicity: Northern Marianas Chamorro or Carolinian," particularly when the number of non-Chamorros in 1950 was "miniscule." *Davis v. Commonwealth Election Commission*, Case No. 1-14-CV-00002, 2014 U.S. Dist. LEXIS 69723, at *44 (D.N.M.I. May 20, 2014).

[8] This Amendment applies with full force in Guam. *See* 48 U.S.C. § 1421b(u).

Here, there is no dispute that Mr. Davis has been denied the right to register to vote in the Plebiscite on account of his race.   That ends the inquiry.   The Fifteenth Amendment expressly prohibits what Guamanian law purports to require.   The Plebiscite must be enjoined.

      **1.**      It is no answer to say that Mr. Davis has only been denied the right to register—not (yet) the right to vote.   The Fifteenth Amendment applies "not only to the physical act of voting but to the entire voting process," "including the matter of registration where registering is required in advance of voting."   *United States v. Dogan*, 314 F.2d 767, 771 (5th Cir. 1963).   Thus, the Constitution "forbids any distinction in the voting process," including during registration, "based on race or color, irrespective of whether such distinction involves an actual denial of the vote." *Id.* (invalidating a poll tax where payment of the tax was a condition precedent to the right to vote).

      In *Guinn v. United States*, 238 U.S. 347 (1915), and *Lane v. Wilson*, 307 U.S. 268 (1939), for example, the Supreme Court invalidated laws imposing various discriminatory registration requirements, reasoning that the "Fifteenth Amendment secures freedom from discrimination on account of race in matters affecting the franchise" and protects against "onerous procedural requirements which effectively handicap exercise of the franchise."   *Lane*, 307 U.S. at 274-75 (voter qualification intended to make it more difficult for one racial group to register violated the Fifteenth Amendment); *see also Guinn*, 238 U.S. at 365 (statute that imposed a literacy requirement on voter registration but contained a "grandfather clause" applicable to certain individuals and their lineal descendants was "void from the beginning" under the Fifteenth Amendment).   The Supreme Court has also ruled that registrars who forbid individuals from registering to vote because of their race are "subject to the ban" of the Fifteenth Amendment. *United States v. Raines*, 362 U.S. 17, 25 (1960); *see also Louisiana v. United States*, 380 U.S. 145, 153 (1965) (sustaining judgment against a registrar of voters who consistently discriminated against members of a racial group by denying them the right to register).

      Because Mr. Davis has been denied the right to register for the Plebiscite because of a "distinction . . . based on race or color," *Dugan*, 314 F.2d at 771, he has been denied his constitutional rights under the Fifteenth Amendment.   As the Supreme Court explained in *Rice*:

> [T]he use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve. . . . Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. . . . The State's electoral restriction enacts a race-based voting qualification.

528 U.S. at 495. Because such an "odious" distinction cannot be sustained under the Constitution, this Court should grant summary judgment in favor of Mr. Davis.

      **2.** This is not to say that the legislators who enacted the Plebiscite statute, based simply on their vote, must harbor racial animus or a sinister motive. Rather, it is clear that many Plebiscite advocates hold sincere views that restricting the vote in the Plebiscite is justified by the political and cultural situation of those with generations of ancestors on Guam. The Supreme Court has recognized, however, that such opinions, even if sincerely held, cannot justify using exclusionary means to address their concerns:

> When the culture and way of life of a people are all but engulfed by a history beyond their control, their sense of loss may extend down through generations; and their dismay may be shared by many members of the larger community. As the State of Hawaii attempts to address these realities, it must, as always, seek the political consensus that begins with a sense of shared purpose.

*Rice*, 528 U.S. at 524.

      Under the United States Constitution—and, indeed, the other sources of law invoked by Mr. Davis in this litigation—the "premise that citizens of a particular race are somehow more qualified than others to vote on certain matters" is "demeaning." *Rice*, 528 U.S. at 523. Whatever the motives of the legislators who defined the Plebiscite electorate, "[t]here is no room under the [Fifteenth] Amendment" or any other federal law "for the concept that the right to vote in a particular election can be allocated based on race." *Id.* Simply put, "[r]ace cannot qualify some and disqualify others from full participation in our democracy." *Id.*

16

**B.      Guam's Voting Restriction Violates The Fourteenth Amendment.**

Guam's racial voting restriction also violates the Equal Protection Clause of the Fourteenth Amendment.[9]  Strict scrutiny is required both because the plebiscite law is racially discriminatory and also because it involves voting rights.   The law cannot satisfy such a demanding inquiry.

The Equal Protection Clause requires strict judicial scrutiny of all government-sponsored racial classifications, and invalidates those that are not narrowly tailored to achieve a compelling state interest.  *See Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2418-19 (2013).   Moreover, "[i]n decision after decision, th[e] [Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).   If a challenged statute, therefore, "grants the right to vote in a limited purpose election to some otherwise qualified voters and denies it to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."  *Cipriano v. City of Houma*, 395 U.S. 701, 704 (1969) (per curiam) (internal quotation marks omitted).

**1.**      Very few compelling state interests may justify racial discrimination.   In the higher education context, the Supreme Court has held that a school's interest in the educational benefits that flow from a diverse student body is a compelling state interest.   *See Bakke*, 438 U.S. at 307-09 (op. of Powell, J.).   The Court has also recognized that a "social emergency rising to the level of imminent danger to life and limb" constitutes a compelling state interest.   *See Johnson v. California*, 543 U.S. 499, 512 (2005) (internal quotation marks omitted).   And the Court has recognized that the government has a compelling interest in remedying past discrimination for which it is responsible.   *See Croson*, 488 U.S. at 500.

Guam, however, has never come close to articulating a compelling state interest to justify its discriminatory voting scheme.   Throughout the process of defending the Plebiscite, Guam has never advanced any argument that Native Inhabitants of Guam are entitled to reparations for any

---

[9]    This Clause applies with full force in Guam, as does a similar provision of the Organic Act.  *See* 48 U.S.C. § 1421b(n), (u).

alleged wrongs committed against them as a race. Rather, Guam has chosen to justify its racial voting qualification on the sole ground that only Chamorros should have the right to vote in the Plebiscite and determine Guam's future political status.

Neither the Supreme Court nor this Court has ever recognized this type of interest as compelling. At most, in *Cipriano*, the Supreme Court assumed, for the sake of argument, that a statute "might, in some circumstances, constitutionally limit the franchise to qualified voters who are . . . 'especially interested' in the election." 395 U.S. at 704. Nevertheless, the Court explained that "whether the statute allegedly so limiting the franchise denies equal protection of the laws to those otherwise qualified voters who are excluded depends on whether all those excluded are in fact substantially less interested or affected than those the statute includes." *Id.* (internal quotation marks omitted). Put simply, the Supreme Court has categorically rejected the "demeaning" premise that a voter can be more or less interested in an election because of race. *Rice*, 528 U.S. at 523.

All of Guam's residents have an interest in and are affected by the results of the Plebiscite. *See*, *e.g.*, *Davis*, 2014 U.S. Dist. LEXIS 69723, at *66 ("The interest of the non-privileged class in whether the privilege will be extended to them is as substantial as the interest of the privileged class in whether it will remain exclusive.") Indeed, Guam's contrary position would require this Court to hold that a longtime Guamanian resident who nonetheless is not a "Native Inhabitant" is somehow "substantially less interested [in] or affected [by]" the possibility of Guamanian statehood or independence than a Native Inhabitant who has rarely set foot on Guam, but whose grandfather received U.S. citizenship through the Organic Act. *Cipriano*, 395 U.S. at 704 (internal quotation marks omitted). That is nonsense. *See Dunn*, 405 U.S. at 336 (even durational residency requirements cannot further a sufficiently substantial state interest). Particularly in this case, where the so-called interested persons are themselves defined by race, *a fortiori* the government does not have a "compelling interest" in using race-based voting restrictions to extend a classification that is itself constitutionally suspect. *See Croson*, 488 U.S. at 496 (plurality op.) ("The desire to have more black medical students or doctors, standing alone,

18

was not merely insufficiently compelling to justify a racial classification, it was 'discrimination for its own sake,' forbidden by the Constitution." (citation omitted)).

**2.**     Guam's classification also cannot survive strict scrutiny because its method of achieving its goal is not narrowly tailored.   As the Supreme Court has recently explained, the government bears the burden of demonstrating that "available, workable race-neutral alternatives do not suffice," and the "reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce [the government's compelling goals]."   *Fisher*, 133 S. Ct. at 2420 (internal quotation marks omitted).   Among other things, Guam has never explained why no race-neutral alternative to invoking the *election machinery of the state* could achieve its asserted goals.   Guam's voting qualification must therefore fail under the Fourteenth Amendment. As Chief Judge Manglona noted in granting summary judgment in *Davis*, "the exclusion of non-NMDs from voting on Article XII risks perpetuating the sort of outdated and overbroad stereotypes about NMDs and non-NMDs that the *Equal Protection Clause* is designed to combat." *Davis*, 2014 U.S. Dist. LEXIS 69723, at *74.

### C.     Guam's Racial Discrimination Violates The Voting Rights Act And The Organic Act.

Aside from the constitutional problems posed by Guam's voting qualification, the race and ancestry-based restriction violates several federal laws, including 52 U.S.C. § 10101 and the Organic Act of Guam.

Section 2 of the Voting Rights Act also prohibits any voter qualification that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."   52 U.S.C. § 10301(a).   For the reasons discussed above, the plebiscite law denied Mr. Davis the right to register "on account of race," *id.*, and thus it is inconsistent with the Voting Rights Act.   The Plebiscite also violates the two additional parts of the Voting Rights Act and yet another provision of the Organic Act.

19

1.     Section 10101 of Title 52[10] contains a broad anti-discrimination provision designed to ensure that duly qualified voters, including in federal Territories, are not excluded from their right to vote in particular elections on account of their race.   *See generally Davis v. Guam*, 785 F.3d at 1314 n.2 ("The Voting Rights Act applies to Guam, a U.S. territory.").   Under Section 10101(a), "[a]ll citizens of the United States who are otherwise qualified by law to vote at any election by the people in any . . . Territory . . . shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any . . . Territory, or by or under its authority, to the contrary notwithstanding."   Notably, the statute broadly defines the term "vote" to "includ[e] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted."   52 U.S.C. § 10101(e) (incorporated by reference in 52 U.S.C. § 10101(a)(3)(A)).

Mr. Davis is a registered voter in Guam, *see* CS ¶¶ 1, 6, so he is "otherwise qualified by law to vote at any election" in the Territory.   But he is nonetheless denied the ability to register to vote in the Plebiscite, which the statute defines as a denial of his right to vote, on account of his race. The racially discriminatory plebiscite law is thus squarely foreclosed by 52 U.S.C. § 10101 as a matter of law.

2.     Mr. Davis is also entitled to summary judgment because Guam's restrictions on registration and voting in the Plebiscite violate a second provision of 52 U.S.C. § 10101.   Section 10101(a)(2) prohibits the creation of separate classes of voters for any reason:

> No person acting under color of law shall, (A) in determining whether any individual is qualified under State law or laws to vote in *any* election, apply any standard, practice, or procedure different from the standards, practices, or

---

[10] Mr. Davis asserts a claim under 42 U.S.C. § 1983 to enforce rights protected by 52 U.S.C. § 10101.   *See*, *e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003); *Davis v. Commonwealth Election Commission*, Case No. 1-14-CV-00002, 2014 U.S. Dist. LEXIS 69723, at *33 (D.N.M.I. May 20, 2014).   The Complaint refers to 52 U.S.C. § 10101 as 42 U.S.C. § 1971, which was its codification at the time the Complaint was filed.   *See Davis v. Guam*, 785 F.3d 1311, 1314 n.2 (9th Cir. 2015).   The Editorial Reclassification Table can be found at http://uscode.house.gov/editorialreclassification/t52/Reclassifications_Title_52.pdf.

procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote.

52 U.S.C. § 10101(a)(2) (emphasis added).

The plain language of Sections 10101(a)(2) prohibits using two different standards for voter registration within a given jurisdiction. In "any" election, no "standard, practice or procedure," such as voting eligibility, may be used to assess Mr. Davis's eligibility to vote if it is "different from" the registration qualifications used for other voters—including, here, Chamorros or other "Native Inhabitants of Guam." Defendants admit as much. CS ¶ 9-10. Because the Plebiscite creates registration qualifications for Mr. Davis that differ from the registration qualifications applied to others, it cannot be sustained under 52 U.S.C. § 10101(a)(2).

**3.** The Plebiscite also cannot be reconciled with that part of the Organic Act providing that "[n]o discrimination shall be made in Guam against any person on account of race, nor shall the equal protection of the laws be denied." 48 U.S.C. § 1421b(n). Because "discrimination" cannot mean the same thing as "equal protection" (or else the clause would be redundant), the Organic Act prohibition must sweep broader than that of the Equal Protection Clause. Thus, the fact that the Plebiscite violates the Equal Protection Clause means *a fortiori* that it violates Section 1421b(n).

## IV. Congress Has Not Approved Guam's Racially Discriminatory Voting Classification.

Defendants have argued that, even if the "Native Inhabitant" classification is a racial one, Congress can engage in discriminatory actions with respect to the residents of unincorporated territories under the Supreme Court's decisions in *The Insular Cases*. But *The Insular Cases* do not shield the plebiscite law from constitutional review. Instead, they hold that Congress may choose to insulate unincorporated territories from the reach of the Constitution so long as the right at issue is not "fundamental." *See, e.g.*, *Dorr v. United States*, 195 U.S. 138, 148-49 (1904).

Of course, it is also true that Congress can *forbid* territories from engaging in racial discrimination—as it has done here. *See* U.S. Const. art. IV, § 3, cl. 2; *see also, e.g.*, *Guam v.*

*Guerrero*, 290 F.3d 1210, 1214 (9th Cir. 2002) (recognizing that Congress may "extend constitutional rights to the inhabitants of unincorporated territories"). Through the Organic Act, Congress extended provisions of the United States Constitution to Guam, including the Fifteenth Amendment and the equal protection portion of the Fourteenth Amendment. *See* 48 U.S.C. § 1421b(n), 1421b(u). Congress also chose to include other anti-discrimination provisions in the Organic Act, including one that forbids Guam from imposing any "qualification" upon voters apart "from citizenship, civil capacity, and residence." *Id.* § 1421b(m). Thus, even if Congress *could* have permitted Guam to engage in racial discrimination in voting, it has elected not to do so, and in fact has prohibited Guam from doing so.

The racial discrimination here stems not from any congressional decision but instead the Guam legislature's determination to hold a plebiscite limited to a racially defined subset of the electorate. For this reason, *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990), on which Defendants have previously relied, is utterly inapplicable. In *Wabol*, this Court considered whether *Congress* could impose race-based restrictions on the acquisition of interests in land in the Northern Mariana Islands. 958 F.2d at 1451. It did not consider whether a *territory* could impose those restrictions—either without Congress's permission, or (as here) against Congress's expressed will. The defendants cannot argue that *Congress* has approved Guam's discriminatory plebiscite law; to the contrary, the Organic Act demonstrates that Congress intended to foreclose such discrimination. As a result, there is no basis for invoking any act of Congress under *The Insular Cases* to justify Guam's own discriminatory law.

22

## CONCLUSION

Plaintiff respectfully requests that the Court grant his Motion for Summary Judgment.


Respectfully submitted,

                              _____/s/ J. Christian Adams_____
                              J. Christian Adams
                              Counsel for Plaintiff

Date: October 30, 2015

MUN SU PARK
LAW OFFICES OF PARK AND ASSOCIATES
415 Chalan San Antonio Road
Baltej Pavilion BLD. #205
Tamuning, Guam 96913
Tel:    (671) 647-1200
Fax:    (671) 647-1211
lawyerpark@hotmail.com

J. CHRISTIAN ADAMS
ELECTION LAW CENTER, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel:    (703) 963-8611
Fax:    703-740-1773
adams@electionlawcenter.com

MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington, DC 20036
Tel:    (202) 833-8400
Fax:    (202) 833-8410
Rosman@cir-usa.org

23

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the forgoing Memorandum in Support of Plaintiff's Motion for Summary Judgment on counsel for the Defendants by filing the same through the Electronic Case Filing System on October 30, 2015, which provides an electronic copy of the same to counsel of record.

_____/s/ J. Christian Adams_____
J. Christian Adams
Counsel for Plaintiff
