MUN SU PARK
LAW OFFICES OF PARK AND ASSOCIATES
415 Chalan San Antonio Road
Baltej Pavilion BLD. #205
Tamuning, Guam 96913
Tel:   (671) 647-1200
Fax:   (671) 647-1211
lawyerpark@hotmail.com

J. CHRISTIAN ADAMS
ELECTION LAW CENTER, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel:   (703) 963-8611
adams@electionlawcenter.com

MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington, DC 20036
Tel:   (202) 833-8400
Fax:   (202) 833-8410
Rosman@cir-usa.org

**UNITED STATES DISTRICT COURT**
**DISTRICT OF GUAM**

------------------------------------------------------------------------x

| | |
|---|---|
| Arnold Davis, on behalf of himself and all others similarly situated, | : |
| | : |
| Plaintiff, | Civil Case No.: 11-00035 |
| | : |
| v. | |
| Guam, Guam Election Commission, et al., | |
| | : |
| Defendants. | : |

------------------------------------------------------------------------x

**RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff Arnold Davis respectfully submits that defendants' motion for summary judgment should be denied.

Defendants (hereinafter, "Guam") seeks summary judgment on the ground that the challenged Political Status Plebiscite ("the Plebiscite") required by 1 GCA § 2110, *et seq.*, supposedly does not violate Mr. Davis's constitutional and statutory rights, even though it admittedly limits the ability to register and ultimately vote to "Native Inhabitants of Guam." As an initial matter, Guam's motion does not address all of Mr. Davis's claims, including his claim that the Plebiscite's restrictions on registration and voting violate the Organic Act regardless of whether those restrictions are characterized as "racial." Summary judgment for Guam is thus unwarranted on that basis alone; rather, as Mr. Davis explained in his motion for summary judgment, this Court should grant summary judgment invalidating the Plebiscite. Moreover, although Guam protests otherwise, the "Native Inhabitant" qualification is an ancestry and bloodline voting qualification that is *per se* unconstitutional. While Guam asserts that Congress has authorized the Plebiscite, it has, in fact, unambiguously prohibited it. Guam's remaining arguments fail because the Ninth Circuit has rejected its argument that the Plebiscite has inadequate import because it is supposedly non-binding, and its discussion of Section 2 of the Voting Rights Act simply misunderstands Mr. Davis's claim under that provision.

I. **Guam's Motion Fails To Address Or Seek Summary Judgment On All Claims In Mr. Davis's Complaint.**

As an initial matter, Guam's motion for summary judgment does not address the claims for relief set forth in Mr. Davis's third claim for relief. That claim does not rely upon racial discrimination at all, but rather alleges that Guam is violating Mr. Davis's fundamental right to register and vote regardless of any racial intent or discrimination. Complaint ¶¶ 37-39. This denial violates various provisions of the Organic Act, including subsections n, m, and u. Accordingly, Guam could not possibly have met its burden of demonstrating the absence of a

1

genuine issue of material fact with respect to that claim. For this reason alone, Guam's motion for summary judgment on the entire complaint should be denied.

Subsection m of the Organic Act prohibits Guam from imposing any "qualification" on a would-be voter except for "citizenship, civil capacity, and residence." 48 U.S.C. § 1421b(m). Guam's qualifications for the Plebiscite, reflected in its definition of "Native Inhabitants of Guam," cannot be characterized as based on citizenship, civil capacity, or residency. It is not surprising, then, that Guam chose not to address this claim.

Qualifications based on citizenship are universally understood to mean requiring a registrant to be an American citizen in order to participate in an American election. *See*, *e.g.*, 52 U.S.C. § 20508(b) (prescribing federal voter registration form that requires attestation of "citizenship" eligibility); 18 U.S.C. § 1015(f) (criminalizing false claims of citizenship when registering to vote); *id.* § 611 (criminalizing voting by noncitizens.). "Civil capacity" relates to cognitive impairments that may permit a government to exclude from the franchise those suffering some mental incapacity. This has no relation to the native inhabitant qualification. *See generally* Sally Bach Hurme & Paul S. Appelbaum, *Defining and Assessing Capacity to Vote: The Effect of Mental Impairment on the Rights of Voters*, 28 McGeorge L. Rev. 931 (2007); *Missouri Prot. & Advocacy Servs., Inc. v. Carnahan,* 499 F.3d 803 (8th Cir. 2007). "Residency" is also unrelated to the native inhabitant requirement because it pertains to where someone considers their permanent place of abode when registering. *See generally Hill v. Stone*, 421 U.S. 289, 297 (1975) (voting qualification unrelated to residence subject to heightened scrutiny).

Even assuming *arguendo* that the Plebiscite's restrictions are not race-based, they are most certainly not based on citizenship, civil capacity, or residency. Citizens of Guam (and the United States) who live in Guam and have never been deemed or adjudicated as incapacitated are nonetheless precluded from registration and voting because they do not satisfy the definition of "Native Inhabitants of Guam." Thus, not only should Guam's motion for summary judgment be denied for having failed even to address this claim (and meet their summary judgment burden),

but—as a matter of law—Mr. Davis's motion for summary judgment on this claim should be granted.

Subsections n and u of the Organic Act similarly incorporate principles of equal protection. Subsection n states that "the equal protection of the law shall [not] be denied," 48 U.S.C. § 1421b(n), and subsection u specifically incorporates both the Fifth Amendment to the United States Constitution and the second sentence of Section 1 of the Fourteenth Amendment, both of which prohibit the government from denying the equal protection of the laws, *see id.* § 1421b(u); U.S. Const. amend. XIV § 1 (precluding states from "deny[ing] to any person within its jurisdiction the equal protection of the law"); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (Due Process Clause of the Fifth Amendment has an equal protection component).

"Voting is a fundamental right subject to equal protection guarantees under the Fourteenth Amendment." *Idaho Coalition United For Bears v. Cenarrusa*, 342 F.3d 1073, 1076 (9th Cir. 2006). Distinctions between citizens in the exercise of fundamental rights are subject to strict scrutiny. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 & n.3 (1976) (noting that the right to vote is a fundamental right that warrants strict scrutiny); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (declaring Virginia's poll tax unconstitutional; "were fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined").

Classifying citizens into different groups with different political rights and permitting only one of those groups to register for and participate in a government-run election denies the disfavored groups their fundamental right to vote. It is, indeed, the antithesis of the principles that the Equal Protection Clause adopts as a bedrock constitutional guarantee. Guam does not identify *any* court that has ever suggested that identifying the views of a demographic subset of the voting population constitutes a compelling government interest. Accordingly, it cannot possibly have met its burden on summary judgment.

**II. Ancestral and Bloodline Tests for Voting are *Per se* Unconstitutional.**

Guam's summary judgment motion should also be denied because the Fifteenth Amendment and the Organic Act prohibit *all* voting qualifications based on ancestry *or* race. This is a *per se* prohibition. And it applies here because, even if the definition of "Native Inhabitants of Guam" were not race-based, it is—by its plain terms—ancestry-based. Moreover, the racial origins of that phrase are so obvious, and the effort of the Guam legislature to circumvent the Organic Act so transparent, that summary judgment should be denied to Guam, and granted to Mr. Davis.

"Native Inhabitants of Guam" is defined as those who were made citizens by the Organic Act of 1950 *and their descendants*. 3 GCA § 21001(e). The definition of "descendant," in turn, plainly uses ancestry and bloodline to vest eligibility to participate in a government-run election. *See id.* § 21001(c) (defining a "descendant" as "a person who has proceeded by birth . . . and who is considered placed in a line of succession from such ancestor where succession is by virtue of blood relations."). The framers and ratifiers of the Fifteenth Amendment had and adopted a broad understanding of "race." "In the middle years of the 19th century, dictionaries commonly referred to race as a 'continued series of descendants from a parent who is called the stock.'" *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 610 (1987) (quoting N. Webster, *An American Dictionary of the English Language* 666 (New York 1830)); *see also id.* at 610-11 (discussing other dictionaries and encyclopedias). Thus, even if (contrary to fact) the definition of Native Inhabitants of Guam were not intended to, and did not have the effect of, favoring a particular race, it would still be "racial" in the sense of the Fifteenth Amendment, and violate that provision, because it uses ancestry or bloodlines. *Cf. Rice v. Cayetano*, 528 U.S. 495, 514 (2000) ("Even if the residents of Hawaii in 1778 had been of more diverse ethnic backgrounds and cultures, it is far from clear that a voting test favoring their descendants would not be a race-based qualifications.").

Indeed, why else would blood relationships be used to determine eligibility if race, even under a more modern definition, were not the purpose of the qualification? Guam claims that

4

"Native Inhabitants of Guam" defines a political group—those who became U.S. citizens through the Organic Act—but political groups are not defined by blood relationships. The definition of Native Inhabitants of Guam conspicuously does not include the *political* heirs of those who became citizens under the Organic Act—those who share the ideological heritage of those individuals—but only those who can claim a tie through biology and blood. Accordingly, the definition of "descendant" alone renders Guam's registration and voting restrictions unconstitutional.

Even if that were not the case, the history and impetus behind the legislation authorizing the Plebiscite makes plain that Guam is using ancestry as a proxy for race. The purpose of the legislation, by the legislature's own words, is "to seek the desires of those *peoples* who were given citizenship in 1950." 3 GCA § 21000 (emphasis added). The use of the plural "peoples" was quite intentional. The singular "people" would have been inaccurate; it is doubtful that the majority of the *people* given citizenship by the Organic Act in 1950 are still alive, and most of their descendants were not given citizenship by that Act, which was repealed only two years later. *See* Act of August 1, 1950, § 4 (amending Nationality Act of 1940 to provide citizenship for certain residents of Guam); Act of June 27, 1952, § 403(a)(42), 66 Stat. 280 (repealing the Nationality Act of 1940). In contrast, the plural "peoples" is understood to refer to races or ethnic groups. *See Rice*, 528 U.S. at 515 ("Noting that the definitions of 'native Hawaiian' and 'Hawaiian' are changed to substitute 'peoples' for 'races,' the drafters of the revised definition stressed that this change is non-substantive and that 'peoples' does mean 'races.'" (citation and alterations omitted)).

The Supreme Court has repeatedly considered cases in which ancestry and bloodlines were used as a proxy for race, and the Court has repeatedly and consistently concluded that, supposedly neutral language notwithstanding, such transparently race-motivated eligibility criteria are unconstitutional. Most recently, in *Rice*, Hawaii employed a voting qualification similar to the one at issue here by imposing a "Hawaiian"-only voter classification. As Guam does in its motion, Hawaii argued that its Hawaiian classification was not a racial classification

5

"but instead a classification limited to those whose ancestors were in Hawaii at a particular time, regardless of race." 528 U.S. at 514. The Court rejected that argument, however, explaining that ancestry was "a proxy for race." *Id*. The Court stated that "racial discrimination is that which singles out identifiable classes of persons solely because of their ancestry or ethnic characteristics." *Rice*, 528 U.S. at 515 (citation and alteration omitted). "The ancestral inquiry mandated by the State," the Court reasoned, "implicates the same grave concerns as a classification specifying a particular race by name," *i.e.*, "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id*. at 517; *see also Al-Khazraji*, 481 U.S. at 613 (concluding that race discrimination means that "identifiable classes of persons . . . are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics").

The Court concluded in terms equally applicable here:

> The ancestral inquiry mandated by the State is forbidden by the Fifteenth Amendment [because] the use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve. . . . Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. . . . The State's electoral restriction enacts a race-based voting qualification.

*Rice*, 528 U.S. at 495.

*Rice* may have been the Court's most recent pronouncement on the use of bloodlines as a proxy for race, but it certainly was not the first. In both *Guinn v. United States*, 238 U.S. 347 (1915), and *Lane v. Wilson*, 307 U.S. 268 (1939), the Supreme Court invalidated facially race-neutral laws imposing various registration requirements, reasoning that the "Fifteenth Amendment secures freedom from discrimination on account of race in matters affecting the franchise" and protects against "onerous procedural requirements which effectively handicap exercise of the franchise." *Lane*, 307 U.S. at 274-75 (invalidating voter qualification intended to make it more difficult for one racial group to register to vote); *Guinn*, 238 U.S. at 365 (statute

6

that imposed a literacy requirement on voting registration but contained a "grandfather clause" applicable to certain individuals and their descendants was "void from the beginning").

In *Guinn*, the Court held that an ancestral and bloodline voting qualification was *per se* unconstitutional. Much like the ancestral tests contained in 1 GCA § 2102 and § 2110, the ancestral test in *Guinn* set eligibility to register to participate in the political process based on bloodlines or ancestry. In particular, the law in Oklahoma prohibited anyone from being registered to vote who could not read and write any section of the Oklahoma Constitution on request, but granted an exception to those who were eligible to vote on or before January 1, 1866 and their descendants. *Guinn*, 238 U.S. at 357. Although the Court recognized that the law "contains no express words of an exclusion from the standard which it establishes of any person on account of race, color, or previous condition of servitude," *id.* at 364, it nonetheless reasoned that the qualification "was stricken with nullity in its *inception* by the self-operative force of the [Fifteenth] Amendment," *id.*. at 358 (emphasis added). The race-neutral and date-driven statutory architecture was no impediment to the Court striking down the Oklahoma voting qualification.

After losing in *Guinn*, Oklahoma enacted a registration test that allowed anyone to register who voted in 1914, or who registered during a twelve day window ending on May 11, 1916. Both blacks and whites could freely register during the twelve days, and thereafter registration was terminated for everyone forever. In *Lane*, the Court confronted this new law, and once again found it unconstitutional. It held that the Fifteenth Amendment "nullifies sophisticated as well as simple minded-modes of discrimination," 307 U.S. at 274, and that the "reach of the Fifteenth Amendment against contrivances by a state to thwart equality in the enjoyment of the right to vote by citizens of the United States regardless of race or color, has been amply expounded by prior decisions," *id.* at 275.

Guam's ancestral and bloodline qualification on registration and voting is *per se* unconstitutional just as Oklahoma's was held to be in *Guinn* and *Lane* and Hawaii's in *Rice*. Indeed, the registration scheme invalidated in *Lane* provided more opportunity for blacks to

register to vote in Oklahoma than the registration scheme challenged in this case provides to Mr. Davis (*i.e.*, none).

*	*	*

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. This provision applies "not only to the physical act of voting but to the entire voting process," "including the matter of registration where registering is required in advance of voting." *United States v. Dogan*, 314 F.32d 767, 771 (5th Cir. 1963). Moreover, "[t]he Amendment grants protection to all persons, not just members of a particular race." *Rice,* 528 U.S. at 512. Guam's discriminatory registration and voting requirements contravene this fundamental right both because they are impermissibly based on ancestry and because Guam's definition of "Native Inhabitants of Guam" uses ancestry and bloodlines as a proxy for race. Guam motion for summary judgment should be denied, and Mr. Davis's motion granted.[1]

### III. Congress Has Not Authorized Voting Discrimination on Guam.

Guam wants "Native Inhabitants of Guam" to be treated like an American Indian tribe. They are not. Although the Supreme Court has held that Indian tribes may in some circumstances engage in otherwise-unconstitutional behavior, given their special tribal status, the Court has squarely limited that decision to Indian tribes alone. *See Rice*, 528 U.S. at 553 n.24 (exception applies "only to members of 'federally recognized' tribes"). Thus, Guam must rest its argument for summary judgment on the theory that Congress has plenary authority over the territories, and that, under the *Insular Cases*, that power permits Congress to authorize discriminatory schemes that otherwise would offend the Constitution.

---

[1] Of course, even if Guam's discriminatory qualifications were not *per se* unconstitutional, the overwhelming additional evidence, set forth in Mr. Davis's papers supporting his separate motion for summary judgment, further confirms that the definition of "Native Inhabitants of Guam" was created to favor the Chamorro race, and thus would also require that Guam's motion be denied.

8

As a threshold matter, it is beyond reasonable dispute that Congress did not exercise any such power to authorize the native inhabitant qualification or the Plebiscite. Congress never created a chosen group of voters who in perpetuity enjoy a greater political voice than other citizens of Guam. To the contrary, instead of authorizing a discriminatory and exclusionary voting qualification, Congress specifically *banned* any qualification other than "citizenship, civil capacity, and residence." 48 U.S.C. § 1421b(m). Rather than make exceptions to the strict ban on ancestry and racial tests in the Fifteenth Amendment, Congress specifically incorporated those constitutional protections in Guam elections. *See id.* § 14216(u). And rather than permit Guam to discriminate against its citizens, Congress prohibited any such discrimination. *See id.* § 1421b(n). Thus, where Congress has exercised its authority over Guam, it has done so to *prohibit* the very type of discrimination that Mr. Davis challenges here.

In the face of this clear congressional decision, Guam relies only on inference to support its argument that Congress granted Guam the power to conduct a racially discriminatory election. This, Guam argues, would subject the discriminatory voter qualification only to rational basis review. Guam's argument is outlandish for multiple reasons.

Guam principally relies on *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979), which upheld Washington's assertion of partial civil and criminal jurisdiction on Indian territory over the objections of the Yakima tribe. But this assertion of jurisdiction was specifically authorized by Congress, which permitted certain states "to assume jurisdiction [over cases in Indian territory] at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." *Id.* at 481-82. And while Washington distinguished in certain respects between non-Indians and Indians, the Supreme Court upheld this classification only because the state law was "not simply another state law," but instead "was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians." 439 U.S. at 501. The federal statute, in turn, was based on "'the unique legal status of Indian tribes under federal law.'" *Id.* at 501-02 (quoting *Morton v. Mancari*, 417 U. S. 535, 551-52 (1974)).

9

Further eroding Guam's argument, Congress had specifically granted federal recognition to the Yakima tribe, and had even authorized the creation of a tribal membership roll. *See* 25 U.S.C. § 601. Moreover, the United States entered into a treaty with the Yakima tribe in 1855. *See* Treaty with the Yakima, June 9, 1855, *available at* http://www.fws.gov/pacific/ea/tribal/treaties/Yakima.pdf. Thus, Congress's decision to accord special status to the Yakima tribe was plainly expressed, as was its decision to permit certain states to "readjust the allocation of jurisdiction over Indians." *See also*, *e.g.*, *Morton*, 417 U.S. at 545-46 (noting the "clear congressional recognition . . . of the unique legal status of tribal and reservation-based activities"). There was no need for inference about its intent. This case, in contrast, does not involve an Indian tribe or any express authorization of discrimination by Congress, but rather a statutory congressional decision to the contrary.

Equally unavailing is Guam's reliance on purported "international obligations," none of which mention the challenged Plebiscite, and the United Nations Charter. While Guam envisions a time when "the territory finally throws off the colonial yoke," ECF No. 106, at 17, and perhaps derives support for that view from some in the international community, the laws *passed by Congress* contemplate no such event, much less provide the means to do so. The wishes of a portion of the population on Guam do not and cannot alter the reality that Congress has authority to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," U.S. Const. art. IV, and has not taken even the first step toward authorizing electoral discrimination on Guam.

The Guam Legislature perhaps might have thought that Congress wanted it to vest one race and ancestral group with special political powers not enjoyed by others citizens, but no such congressional action occurred. When Congress did speak, it squarely prohibited the classifications contained in the Plebiscite. Guam cannot change this basic fact by invoking opaque and fanciful notions of what Congress might instead have done.[2]

---

[2] To the contrary, Congress *stripped* discriminatory ancestral language *out* of the Organic Act. An original draft of the law would have permitted restricting certain rights to "persons of

10

Case 1:11-cv-00035   Document 110   Filed 11/20/15   Page 11 of 18

**IV.    The Ninth Circuit Has Foreclosed Guam's Argument That The Plebiscite Is Merely A Non-Binding Poll Of Native Inhabitants' Desires.**

Guam previously argued that Mr. Davis lacked standing because he purportedly could not be injured by a non-binding election to gauge the preferences of native inhabitants.   Guam argued that not being allowed to participate in an election without concrete effect was not a concrete injury.   The Ninth Circuit squarely rejected this argument.   *See Davis v. Guam*, 785 F.3d 1311, 1316 (9th Cir. 2015).

Guam nonetheless argues that "[n]owhere does the [challenged law] actually suggest that the results of the plebiscite will have the effect, immediate or otherwise, of actually altering" Guam's relationship with the United States.   ECF No. 106, at 18.   The Ninth Circuit rejection of Guam's effort to diminish the effect of the Plebiscite is controlling here:

> But this contradicts *Mathews*, which held that unequal treatment is an injury even if curing the inequality has no tangible consequences.   465 U.S. at 739. Moreover, Guam understates the effect of any plebiscite that would be held if the registration threshold were triggered.   After the plebiscite, the Commission on Decolonization would be required to transmit the results to the President, Congress and the United Nations, 1 Guam Code Ann. § 2105, thereby taking a public stance in favor of whatever outcome is favored by those voting in the plebiscite.   If the plebiscite is held, this would make it more likely that Guam's relationship to the United States would be altered to conform to that preferred outcome, rather than one of the other options presented in the plebiscite, or remaining a territory.

---

Guamanian ancestry."   This provision was deleted after drawing the scrutiny of Senator and subcommittee chairman Clinton Anderson who said the ancestry clause "sounds a little bit like discrimination itself, does it not, I mean, putting it mildly." Francisco B. Leon-Guerrero, appearing as a witness, in response to Senator Anderson agreed. "That sounds very bad, Mr. Chairman. . . . It does sound discriminatory," he testified.   A.B. Won Pat, as a witness, agreed that the right to discriminate based on ancestry should be removed from the draft Organic Act. "I am in full accord that that provision should be stricken out of here," he testified. *Hearing Before the Subcommittee of the Committee on Interior and Insular Affairs, S. 185, S. 1892, H.R. 7273*, 81st Cong., 46-52 (1950).

*Davis*, 785 F.3d at 131 (footnote omitted). As the Ninth Circuit further noted, "[t]he U.S. House of Representatives, for one, has indicated that it has open ears. In a 1998 resolution, it acknowledged the Commission on Decolonization and 'reaffirm[ed] its commitment to the United States citizens of Guam for increased self-government, consistent with self-determination for the people of Guam.'" *Id.* n.3 (citation omitted). Guam's repetition of the same rejected argument should carry no force here.

V. **Guam Misunderstands The Two Distinct Causes Of Action Under Section 2 Of The Voting Rights Act.**

Guam seeks summary judgment on Mr. Davis's claim under Section 2 of the Voting Rights Act. It argues that Section 2 requires more than a mere statistically disparate impact in order to prove a *results claim* under the amended version of the statute. On that small point, Guam is certainly correct.

But Guam misunderstands that Section 2 of the Voting Rights Act provides *two distinct and entirely independent* causes of action: an intent claim as well as a results (sometimes called "effects") claim. Each claim uses distinct and generally unrelated evidence. A results claim is a fact-intensive inquiry. "A plaintiff must also move beyond numbers and prove that the totality of the circumstances support liability using a multi-element Senate Factor test." *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986). And thus a mere statistical disparity is not enough to prove a results claim, and Mr. Davis has never suggested that it is.

An intent claim under Section 2, however, does not present the same factual inquiry. An intent claim simply incorporates the standards of the Fifteenth Amendment. As discussed above, the Fifteenth Amendment *per se* bans ancestry and bloodline tests for registration and vote. But even beyond this *per se* prohibition, as a matter of law, this Court should deny Guam's motion for summary judgment and grant Mr. Davis's cross-motion for summary

12

judgment on the intent claim as the district court did in *Davis v. Commonwealth Election Comm'n*, Case No. 1-14-CV-00002, 2014 U.S. Dist. LEXIS 69723, at *44 (D.N.M.I. May 20, 2014). In *Davis*, the court used an analogous study of 1950 Census data to establish that, because nearly the entire set of Northern Marianas islanders in 1950 was composed of a single race, modern voting qualifications based on that set violate the Fifteenth Amendment as a matter of law. *Id.* As in the *Davis* case, Guam's "ancestry test" is a "substitute or proxy for race because it excludes nearly all persons whose ancestors were not Chamorro" as a matter of law. *Id.*[3]

The 1950 Census data demonstrating the unambiguous racially discriminatory design of the native inhabitant qualification are relevant not because the data establishes statistical disparity, but instead because it *confirms* Mr. Davis's intent claim under Section 2 and the Fifteenth Amendment. As a matter of law, the 1950 Census statistical data cataloging the population on Guam demonstrates that Guam's use of a voting qualification tied to the population at that time was designed to (and does) exclude voters on the basis of race. This is especially true when the number of non-Chamorros in 1950 was "miniscule," as the court found in *Davis* in granting summary judgment to the plaintiff on his Fifteenth Amendment claims. 2014 U.S. Dist. LEXIS 69723, at *44.

Moreover, the court need not rely only on Census data to see that the Guamanian legislature accomplished exactly what it set out to do: reward one ancestral class with voting

---

[3] Mr. Davis objects to and disputes Item 10 in Guam's Concise Statement of Material Facts In Support of Motion for Summary Judgment. *See* ECF 107. Item 10 states that the "purpose of the plebiscite is to ascertain the desires of those peoples who were given citizenship in 1950" (citations omitted). Mr. Davis does not contest that 3 GCA § 21000 may state as much, but *as a matter of law* that is neither the purpose nor the intended effect of the Plebiscite. The eligible class of voters is also indisputably larger than those stated in Defendants' Item 10.

13

power and exclude all others. The explicit and undeniable design of the legislature was to fence out as many or all voters who did not have the preferred ancestry. Indeed, Guam has repeatedly and plainly told this court as much. The challenged law was designed to erect barriers to the ballot for voters who lacked the chosen ancestry or bloodline anchored to the 1950 population.

Contrary to Guam's assertion, "animus" is not an element to a racial-intent claim. That is, racial hatred or ill-will is not something a Mr. Davis must prove. Rather, actions taken with the intent of effectuating a disproportionately negative impact on a racial minority violate the intent standard regardless of the motivation. *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (1991) (Kozinski, J., concurring and dissenting in part). As Judge Kozinski cogently explained, one might

> wonder if there can be intentional discrimination without an invidious motive. Indeed there can. A simple example may help illustrate the point. Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Id.* at 778 n.1 (Kozinski, J., concurring and dissenting in part). "[D]iscrimination need not be the sole goal in order to be unlawful." *Id.*

To be sure, Mr. Davis "cannot cite a single case that involves the application of the Voting Rights Act to a non-binding political status plebiscite in an unincorporated territory." ECF No. 106 at 19. But that lack of authority is a result of rarity of unincorporated territories entertaining such a plebiscite. Regardless, the Voting Rights Act "should be interpreted in a

14

manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation omitted).

Guam's voting qualification plainly violates Section 2 of the Voting Rights Act. The Ninth Circuit's decision in *Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002), is instructive. In that case, the Ninth Circuit considered whether Hawaii could limit trustee membership on the Office of Hawaiian Affairs' board to certain ancestral groups. By "systematically disqualifying all non-Hawaiians . . . on the basis of their race alone," the Court explained, the trustee qualification was "a clear violation" of Section 2 of the Voting Rights Act. *Id*. at 1096. Because Guam's voting qualification also systematically disqualifies all non-"Native Inhabitants" of Guam, it too runs afoul of Section 2 of the Voting Rights Act.

Finally, Guam reads the reach of the Voting Rights Act far too narrowly. Participation in a referendum is not excluded from federal civil rights protections. *Armstrong v. Allain*, 893 F. Supp. 1320 (S.D. Miss. 1994) and *Operation King's Dream v. Connerly*, 2006 WL 2514115, at *14 (E.D. Mich. Aug. 29, 2006), appeal dismissed, 501 F.3d 584 (6th Cir. 2007).

## CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

                                            /s/ J. Christian Adams
                                            J. Christian Adams
                                            Counsel for Plaintiff

Date: November 20, 2015

MUN SU PARK
LAW OFFICES OF PARK AND ASSOCIATES
415 Chalan San Antonio Road
Baltej Pavilion BLD. #205
Tamuning, Guam 96913
Tel:    (671) 647-1200

Fax: (671) 647-1211
lawyerpark@hotmail.com

J. CHRISTIAN ADAMS
ELECTION LAW CENTER, PLLC
300 N. Washington St., Suite 405
Alexandria, VA 22314
Tel: (703) 963-8611
Fax: 703-740-1773
adams@electionlawcenter.com

MICHAEL E. ROSMAN
CENTER FOR INDIVIDUAL RIGHTS
1233 20th St. NW, Suite 300
Washington, DC 20036
Tel: (202) 833-8400
Fax: (202) 833-8410
Rosman@cir-usa.org

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the forgoing Memorandum in Opposition to Defendants' Motion for Summary Judgment on counsel for the Defendants by filing the same through the Electronic Case Filing System on November 20, 2015, which provides an electronic copy of the same to counsel of record.

                                                                           /s/ J. Christian Adams_____
                                                                           J. Christian Adams
                                                                           Counsel for Plaintiff