**THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| ARNOLD DAVIS, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>      vs.<br><br>GUAM, GUAM ELECTION COMMISSION, ALICE M. TAIJERON, MARTHA C. RUTH, JOSEPH F. MESA, JOHNNY P. TAITANO, JOSHUA F. RENORIO, DONALD I. WEAKLEY, and LEONARDO M. RAPADAS,<br><br>        Defendants. | CIVIL CASE NO. 11-00035<br><br><br>**DECISION AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT** |

       This court heard the following matters on September 1, 2016: Plaintiff's Motion for Summary Judgment Pursuant to FED. R. CIV. P. 56(a) (*see* ECF No. 103); and Defendants' Motion for Summary Judgment Pursuant to FED. R. CIV. P. 56 (*see* ECF No. 106). Appearing on behalf of the Plaintiff were Mr. J. Christian Adams of Election Law Center, PLLC, and Mr. Mun Su Park of Law Offices of Park and Associates. Appearing on behalf of the Defendants were Attorney General of Guam Elizabeth Barrett-Anderson, Deputy Attorney General Kenneth Orcutt, and Special Assistant Attorney General Julian Aguon. After careful consideration and after having reviewed the parties' briefs, relevant cases and statutes, and having heard argument

1

from counsel on the matter, the court hereby **GRANTS** the Plaintiff's Motion for Summary Judgment and finds **MOOT** Defendants' Motion for Summary Judgment for the reasons stated herein.

## I.    CASE OVERVIEW[1]

This is a civil rights action which deals with the topic of self-determination of the political status of the island and who should have the right to vote on a referendum concerning such. The Plaintiff claims that he is prohibited from registering to vote on the referendum, which is a violation of the Voting Rights Act, the Organic Act of Guam, and his Fifth, Fourteenth and Fifteenth Amendment rights.

### a.    Factual Background[2]

On November 22, 2011, Plaintiff filed his complaint for declaratory and injunctive relief. *See* Compl., ECF No. 1.  In the complaint, he alleges discrimination in the voting process by Guam and the Defendants. *Id.*  Plaintiff alleges that under Guam law, a Political Status Plebiscite ("Plebiscite") is to be held concerning Guam's future relationship with the United States.  *Id.* at ¶ 8.  Plaintiff, a white, non-Chamorro, male and resident of Guam, states that he applied to vote for the Plebiscite but was not permitted to do so because he did not meet the definition of "Native Inhabitant of Guam." *Id.* at ¶¶ 20 and 21. "Native Inhabitants of Guam" is defined as "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Guam Organic Act and descendants of those persons."  3 Guam Code Ann. § 21001(e).

The Plebiscite would ask native inhabitants which of the three political status options they preferred. The three choices are Independence, Free Association with the United States, and

---

[1] The page citations throughout this Decision and Order are based on the page numbering provided by the CM/ECF system.

[2] A portion of the factual background is based on the same information that was contained in a prior decision of the court. *See* Report and Recommendation, ECF No. 44.

2

Statehood. *See* Compl., ECF No. 1, at ¶ 8.

Because Plaintiff was denied the right to register for the Plebiscite, he filed the instant complaint, stating three causes of action. In his first cause of action, he alleges that by limiting the right to vote in the Plebiscite to only Native Inhabitants of Guam, the purpose and effect of the act was to exclude him and most non-Chamorros from voting therein, thereby resulting in a denial or abridgment of the rights of citizens of the United States to vote on account of race, color, or national origin, a violation of Section 2 of the Voting Rights Act of 1965.

In his second cause of action, Plaintiff alleges that Defendants are preventing him from registering to vote in the Plebiscite because he is not a Native Inhabitant of Guam. Thus, Defendants are engaged in discrimination on the basis of race, color, and/or national origin in violation of various laws of the United States.

Lastly, the Plaintiff's third cause of action alleges that he is being discriminated in relation to his fundamental right to vote in the Plebiscite in violation of the Organic Act of Guam, the U.S. Constitution and other laws of the United States for the reason that he is not a Native Inhabitant of Guam.

In his Prayer for Relief, Plaintiff seeks a judgment: enjoining Defendants from preventing Plaintiff and those similarly situated from registering for and voting in the Plebiscite; enjoining Defendants from using the Guam Decolonization Registry in determining who is eligible to vote in the Plebiscite; enjoining Defendant Leonardo Rapadas from enforcement of the criminal law provisions of the Act that make it a crime to register or allow a person to vote in the Plebiscite who is not a Native Inhabitant of Guam[3]; and a declaration that Defendants' conduct has been

---

[3]  In the appellate decision issued on May 8, 2015, the Ninth Circuit found that because Plaintiff did not argue on appeal that this court erred by dismissing his claim against Mr. Leonardo Rapadas, the Attorney General of Guam, to enforce a provision of Guam's criminal law that makes it a crime for a person who knows he is not a Native Inhabitant to register for the Plebiscite, any claim of error in that regard was waived. *See Davis v. Guam*, 785 F.3d 1311, 1316 (9th Cir. 2015).

3

1  and would be, if continued, a violation of law.

2  **b.  Relevant Procedural Background**

3  On November 22, 2011, Plaintiff filed his complaint herein.  *See* Compl., ECF No. 1.  On

4  December 2, 2011, the then-Attorney General of Guam, Leonardo M. Rapadas, a named

5  Defendant, on behalf of himself and all named defendants, moved to dismiss the complaint on

6  the ground that it failed to present a case or controversy.  *See* Defs.' Mot., ECF No. 17. On

7  January 9, 2013, the court granted Defendants' motion to dismiss finding that the Plaintiff lacked

8  standing and the case was not ripe for adjudication. *See* Order, ECF No. 78. The Plaintiff

9  appealed.

10  On May 8, 2015, the Ninth Circuit issued its decision, finding that the Plaintiff has

11  standing to pursue his challenge to Guam's alleged race-based registration classification and that

12  the claim was ripe because the Plaintiff alleged he was currently subjected to unlawful unequal

13  treatment in the ongoing registration process. *See Davis v. Guam*, 785 F.3d 1311 (9th Cir. 2015).

14  On October 30, 2015, both parties filed their respective motions for summary judgment.

15  *See* Pl.'s Mot., ECF Nos. 103; and Defs.' Mot., ECF No. 106. The court heard the matter on

16  September 1, 2016, and thereafter took it under advisement.

17  **c.  Instant Motions Before the Court**

18  **i.  Plaintiff's Motion for Summary Judgment**

19  The Plaintiff moves the court for a judgment pursuant to FED. R. CIV. P. 56(a), wherein

20  he seeks the enjoinment of the Plebiscite, and (ii) a declaration from the court that the Plebiscite

21  violates the Fourteenth and Fifteenth Amendments of the United States Constitution, the Voting

22  Rights Act, and the Organic Act. *See* Pl.'s Mot., ECF No. 103.

23  **ii.  Defendants' Motion for Summary Judgment**

24  Defendants likewise move the court for a judgment pursuant to FED. R. CIV. P. 56,

4

wherein they seek judgment granted in their favor because Plaintiff cannot make a prima facie case of impermissible race-based discrimination under the United States Constitution or any federal statutes. *See* Defs.' Mot., ECF No. 106.

## II.    JURISDICTION AND VENUE

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1331 and 1343, for Plaintiff's claims under the Voting Rights Act, the Organic Act of Guam, and his Constitutional rights under the Fifth, Fourteenth, and Fifteenth Amendments. *See also* 48 U.S.C. § 1424.

Venue is proper in this judicial district, the District Court of Guam, because Defendants are Guam, the Government of Guam and its officials, and all of the events giving rise to Plaintiff's claims occurred here. *See* 28 U.S.C. § 1391.

## III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a material fact cannot be genuinely disputed, the movant may:

> (A)    cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)    show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Thus, the evidence presented in opposition to summary judgment must be "enough 'to require a jury or judge to resolve the parties' differing versions of the truth at

trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Servs. Co.*, 391 U.S. 253, 288-89 (1968)).

A shifting burden of proof governs motions for summary judgment under Rule 56. *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking summary judgment bears the initial burden of proving an absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where, as here, the moving party will have the burden of proof at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets that burden, the burden then shifts to the nonmoving party to set forth "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. "The mere existence of a scintilla of evidence . . . will be insufficient" and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Viewing the evidence in the light most favorable to the non-moving party, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV.   DISCUSSION

### a.   Guam law on voter qualification for the Plebiscite violates the Fifteenth Amendment's prohibition of racial discrimination in voting.

The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall be not denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. AMEND. XV. The Fifteenth Amendment applies to Guam. *See* 48 U.S.C. §1421b(u) ("The following provisions of and amendments to the Constitution of the United States are hereby extended to Guam . . . and shall have the same force

6

and effect there as in the United States or in any State of the United States: . . . the fifteenth [ ] amendment[].").

Plaintiff asserts that Defendants are in violation of the Fifteenth Amendment because Plaintiff was denied the right to register to vote in the Plebiscite on account of his race. Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), ECF No. 104, at 20. Plaintiff is Caucasian with no Chamorro ancestry. Pl.'s Ex. A, ECF No. 105-1, at 2. He attempted to register to vote in the Plebiscite, but the Guam Election Commission did not accept his application to register and instead marked the form as "void." Pl.'s Ex. C, ECF 105-3, at 1.

### i. **The Fifteenth Amendment prohibits use of ancestry as proxy for race.**

"Fundamental in purpose and effect and self-executing in operation, the [Fifteenth] Amendment prohibits all provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of race." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). While there were attempts to manipulate the system to exclude others from voting since the passage of the Amendment, the Supreme Court noted that "[t]he Fifteenth Amendment was quite sufficient to invalidate a scheme which did not mention race but instead used ancestry in an attempt to confine and restrict the voting franchise." *Id.* at 113. "[R]acial discrimination is that which singles out identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics." *Id.* at 515, citing *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (internal quotation marks omitted).

Recognizing that ancestry can be proxy for race, the court in *Rice* found that the voting qualification requirements for the Office of Hawaiian Affairs ("OHA") trustees, which are chosen in a statewide election, uses ancestry as proxy for race. 528 U.S. at 514. In that case, the Hawaiian Constitution limits the right to vote for the OHA trustees to "Hawaiians," which consists of two subclasses of the Hawaiian citizenry. *Id.* at 498-99. The smaller class, known as

7

"native Hawaiians," is made up of descendants of not less than one-half part of the races inhabiting the Hawaiian Islands prior to 1778.[4] *Id.* at 499. The larger class, known as "Hawaiians," is made up of descendants of people inhabiting the Hawaiian Islands in 1778.[5] *Id.* Petitioner Rice is a citizen of Hawaii, but he does not have the requisite ancestry to qualify to vote in the OHA trustee election. *Id.* His application to register to vote for OHA trustees was denied. *Id.* at 510.

The state of Hawaii maintains that the statute "is not a racial category at all but instead a classification limited to those whose ancestors were in Hawaii at a particular time, regardless of their race." *Id.* at 514. The state puts forth the following arguments: some inhabitants of Hawaii as of 1778 may have migrated from the Marquesas Islands, the Pacific Northwest, and Tahiti; "the restriction in its operation excludes a person whose traceable ancestors were exclusively Polynesian if none of those ancestors resided in Hawaii in 1778;" and, "the vote would be granted to a person who could trace, say, one sixty-fourth of his or her ancestry to a Hawaiian inhabitant on the pivotal date." *Id.*

The Supreme Court rejected the state's argument that the classification is not racial in nature, holding that ancestry can be proxy for race. *Id.* In finding that the state "has used ancestry as a racial definition and for a racial purpose", the court noted that "[t]he very object of the statutory definition in question and of its earlier congressional counterpart in the Hawaiian

---

[4] The statutory definition of "native Hawaiian" is as follows: "'Native Hawaiian' means any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act . . . provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii."

[5] The statutory definition of "Hawaiian" is as follows: "'Hawaiian' means any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii."

Homes Commission Act[6] is to treat the early Hawaiians as a distinct people[.]" *Id.* at 514-15.

Looking at the legislative history, the court also noted that the definition of "Hawaiian" was

changed to substitute "peoples" for "races" but such change—based on congressional committee

records—was "merely technical" and the meaning did not change: "peoples" still meant "races."

*Id.* at 516.

"Distinctions between citizens solely because of their ancestry are by their very nature

odious to a free people whose institutions are founded upon the doctrine of equality."

*Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). Further, "it demeans the dignity and

worth of a person to be judged by ancestry instead of by his or her own merit and essential

qualities." *Rice*, 528 U.S. at 517.

### ii. **"Native Inhabitants of Guam" is a race-based classification.**

The statute in question is the definition of "Native Inhabitants of Guam," as provided in

Public Law No. 25-106 and codified in 3 Guam Code Ann. § 21001(e), since Guam law requires

that only "Native Inhabitants of Guam" be allowed to vote in the Plebiscite.[7] *See* 1 Guam Code

---

[6] The Hawaiian Homes Commission Act set aside approximately 200,000 acres of land and created a program of loans and long-term leases for the benefit of native Hawaiians. *Rice*, 528 U.S. at 507.

[7] Section 2110 of Title 1 of the Guam Code Annotated provides in its entirety the following:

   **Plebiscite Date and Voting Ballot.**

   (a) The Guam Election Commission shall conduct a "Political Status Plebiscite", at which the following question, which shall be printed in both English and *Chamorro*, shall be asked of the eligible voters:

   In recognition of your right to self-determination, which of the following political status options do you favor? (Mark ONLY ONE):

   1. Independence ( )
   2. Free Association with the United States of America ( )
   3. Statehood ( ).

   Persons eligible to vote shall include those persons designated as Native Inhabitants of Guam, as defined within this Chapter of the Guam Code Annotated, who are eighteen (18) years of age or older on the date of the "Political Status Plebiscite" and are registered voters on Guam.

   The "Political Status Plebiscite" mandated in Subsection (a) of this  Section shall be held on a date of the

9

Ann. § 2110. "Native Inhabitants of Guam" is defined as "persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Guam Organic Act and descendants of those persons." 3 Guam Code Ann. § 21001(e). "Descendant" is defined as "a person who has proceeded by birth . . . from any 'Native Inhabitant of Guam' . . . and who is considered placed in a line of succession from such ancestor where such succession is by virtue of *blood relations*." 3 Guam Code Ann. §21001(c) (emphasis added).

In other words, the voter qualification for the Plebiscite is set up to limit it to only two groups: (1) those individuals who obtained their U.S. citizenship by virtue of the Organic Act in 1950, and (2) their descendants. *Id.* Similar to *Rice*, the voter qualification here is a proxy for race because it excludes nearly all persons whose ancestors are not of a particular race. *See* 528 U.S. at 514-16. As Plaintiff correctly points out, even an adopted child of a descendant cannot vote in the Plebiscite. *See* Pl.'s Reply, ECF No. 115, at 8-9. Bloodline/ancestry is required.

Defendants argue that the statute is not race-based but rather based on "the 1950 date [which] refers to the passage of a specific law that changed the citizenship status of a defined class of people." [8] Defs.' Opp'n., ECF No. 112, at 11. Defendants support their non-racial argument by pointing to the 1950 census for Guam, which confirms that there are multiple racial or ethnic groups that became U.S. citizens by virtue of the Organic Act. *Id.* at 11-12, 18. It was not limited to one racial group such as Chamorros. *Id.* The court finds this argument to be unpersuasive. *See Davis v. Commonwealth Election Comm'n.*, 844 F.3d 1087, 1093 (9th Cir.

General Election at which seventy percent (70%) of eligible voters, pursuant to this Chapter, have been registered as determined by the Guam Election Commission.

1 Guam Code. Ann. § 2110.

[8] Defendants also argue that the definition of "Native Inhabitants of Guam" does not "provide that all Chamorro people are eligible to vote" in the Plebiscite and therefore, the statute is not racial. Defs.' Opp'n., ECF No. 112, at 6. The U.S. Supreme Court in *Rice* has already addressed this issue, holding that "[s]imply because a class defined by ancestry does not include all members of the race does not suffice to make the classification race neutral." *Rice*, 528 U.S. at 516-17.

10

2016) ("While there is historical evidence that some persons who were not of Chamorro or Carolinian ancestry lived on the islands in 1950 [and therefore qualify as a 'full blooded' Northern Marianas descent], *Rice* forecloses this argument. The Fifteenth Amendment will not tolerate a voter restriction which singles out identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics." (internal quotation marks and citations omitted)).

The 1950 census data shows that the total population in Guam was 59,498. *See* Pl.'s Ex. D1, ECF No. 105-5, at 4. Out of that number were 26,142 non-U.S. citizens.[9] *Id.* The breakdown of these non-U.S. citizens is as follows: 24 Chinese; 36 Whites; 127 Filipinos; 25,788 Chamorros; and 167 "Other". *Id.* That is a total of 354 non-Chamorros living on Guam in 1950, a diminutive number (approximately 1.4 percent) compared to the 25,788 Chamorros on Guam during that same time period.

In *Rice*, the state of Hawaii advanced a similar argument as the Defendants here, noting that the individuals living in Hawaii in 1778 are not exclusively from one particular race but rather, some came from the Marquesas Islands, the Pacific Northwest, and Tahiti. 528 U.S. at 514. The Supreme Court rejected this line of argument. *Id.* It noted that the inhabitants shared common physical characteristics and a common culture, making them distinct people, and the law reflects "the State's effort to preserve that commonality of people to the present day." *Id.* at 514-15. The court further went on to review the history of the statute in question. *Id.* at 515.

In this case, the current Plebiscite law traces its beginnings to Public Law No. 23-130, which became law on December 30, 1996. *See* Pub. L. No. 23-130; Pl.'s Ex. F, ECF No. 105-7. Therein, the Guam Legislature established a Chamorro Registry for the purpose of establishing

---

[9] This number represents the total population of non-U.S. citizens residing on Guam in 1950, who presumably, became U.S. citizens by virtue of the Organic Act. Accordingly, this is the number that represents those who are considered "Native Inhabitants" pursuant to 3 Guam Code Ann. § 21001(e). Those living on Guam who were already U.S. citizens prior to the enactment of the Organic Act do not fall within the definition of "Native Inhabitants." *See id.*

an index of names by the Guam Election Commission for registering Chamorros and recording their names. *Id.* The Registry was to serve as a tool to educate Chamorros about their status as an indigenous people and their inalienable right to self-determination. *Id.* at § 1.

Shortly after the passage of the above-referenced law, the Guam Legislature passed Public Law No. 23-147, and it became law on January 23, 1997. *See* Pub. L. No. 23-147; Pl.'s Ex. G, ECF No. 105-8. This new law created the Commission on Decolonization for the Implementation and Exercise of Chamorro Self-Determination ("Commission on Decolonization"). *See* § 4, Pub. L. No. 23-147. The purpose of the Commission was to ascertain the desires of the "Chamorro people of Guam" as it pertained to their future political relationship with the United States. *Id.* at § 5. The law required the Guam Election Commission to conduct a Political Status Plebiscite at the next island-wide Primary Election,[10] during which the "Chamorro people entitled to vote" would be asked to choose among three political status options: Independence, Free Association, and Statehood. *Id.* at § 10. The results of the Plebiscite were to be transmitted to the President and Congress of the United States and the Secretary General of the United Nations. *Id.* at § 5.

In that same public law, "Chamorro people of Guam" was defined as "[a]ll inhabitants of Guam in 1898 and their descendants who have taken no affirmative steps to preserve or acquire foreign nationality." *Id.* at § 2(b). Thereafter, the Guam Legislature passed Public Law No. 25-106, which became law on March 24, 2000. *See* Pub. L. No. 25-106; Pl.'s Ex. H, ECF No. 105-9. That law changed the persons entitled to vote from "Chamorro people of Guam" to "Native Inhabitants of Guam". *See* § 11, Pub. L. 25-106. The definition of "Native Inhabitants of Guam" in Public Law No. 25-106 (codified as 3 Guam Code Ann. § 21001(e)), is nearly identical to the

---

[10] The law was later amended, and it required the Plebiscite to be held on a general election at which seventy percent (70%) of eligible voters have been registered as determined by the Guam Election Commission. *See* § 23, Pub. L. No. 27-106.

definition of "Native Chamorro"[11] as defined in the Chamorro Land Trust Commission Act.[12] *See* 21 Guam Code Ann. § 75101(d).

Public Law No. 25-106 also created a Guam Decolonization Registry, which is a registry for qualified voters of the Plebiscite.[13] *See* Pub. L. No. 25-106. The Guam Legislature also provided for the waiver of an affidavit (required when you register to vote for the Plebiscite) for individuals who have received a Chamorro Land Trust Commission ("CLTC") lease or have been preapproved to receive one (pursuant to 21 Guam Code Ann. § 75107, to be eligible for a CLTC lease, one must be a "Native Chamorro"). *See* § 3, Pub. L. No. 30-102, codified as 3 Guam Code Ann. §21002.1. That same law also automatically registers those individuals into the registration roll of the Guam Decolonization Registry. *Id.*

The specific sequence of events shows that the Guam Legislature passed into law Public Law No. 25-106 soon after the U.S. Supreme Court issued its decision in *Rice*, wherein the court invalidated the use of ancestry as a voting qualification requirement, because it was determined to be a proxy for race. *See* 528 U.S. 495 (2000). The *Rice* decision was issued on February 23, 2000, and Public Law No. 25-106 was passed by the legislature on March 9, 2000, and enacted into law on March 24, 2000. *See id.* and Pl.'s Ex. H, ECF No. 105-9.

The court finds that similar to *Rice*, the use of "Native Inhabitants of Guam" as a requirement to register and vote in the Plebiscite is race-based and that the Guam Legislature has used ancestry as a racial definition and for a racial purpose. It is clear to the court that the Guam

---

[11] "Native Inhabitants of Guam" is defined as "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Guam Organic Act and descendants of those persons", whereas "Native Chamorro" is defined as "any person who became a U.S. citizen by virtue of the authority and enactment of the Guam Organic Act or descendants of such person." *See* 3 Guam Code Ann. § 21001(e) and 21 Guam Code Ann. §75101.

[12] The Chamorro Land Trust Commission was created for the administration of the returned land for native Chamorros. *See* Chapter 75 of Title 21 of the Guam Code Annotated.

[13] It was a registry separate and apart from the Chamorro Registry that was created by Public Law No. 23-130.

13

Legislature attempted to manipulate the system to exclude others from voting by immediately deleting the term "Chamorro people" from the law that mandated the Plebiscite and replacing it with "Native Inhabitants"—a neutral term on its face, without any reference to a specific race, when the *Rice* decision was issued. Yet, the Guam Legislature used the same definition of "Native Chamorro", as contained in the Chamorro Land Trust Commission Act, for the artfully and newly created term "Native Inhabitants" in the Plebiscite statute. Further, a "Native Chamorro" who has received or has been preapproved for a CLTC lease is automatically registered into the Plebiscite registration roll (the Guam Decolonization Registry). Gleaning from all of these—similar to *Rice*, the very object of the statutory definition in question here is to treat the Chamorro people as "a distinct people". *See Rice*, 528 U.S. at 515. It is clear to the court that the Guam Legislature has used ancestry as a proxy for race.

Defendants attempt to distinguish *Rice* from the present case by arguing that the statute being challenged has no discriminatory purpose.[14] *See* Defs.' Opp'n., ECF No. 112, at 9, 16. Discriminatory purpose is required under the Fifteenth Amendment when a restriction is race-neutral on its face. *Davis*, 844 F.3d at 1094 n.5, citing *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 62 (1980). Defendants support their argument by pointing to the "Legislative Findings and Intent" contained in Section 1 of Public Law No. 25-106. It states in relevant part the following:

> . . . *I Liheslaturan Guahan's* [Guam Legislature's] intent that the qualifications for voting in the political status plebiscite shall *not* be race-based, but based on a clearly defined political class of people resulting from historical acts of political entities in relation to the people of Guam.

P.L. 25-106, § 1. *See* Defs.' Opp'n., ECF No. 112, at 7. The Guam Legislature further emphasized that "[t]he intent of [the legislation] shall *not* be construed nor implemented

---

[14] Defendants also seem to infer that "animus" is required in order for the court to find a violation of the Fifteenth Amendment. *See generally* Defs.' Opp'n., ECF No. 112 (Defendants used the term repeatedly throughout their brief.). However, Defendants have not provided any legal authority to support this inference.

14

by the government officials effectuating its provisions to be race based, but founded upon the classification of persons as defined by the U.S. Congress in the 1950 Organic Act of Guam." 3 Guam Code Ann. § 21000. It further noted that the Guam Decolonization Registry (registry for the Plebiscite) is a separate registry from the Chamorro Registry and that it is not "one based on race." *Id.*

Defendants contend that "[i]t is firmly established that the carefully chosen words of a statute prevail over the isolated statements of individual lawmakers," providing a string citation to cases regarding review of legislative history to determine legislative intent.[15] *See* Defs.' Opp'n., ECF No. 112, at 7-8. The isolated statements being referred to were made by then-senator Tina Muna Barnes. *Id.* at 6-7. In Plaintiff's Motion, he discussed Ms. Muna Barnes' introduction of Bill No. 151-31, which would have allowed all registered voters to vote in the Plebiscite. *See* Pl.'s Mem., ECF No. 104, at 12.

The following conversation transpired during the Roundtable Meeting on the Political Status Bills (Bill Nos. 151-31, 154-31, and 168-31) on May 20, 2011:

> Sen. Tom Ada: "Chairman, may I speak to best clarify the issue. This (indicating Bill No. 151) does say that all registered voters in Guam can vote on this. To include, the outside people, even if they're not Chamorro."
>
> Sen. Muna Barnes: "I apologize that wasn't the intent. This straw poll would not be the determinant factor in what the people want. I support a Chamorro-only vote, and it's up to the people, the Chamorros of Guam . . . [to] determine what their determination should be. Again, I apologize, that wasn't the intent."
>
> . . .

---

[15] For example, in *Garcia v United States*, the court found that "[i]n surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation . . . We have eschewed reliance on the passing comments of one Member . . . and casual statements from the floor debates . . . we stated that Committee Reports are more authoritative than comments on the floor[.]" 469 U.S. 70, 76 (1984). This is in line with one of the factors articulated in *Arlington Heights* in determining intent; that is, the court reviews legislative history, including the minutes and committee reports of the legislation, as discussed *infra*.

15

Sen. Respicio: " . . . You just heard Sen. Barnes clarify and this bill would have to be amended because it says by all Guam voters. She just clarified that her intent was only to make those eligible to vote on the plebiscite vote, so bill 151 is kind of closer now to bill 154 that Sen. Guthertz is proposing but only 154 kind of talks about the methodology to which the vote shall take place so you can have some comfort knowing that the author is more in agreement with most of us on this issue . . ."

. . .

Sen. Respicio: "But earlier you said that it wasn't your intent to make all of Guam voters vote and so that you agreed with the position that only people who should be eligible to vote . . ."

Sen. Muna Barnes: "Yes, and I said that the drive for the Chamorro only vote should exist, I've said that over and over and over . . ."

Sen. Respicio: "But first would you want everybody who is a Guam voter to vote on their preferred political status and it's really it's not a Chamorro only vote because it's date-based rather than race-based so people ask that we not call it Chamorro only vote because that's what's been supported . . ."

Sen. Muna Barnes: "As defined by the laws and provisions that are in place today, Mr. Chairman."

Sen. Respicio: "But are you suggesting then, we amend this 'by all of Guam voters' and limit it to those eligible to vote in the plebiscite which is what the original law is."

Sen. Muna Barnes: "Yes."

. . .

Sen. Respicio: "I think what she's saying is that, maybe I'm misunderstanding, but only those who are eligible to vote on the plebiscite should vote for what their preferred status is. Only those who obtained their citizenship through the Organic Act should be the one to vote on the plebiscite, that's most of our positions, and the Senator just clarified that it wasn't her intent to make everybody vote, although the bill reflected that, so this bill will have to be amended, and so the purpose of this roundtable . . . , is that we have three bills with all completing outcomes, and rather than having a public hearing and looking like we were all over the place, we wanted to have a roundtable to kind of focus on what kind of direction we wanted to have."

16

Portion of Transcript during Roundtable Meeting on the Political Status Bills (May 20, 2011).

*See* Pl.'s Ex. I, ECF No. 105-10, at 75-76, 84. The legislative history of Bill No. 151-31 is

contained within the legislative committee report of Bill No. 154-31, which became Public Law

No. 31-92. Plaintiff notes that Bill No. 151-31 was subsequently withdrawn. Pl.'s Mem., ECF

No. 104, at 12.

Defendants argue that Ms. Muna Barnes' isolated statements should carry very little

weight, if any, in determining whether there was discriminatory purpose in the Plebiscite. *See*

Defs.' Opp'n., ECF No. 112, at 6-7. Defendants' reliance on the cases they cited to on this point

is misplaced. *See* Defs.' Opp'n., ECF No. 112, at 7-8. For example, in *Florida v. United States*,

the district court noted that the legislator's sole statement "is the only statement to which the

defendants point as evidencing a discriminatory purpose on the part of the Florida legislature."

885 F.Supp.2d 299, 354 (D.D.C. Aug. 16, 2012). That is not the case here. Plaintiff does not rely

solely on one legislator's statement to demonstrate discriminatory purpose. He relies on the

legislative history and the surrounding circumstances of the enactment of the Plebiscite statute.

The Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.*

articulated the following method in determining discriminatory purpose:

> Determining whether invidious discriminatory purpose was a motivating
> factor demands a sensitive inquiry into such circumstantial and direct
> evidence of intent as may be available. . . . The *historical background* of
> the decision is one evidentiary source, particularly if it reveals a series of
> official actions taken for invidious purposes. . . . The *specific sequence
> of events leading up the challenged decision* also may shed some light on
> the decisionmaker's purposes. Departures from the normal procedural
> sequence also might afford evidence that improper purposes are playing a
> role. . . . The *legislative or administrative history* may be highly
> relevant, *especially where there are contemporary statements by members
> of the decisionmaking body, minutes of its meetings, or reports*.

429 U.S. 252, 265-68 (1977) (emphasis added).

The court recognizes that the Guam Legislature articulated its intent in Public Law 25-

17

106, that the Plebiscite not be based on race. However, the court cannot ignore the specific

sequence of events leading up to the passage of that particular legislation. As discussed *supra*,

the legislation was passed into law immediately after the *Rice* decision. Further, the definition of

"Native Inhabitants of Guam" is nearly identical to the definition of "Native Chamorro"—a

facially race-based term—used in the Chamorro Land Trust Commission Act. The law also

provides that a "Native Chamorro" who has received or is preapproved for a CLTC lease be

automatically registered into the Guam Decolonization Registry, a registry maintained for the

purposes of the Plebiscite.

Further, aside from Ms. Muna Barnes' reference to the Plebiscite as a "Chamorro-only"

vote during the roundtable meeting, the legislative committee report reveals that there was a

common theme from the individuals who spoke at the meeting—that being that the Plebiscite is a

Chamorro-only vote and non-Chamorros should not be allowed to have a say in the Chamorro

self-determination process. *See* Legislative Committee Report on Bill No. 154-31 (COR) As

Substituted, Pl.'s Ex. I, ECF No. 105-10, at 73-100. Although the committee report that

contained this information was for Public Law No. 31-92 and not the committee report for Public

Law No. 25-106, the court cannot ignore the historical background and legislative history of the

Plebiscite as a whole. Public Law No. 31-92 is relevant to the Commission on Decolonization

legislation, having provided for the registration method and educational campaign programs for

the Plebiscite. *See* Pub. L. No. 31-92; Pl.'s Ex. I, ECF No. 105-10. In fact, the legislative body as

a whole referred to the self-determination as "Chamorro" self-determination, when it required

that the registration method and educational campaign programs for the Plebiscite were to be

developed in consultation with the "Commission on Decolonization for the Implementation and

Exercise of *Chamorro* Self Determination." *See id.*, §§ 1-3.

Defendants also argue that the discriminatory purpose must be the primary or dominant

18

factor in creating the legislation, citing to *Bush v. Vera*, 517 U.S. 952 (1996); and *Miller v. Johnson*, 515 U.S. 900 (1995). *See* Defs.' Opp'n., ECF No. 112, at 11. These cases are inapposite. Both *Vera* and *Miller* deal with the constitutionality of redistricting legislations. The Supreme Court explicitly recognized the complexity of electoral districting and thus placed a burden on the plaintiff to show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 913-16.

In this case, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and the Fifteenth Amendments to occur." *Velasquez v. City of Abilene,* 725 F.2d 1017, 1022 (5th Cir. 1984) (citing *Arlington Heights*, 429 U.S. at 265).

Based on the foregoing, the court finds that the Plebiscite law violates the Fifteenth Amendment.

### iii. The Plebiscite is an election within the meaning of the Fifteenth Amendment.

Defendants contend that the Plebiscite is not an election within the meaning of the Fifteenth Amendment because "no public official will be elected, nor will any issue of state law or policy be decided." *See* Defs.' Opp'n., ECF No. 112, at 13-14. Defendants argue that the Plebiscite's purpose is merely to ascertain the intent of the Native Inhabitants of Guam as to their future political relationship with the United States. *Id.* at 14. The court finds Defendants' argument to be without merit.

The U.S. Supreme Court has held that the Fifteenth Amendment includes "any election in which *public issues are decided* or public officials selected." *Terry v. Adams*, 345 U.S. 461, 468 (1953) (emphasis added). In this case, ascertaining the future political relationship of Guam to the United States is a public issue that affects not just the Native Inhabitants of Guam but rather,

19

the entire people of Guam. Every Guam resident otherwise qualified to vote can claim a profound interest in the outcome of the Plebiscite. The result of the Plebiscite will be transmitted to the President and Congress, as well as to the United Nations. *See* 1 Guam Code Ann. §2105. It is also very likely that the government of Guam and its political leaders will use the Plebiscite result as the starting point in working towards achieving the "Native Inhabitants of Guam's" desired political relationship with the United States. The Ninth Circuit recognized the important implications of the Plebiscite and noted that "[i]f the plebiscite is held, this would make it more likely that Guam's relationship to the United States would be altered to conform to that preferred outcome, rather than one of the other options presented in the plebiscite, or remaining a territory." *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015).

Accordingly, this court finds that the Plebiscite is an election that falls within the meaning of the Fifteenth Amendment.

**b. Guam law on voter qualification for the Plebiscite violates the Fourteenth Amendment's Equal Protection Clause.**

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV. The Equal Protection Clause of the Fourteenth Amendment applies to Guam. *See* 48 U.S.C. §1421b(u) ("The following provisions of and amendments to the Constitution of the United States are hereby extended to Guam . . . and shall have the same force and effect there as in the United States or in any State of the United States: . . . the second sentence of section 1 of the fourteenth amendment[.]").

"[T]he Equal Protection Clause demands that racial classifications . . . be subjected to the 'most rigid scrutiny.'" *Loving v. Virginia*, 388 U.S. 1, 11 (1967). Judicial review must begin from the position that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. University of Texas at Austin*, 133 S.Ct. 2411, 2419

20

(2013) (citations omitted). *See also Korematsu v. United States*, 323 U.S. 214, 216 (1944).

The law is well established that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Any racial classification will only be allowed if the government proves "that the reasons . . . are clearly identified and unquestionably legitimate." *Fisher*, 133 S.Ct. at 2419 (internal quotes and brackets omitted). In other words, racial classifications must be narrowly tailored to further compelling governmental interests. *Grutter v. Bollinger*, 123 S.Ct. 2325, 326 (2003).

In this case, Plaintiff's arguments are straight forward. First, Plaintiff alleges that Guam "has never come close to articulating a compelling state interest to justify its discriminatory voting scheme." Pl.'s Mem., ECF No. 104, at 22. Plaintiff contends that Guam's only reason for the Plebiscite is that "only Chamorros should have the right to vote in the Plebiscite and determine Guam's future political status." *Id.* at 23. Second, Plaintiff alleges that the classification cannot survive strict scrutiny because "its method of achieving its goal is not narrowly tailored." *Id.* at 24. Guam has not "explained why no race-neutral alternative to invoking the election machinery of the state could achieve its asserted goals." *Id.* (emphasis in original omitted).

Defendants, on the other hand, argue that the law is facially neutral, *i.e.*, the term "Chamorro" is not even used in the Plebiscite law defining Native Inhabitants of Guam. *See* Defs.' Opp'n., ECF No. 112 at 5-6. Therefore, Defendants argue that Plaintiff must prove discriminatory purpose in order for strict scrutiny to apply. *Id.* at 5, 12-13. Defendants urge the court to apply rational basis standard instead. *Id.* at 12-13, 19, 22-23. When reviewing statutes that deny some residents the right to vote, rational basis does not apply. *See Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 627-28 (1969). However, even assuming that

21

discriminatory purpose is necessary under the Fourteenth Amendment in cases such as this—where others are excluded and denied the right to register to vote—this court has already made a finding that discriminatory purpose exists under the Fifteenth Amendment and therefore finds it unnecessary to further discuss it under the Fourteenth Amendment.

In applying strict scrutiny, the court must carefully scrutinize whether each otherwise qualified voter "has, as far as is possible, an equal voice" in the Plebiscite. *Kramer*, 395 U.S. at 627. In *Cipriano v. City of Houma*, the Supreme Court explained that "whether the statute allegedly so limiting the franchise denies equal protection of the laws to those otherwise qualified voters who are excluded *depends on whether all those excluded are in fact substantially less interested or affected than those the statute includes*." 395 U.S. 701, 704 (1969) (internal quotes omitted) (emphasis added). Put simply, the racial classification must be narrowly tailored so that the exclusion of otherwise qualified voters is necessary to achieve the articulated state goal. *Kramer*, 395 U.S. at 632.

The Plebiscite statute "contains a classification which excludes otherwise qualified voters who are as substantially affected and directly interested in the matter voted upon as are those who are permitted to vote." *Cipriano*, 395 U.S. at 706. All Guam voters have a direct interest and will be substantially affected by any change to the island's political status—whether it be for statehood, wherein Guam will petition the United States to be admitted into statehood; or for independence, wherein Guam will sever its ties with the United States; or for free association, wherein Guam will be freely associated with the United States. As discussed *supra*, "[i]f the plebiscite is held, this would make it more likely that Guam's relationship to the United States would be altered to conform to that preferred outcome[.]" *Davis*, 785 F.3d at 1315. This change will affect not just the "Native Inhabitants of Guam," but every single person residing on this island. There is no evidence that all those excluded (the non-Native Inhabitants of Guam) are in

fact substantially *less* interested or affected than those the statute includes. *See Cipriano*, 395 U.S. at 704. Defendants have not shown that the exclusion of others is necessary to promote a compelling state interest.

Defendants maintain that the Plebiscite should only be for the Native Inhabitants of Guam because they are colonized people who have the right to self-determination. *See* Defs.' Opp'n., ECF No. 112, at 17-18. Defendants quoted *Akina v. Hawaii*, 141 F.Supp.3d 1106, 1132 (D. Haw. 2015), wherein in discussing strict scrutiny, the district court noted that the state of Hawaii has "a compelling interest in bettering the conditions of its indigenous people and, in doing so, providing dignity in simply allowing a starting point for a process of self-determination." *Id.* at 18-19. *Akina* involves an election organized by a non-profit corporation, whose purpose was to support efforts to achieve Native Hawaiian self-determination. 141 F.Supp.3d at 1111-18. Qualified voters for said election must be a "qualified Native Hawaiian." *Id.* at 1111-12. Despite the district court making a finding that strict scrutiny would be met because of the Hawaiian history and Hawaii's trust relationship with Native Hawaiians, the court found that the election did not violate the Equal Protection Clause, because there was no "state action." *Id.* at 1127-28, 1131.

This court will not entertain the strict scrutiny analysis provided in *Akina*, because *Akina* is a district court decision that has not been reviewed by an appellate court and is non-binding to this court. In addition, the instant case is distinguishable in that the Plebiscite statute was created by the Guam Legislature, and the election is going to be conducted by the Guam Election Commission (a Government of Guam entity) in an island-wide general election. *See* Pub. Law Nos. 25-106 and 27-106. Unlike *Akina*, the Plebiscite is a government-sanctioned election.

Next, Defendants maintain that limiting the Plebiscite to the "Native Inhabitants of Guam" would allow for the United States to uphold its "international obligations" to the native

inhabitants as colonized people.[16] *See* Defs.' Opp'n., ECF No. 112, at 17, 21. Defendants, however, failed to provide this court with any legal authority—whether it be international law or a binding international treaty or agreement—that allows for this court to disregard or circumvent the U.S. Constitution and the laws of the United States, so that the Plebiscite can proceed despite the racial classification.

The racial classification must fail strict scrutiny, because Defendants also have not shown that the government's method of achieving its goal is narrowly tailored. There are other alternatives for the government to determine the desires of the colonized people, who have the right to self-determination. For example, as discussed at the hearing, the government can consider less restrictive means, such as conducting a poll with the assistance of the University of Guam.

Accordingly, based on the discussion above, the court finds that the Plebiscite law violates the Equal Protection Clause of the Fourteenth Amendment.

### c. The *Insular Cases* Doctrine is not applicable in this case.

Defendants argue that "Plaintiff's attempt to characterize his ability to vote in the plebiscite as a 'fundamental' right is misguided from the start because the 'right to vote' does not necessarily mean the same thing in an unincorporated territory as it does in a state, or other integral part of the 'United States,'" citing to the *Insular Cases*. Defs.' Opp'n., ECF No. 112, at 19-23. The court finds Defendants' argument to have no merit.

"The *Insular Cases* held that United States Constitution applies in full to incorporated territories, but that elsewhere, absent congressional extension, only fundamental constitutional

---

[16] Defendants rely on authorities such as (1) the congressional reports surrounding the enactment of Guam's Organic Act, 1950 U.S.C.C.A.N. 2840, 2841; (2) the United Nations Resolution on "Plan of the Action for the Full Implementation of the Declaration of the Granting of Independence on Colonial Countries and Peoples," G.A. Res. 35/118, U.N. GAOR, 35th Sess., Supp. No. 48, at 21, U.N. Doc. AIRES/35/118 (1980); (3) *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804); and (4) the Restatement (Third) of Foreign Relations Law §114 (1987). *See* Defs.' Opp'n., ECF No. 112, at 12-21.

rights apply in the territory." *Davis*, 844 F.3d at 1095, citing *Wabol v. Villacrusis*, 958 F.2d

1450, 1459 (9th Cir. 1990), and *Boumediene v. Bush*, 553 U.S. 723, 756-57 (2008) (internal

quotation marks and brackets omitted). Congress has explicitly extended the Fifteenth

Amendment and the Equal Protection Clause of the Fourteenth Amendment to Guam when it

enacted the Organic Act of Guam. *See* 48 U.S.C. §1421b(u). Accordingly, Defendants' use of the

*Insular Cases* doctrine to support their argument in this case fails.

## V.    CONCLUSION

The court recognizes the long history of colonization of this island and its people, and the

desire of those colonized to have their right to self-determination. However, the court must also

recognize the right of others who have made Guam their home. The U.S. Constitution does not

permit for the government to exclude otherwise qualified voters in participating in an election

where public issues are decided simply because those otherwise qualified voters do not have the

correct ancestry or bloodline. Having found that the classification is racial, this court finds that

the Plebiscite statute impermissibly imposes race-based restrictions on the voting rights of non-

Native Inhabitants of Guam, in violation of the Fifteenth Amendment.

Further, the court also finds that the Plebiscite statute violates the Fourteenth

Amendment.

Because the Fifteenth and Fourteenth Amendments are clearly violated in this case, the

court need not address the statutory arguments (Voting Rights Act and Organic Act of Guam)

that were raised by Plaintiff.

The court hereby **ORDERS** the following:

(1) Plaintiff's Motion for Summary Judgment (ECF No. 103 and 104) is hereby
    **GRANTED**.[17]

---

[17] All other pending motions in this case are hereby **MOOT**.

(2) Defendant's Motion for Summary Judgment (ECF No. 106) is hereby **DENIED** as **MOOT**.[18]

(3) The court **PERMANENTLY ENJOINS** the Government of Guam and its officers, employees, agents, and political subdivisions from enforcing the Political Status Plebiscite (1 Guam Code Ann. § 2110) that specifically limits the voters to "Native Inhabitants of Guam" as defined in 3 Guam Code Ann. §21001(e), and any laws and regulations designed to enforce the Plebiscite law, insofar as such enforcement would prevent or hinder Plaintiff and other qualified voters who are not Native Inhabitants of Guam from registering for and voting in the Political Status Plebiscite.

(4) The Clerk is directed to enter judgment for Plaintiff.


**SO ORDERED.**



/s/ **Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Mar 08, 2017**

---

[18] Because Plaintiff's Motion Summary Judgment is granted, the court need not discuss Defendants' Motion for Summary Judgment.