**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARNOLD DAVIS, on behalf of himself and all others similarly situated, *Plaintiff-Appellee*, v. GUAM; GUAM ELECTION COMMISSION; ALICE M. TAIJERON; MARTHA C. RUTH; JOSEPH F. MESA; JOHNNY P. TAITANO; JOSHUA F. RENORIO; DONALD I. WEAKLEY; LEONARDO M. RAPADAS, *Defendants-Appellants.* | No. 17-15719 D.C. No. 1:11-cv-00035 OPINION |

Appeal from the United States District Court
for the District of Guam
Frances Tydingco-Gatewood, Chief District Judge,
Presiding

Argued and Submitted October 10, 2018
University of Hawaii Manoa

Filed July 29, 2019

Before: Kim McLane Wardlaw, Marsha S. Berzon,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Berzon

2                          DAVIS V. GUAM

# SUMMARY[*]

### Civil Rights / Fifteenth Amendment

The panel affirmed the district court's summary judgment in favor of plaintiff, a Guam resident, who challenged a provision of Guam's 2000 Plebiscite Law that restricted voting to "Native Inhabitants of Guam."

Guam's 2000 Plebiscite Law provided for a "political status plebiscite" to determine the official preference of the "Native Inhabitants of Guam" regarding Guam's political relationship with the United States. Plaintiff alleged, among other things, that the provision of that law restricting voting to "Native Inhabitants of Guam" constituted an impermissible racial classification in violation of the Fifteenth Amendment, which provides that the right of a United States citizen to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude.

The panel first rejected Guam's contention that the Fifteenth Amendment was inapplicable to the plebiscite because that vote will not decide a public issue but rather requires Guam to transmit the results of the plebiscite to Congress, the President and the United Nations. The panel held that despite its limited immediate impact, the results of the planned plebiscite commit the Guam government to take specified actions and thereby constitute a decision on a public issue for Fifteenth Amendment purposes.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel applied *Rice v. Cayetano*, 528 U.S. 495 (2000), and *Davis v. Commonwealth Election Comm'n*, 844 F.3d 1087 (9th Cir. 2016), which respectively invalidated laws in Hawaii and the Commonwealth of the Northern Mariana Islands limiting voting in certain elections to descendants of particular indigenous groups because those provisions employed ancestry as a proxy for race in violation of the Fifteenth Amendment. The panel held that Guam's 2000 Plebiscite Law suffered from the same constitutional flaw. The panel determined that history and context confirmed that the "Native Inhabitants of Guam" voter eligibility restriction so closely paralleled a racial classification as to be a proxy for race. The panel therefore concluded that its use as a voting qualification violated the Fifteenth Amendment as extended by Congress to Guam.

## COUNSEL

Julian Aguon (argued), Special Assistant Attorney General; Kenneth Orcutt, Deputy Attorney General; Office of the Attorney General, Tamuning, Guam; for Defendants-Appellants.

Lucas C. Townsend (argued); Douglas R. Cox, Gibson Dunn & Crutcher LLP, Washington, D.C.; J. Christian Adams, Election Law Center PLLC, Alexandria, Virginia; Michael E. Rosman, Center for Individual Rights, Washington, D.C.; Mun Su Park, Law Offices of Park & Associates, Tamuning, Guam; for Plaintiff-Appellee.

Dayna J. Zolle, Attorney; Civil Rights Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States.

4                           DAVIS V. GUAM

## OPINION

BERZON, Circuit Judge:

Guam's 2000 Plebiscite Law provides for a "political status plebiscite" to determine the official preference of the "Native Inhabitants of Guam" regarding Guam's political relationship with the United States. Guam Pub. L. No. 25-106 (2000). Our question is whether the provisions of that law restricting voting to "Native Inhabitants of Guam" constitutes an impermissible racial classification in violation of the Fifteenth Amendment.[1]

*Rice v. Cayetano*, 528 U.S. 495 (2000), and *Davis v. Commonwealth Election Comm'n*, 844 F.3d 1087 (9th Cir. 2016), respectively invalidated laws in Hawaii and the Commonwealth of the Northern Mariana Islands limiting voting in certain elections to descendants of particular indigenous groups because those provisions employed "[a]ncestry [as] a proxy for race" in violation of the Fifteenth Amendment. *Rice*, 528 U.S. at 514. Guam's 2000 Plebiscite Law suffers from the same constitutional flaw. History and context confirm that the "Native Inhabitants of Guam" voter eligibility restriction so closely parallels a racial classification as to be a proxy for race. Its use as a voting qualification therefore violates the Fifteenth Amendment as extended by Congress to Guam.

---

[1] Because we affirm the district court on Fifteenth Amendment grounds, we do not address Davis's arguments that the 2000 Plebiscite Law violates the Fourteenth Amendment, the Voting Rights Act, and the Organic Act of Guam.

## I

The factual background of this case is intertwined with the history of Guam (the "Territory"), of its indigenous people, and of its colonization. We recognize that this history, like history in general, is subject to contestation both as to exactly what happened in the past and as to the interpretation of even well-established facts. We do not attempt to settle those debates. "Our more limited role, in the posture of this particular case, is to recount events as understood by the lawmakers, thus ensuring that we accord proper appreciation to their purposes in adopting the policies and laws at issue." *Rice*, 528 U.S. at 500.

Guam has long been inhabited by an indigenous people, commonly referred to as Chamorro. *See* William L. Wuerch & Dirk Anthony Ballendorf, *Historical Dictionary of Guam and Micronesia* 40–44 (The Scarecrow Press, Inc. 1994); Developments in the Law, *Chapter Four: Guam and the Case for Federal Deference*, 130 Harv. L. Rev. 1704, 1722 (2017). Beginning in the sixteenth century, Spain colonized Guam. Then, in 1899, after the Spanish-American war, Spain ceded Guam to the United States through Article II of the 1898 Treaty of Paris. Until 1950, Guam remained under the control of the U.S. Navy, except for a Japanese occupation from 1941 through 1944. *See Guam v. Guerrero*, 290 F.3d 1210, 1214 (9th Cir. 2002). In 1950, responding to petitions from Guam's inhabitants, Congress passed the Organic Act of Guam. Pub. L. No. 81-630, 64 Stat. 384 (1950) (codified at 48 U.S.C. §§ 1421–24) ("Organic Act").

The Organic Act (1) designated Guam as an unincorporated territory of the United States subject to Congress's plenary power, 48 U.S.C. § 1421a; (2) established executive, legislative, and judicial branches of government for the Territory, *id.* §§ 1422–24, as well as a

limited Bill of Rights modeled after portions of the Bill of Rights in the Federal Constitution, *id.* § 1421b;[2] and (3) extended U.S. citizenship to three categories of people:

> (a)(1): All inhabitants of the island of Guam on April 11, 1899, including those temporarily absent from the island on that date, who were Spanish subjects, who after that date continued to reside in Guam or other territory over which the United States exercises sovereignty, and who have taken no affirmative steps to preserve or acquire foreign nationality[, and their children.]

> (a)(2): All persons born in the island of Guam who resided in Guam on April 11, 1899, including those temporarily absent from the island on that date, who after that date continued to reside in Guam or other territory over which the United States exercises sovereignty, and who have taken no affirmative steps to preserve or acquire foreign nationality[, and their children.]

> (b): All persons born in the island of Guam on or after April 11, 1899 . . . Provided, That in the case of any person born before the date of enactment of [the Organic Act], he has

---

[2] Absent an act of Congress, federal constitutional rights do not automatically apply to unincorporated territories. *Guerrero*, 290 F.3d at 1214. In 1968, Congress amended the Organic Act to extend certain federal constitutional rights to Guam, including the Fifteenth Amendment. *See* 48 U.S.C. § 1421b(u).

taken no affirmative steps to preserve or
acquire foreign nationality.

8 U.S.C. § 1407 (1952), *repealed by* Pub. L. No. 82-414,
§§ 101(a)(38), 301(a)(1) 66 Stat. 163, 171, 235 (1952)
(codified at 8 U.S.C. §§ 1101(a)(38), 1401(a)).

According to the 1950 Census—which derived its racial
categories from "that which is commonly accepted by the
general public"—the Chamorro population comprised the
single largest racial group in Guam at the time (45.6%). *See*
U.S. Bureau of the Census, *Census of Population: 1950*, Vol.
II at 54–46 tbl. 36 (1953) ("1950 Census"). The second
largest racial group was White (38.5%), and the rest of the
population was Filipino, Chinese, or other races. Virtually
all non-Chamorro people residing in the Territory were
either already U.S. citizens (99.4% of all Whites were U.S.
citizens) or were born outside the jurisdiction of the United
States and therefore likely not citizens by authority of the
Organic Act (e.g., 94.4% of Filipinos were non-citizens). As
of 1950, 98.6% of all non-citizens in Guam were Chamorro.
*Id.* at 54–49 tbl. 38.

The citizenship provisions of the Organic Act were in
force for less than two years. In 1952, Congress enacted the
Immigration and Nationality Act of 1952 ("INA"), which,
among other things, repealed the citizenship provisions of
the Organic Act, *see* Pub. L. No. 82-414, § 403(a)(42), 66
Stat. 163, 280, and conferred U.S. citizenship on all persons
born in Guam after passage of the new INA. *See id.*
§§ 101(a)(38), 301(a)(1), 66 Stat. 163, 171, 235 (codified at
8 U.S.C. §§ 1101(a)(38), 1401(a)).

In the decades following passage of the Organic Act,
some of Guam's inhabitants continued to advocate for more
political autonomy. Those efforts eventually resulted in,

among other things, "An Act to Establish the Chamorro
Registry," enacted by the Guam legislature in 1996. Guam
Pub. L. No. 23-130, § 1 (codified as amended at 3 Guam
Code Ann. §§ 18001–31) ("Registry Act"), *repealed in part
by* Guam Pub. L. No. 25-106 (2000). The Registry Act
created a registry of "Chamorro individuals, families, and
their descendants." *Id*. § 1. It referred to the "Chamorro" as
the "indigenous people of Guam" who possess "a distinct
language and culture." *Id*.[3] The Act's stated purpose was for
the registry to "assist in the process of heightening local
awareness among the people of Guam of the current struggle

---

[3] Another section of the Registry Act defined "Chamorro":

(a)  Chamorro means those persons defined by
the U.S. Congress in Section IV of the Organic
Act of Guam . . . and their descendants:

(1)  All inhabitants of the island of Guam on
April 11, 1899, including those temporarily
absent from the island on that date, who were
Spanish subjects, who after that date
continued to reside in Guam or other territory
over which the United States exercises
sovereignty, and have taken no affirmative
steps to preserve or acquire foreign
nationality; and

(2)  All persons born in the island of Guam,
who resided in Guam on April 11, 1899,
including those temporarily absent from the
island on that date, who after that date
continued to reside in Guam or other territory
over which the United States exercises
sovereignty, and who have taken no
affirmative steps to preserve or acquire
foreign nationality.

Registry Act § 20001(a).

for Commonwealth, of the identity of the indigenous
Chamorro people of Guam, and of the role that Chamorros
and succeeding generations play in the island's cultural
survival and in Guam's political evolution towards self-
government." *Id.*

One year later, the Guam legislature established the
"Commission on Decolonization for the Implementation and
Exercise of Chamorro Self-Determination," Guam Pub. L.
No. 23-147 (1997) (codified at 1 Guam Code Ann. §§ 2101–
15) ("1997 Plebiscite Law"), *repealed in part by* Guam Pub.
L. No. 25-106 (2000). The Legislature established the
Commission on Decolonization "in the interest of the will of
the people of Guam, desirous to end colonial discrimination
and address long-standing injustice of [the Chamorro]
people." *Id*. § 1. The purpose of the Commission on
Decolonization was to "ascertain the desire of the Chamorro
people of Guam as to their future political relationship with
the United States." *Id*. § 5. It was charged with writing
position papers on the political status options for Guam and
with conducting a public information campaign based on
those papers. *Id*. §§ 6–9. The 1997 Plebiscite Law also called
for a "political status plebiscite" during the next primary
election, in which voters would be asked:

> In recognition of your right to self-
> determination, which of the following
> political status options do you favor?
>
> 1.  Independence
>
> 2.  Free Association
>
> 3.  Statehood

*Id*. § 10. Voting in the plebiscite was to be limited to "Chamorro People," defined as "[a]ll inhabitants of Guam in 1898 and their descendants who have taken no affirmative steps to preserve or acquire foreign nationality." *Id*. §§ 2(b), 10. The Commission on Decolonization was then directed to "transmit [the results of the plebiscite] to the President and Congress of the United States and the Secretary General of the United Nations." *Id*. § 5.

Before the planned date of the self-determination plebiscite, the Supreme Court in *Rice v. Cayetano* invalidated a Hawaii law restricting the right to vote in certain elections to "Hawaiians," defined as the descendants of people inhabiting the Hawaiian Islands in 1778. 528 U.S. at 499. A month after *Rice* was decided, the Guam legislature enacted the law at issue in this case. Guam Pub. L. No. 25-106 (2000) (codified at 3 Guam Code Ann. §§ 21000–31, 1 Guam Code Ann. §§ 2101–15) ("2000 Plebiscite Law").

The 2000 Plebiscite Law contains several interrelated provisions: First, it leaves the Registry Act intact and creates a separate "Guam Decolonization Registry" in which those voters qualified for the new political status plebiscite would be listed.[4] 3 Guam Code Ann. §§ 21000, 21026. Those

---

[4] The 2000 Plebiscite Law modified the definition of "Chamorro" in the Registry Act, to the following:

(a)  '*Chamorro*' shall mean:

(1)  all inhabitants of the Island of Guam on April 11, 1899, including those temporarily absent from the Island on that date and who were Spanish subjects; *and*

qualified to register, and therefore to vote, in the plebiscite must be "Native Inhabitants of Guam," defined as "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Organic Act of Guam and descendants of those persons." *Id*. § 21001(e).

Second, the 2000 Plebiscite Law retains the Commission on Decolonization but amends portions of the 1997 Plebiscite Law to replace all references to "Chamorro" with "Native Inhabitants of Guam." 1 Guam Code Ann. §§ 2101–02, 2104–05, 2110. As revised, the law establishing a new plebiscite provides:

> The general purpose of the Commission on Decolonization shall be to ascertain the intent of the Native Inhabitants of Guam as to their future political relationship with the United States of America. Once the intent of the Native Inhabitants of Guam is ascertained, the Commission shall promptly transmit that desire to the President and the Congress of

---

(2)  all persons born on the Island of Guam *prior* to 1800, and their *descendants*, who resided on Guam on April 11, 1899, including those temporarily absent from the Island on that date, and their descendants;

(i)  '*descendant*' means a person who has proceeded by birth, such as a child or grandchild, to the remotest degree, from any *'Chamorro'* as defined above, and who is considered placed in a line of succession from such ancestor where such succession is by virtue of blood relations.

2000 Plebiscite Law § 12.

the United States of America, and to the Secretary General of the United Nations.

*Id.* § 2105.

Finally, the 2000 Plebiscite Law states that "[t]he intent of [the law] shall *not* be construed nor implemented by the government officials effectuating its provisions to be race based, but founded upon the classifications of persons as defined by the U.S. Congress in the 1950 Organic Act of Guam." 3 Guam Code Ann. § 21000. Rather, the intent of the law is "to permit the native inhabitants of Guam, as defined by the U.S. Congress' 1950 Organic Act of Guam to exercise the inalienable right to self-determination of their political relationship with the United States of America," as that "right has never been afforded." *Id.*

One subsequent amendment to the plebiscite relevant to this case followed. In 2010, the Guam legislature passed a law providing that individuals who received or had been preapproved for a Chamorro Land Trust Commission ("CLTC") property lease would be automatically registered in the Guam Decolonization Registry. Guam Pub. L. No. 30-102, § 21002.1 (codified at 3 Guam Code Ann. § 21002.1). The CLTC was created in 1975 to administer leases for lands that the United States had seized from Guam inhabitants during and after World War II and had later returned to the Guam government. *See* Guam Pub. L. 12-226 (codified as amended at 21 Guam Code Ann. §§ 75101–75125). Persons eligible to receive CLTC leases must be "Native Chamorros," defined as "any person who became a U.S. citizen by virtue of the authority and enactment of the Organic Act of Guam or descendants of such person." 21 Guam Code Ann. §§ 75101(d), 75107(a).

Arnold Davis, a non-Chamorro resident of Guam, sought to register for the Guam Decolonization Registry and thereby to qualify as a voter in the plebiscite. He was denied registration because he did not meet the definition of "Native Inhabitant of Guam." Davis filed suit in 2011, challenging the 2000 Plebiscite Law on grounds that it violated the Fourteenth and Fifteenth Amendments of the Constitution, the Voting Rights Act of 1965, and the Organic Act.

At the time the suit was filed, the plebiscite had not yet occurred, and no date was set for it to take place. *Davis v. Guam*, Civil Case No. 11-00035, 2013 WL 204697, *2–3 (D. Guam 2013) ("*Davis I*"). Relying on the uncertain timing of the plebiscite, the district court initially dismissed the case for lack of standing and ripeness. *Id*. at *9. We reversed that dismissal on appeal, holding that Davis's alleged unequal treatment was a sufficient injury to establish standing and that his claim was ripe because he adequately alleged that he was "currently being denied equal treatment under Guam law." *Davis v. Guam*, 785 F.3d 1311, 1315–16 (9th Cir. 2015) ("*Davis II*").

After remand to the district court the parties filed cross-motions for summary judgment. The district court granted Davis's motion for summary judgment and permanently enjoined Guam from conducting a plebiscite restricting voters to Native Inhabitants of Guam. *Davis v. Guam*, No. CV 11-00035, 2017 WL 930825, at *1 (D. Guam 2017) ("*Davis III*").

The district court concluded, first, that the plebiscite was an election for Fifteenth Amendment purposes because the result of the vote would decide a public issue. *Id*. at *11. Next, the court determined that although "Native Inhabitants of Guam" is not an explicit racial classification, the history and structure of the 2000 Plebiscite Law reveal that "the very

14          Davis v. Guam

object of the statutory definition in question here . . . is to treat the Chamorro people as a 'distinct people.'" *Id*. at *8 (quoting *Rice*, 528 U.S. at 515). The 2000 Plebiscite Law therefore used "ancestry as a proxy for race," the district court held, in violation of the Fifteenth Amendment. *Id*.

The court also decided that the 2000 Plebiscite Law violated the Equal Protection Clause of the Fourteenth Amendment. Applying strict scrutiny, the court held the law was not narrowly tailored to a compelling state interest as all inhabitants of Guam, not just its "Native Inhabitants," have an interest in the results of the plebiscite. *Id*. at *12–*14. The district court concluded that less restrictive alternatives exist, including "conducting a poll with the assistance of the University of Guam." *Id*. at *14.

This appeal followed. "We review a district court's decision on cross motions for summary judgment *de novo*." *Commonwealth Election Comm'n*, 844 F.3d at 1091.

## II

Congress has provided that the Fifteenth Amendment "shall have the same force and effect [in Guam] as in the United States." 48 U.S.C. § 1421b(u); *accord Davis II*, 785 F.3d at 1314 n.2. That Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. The Fifteenth Amendment is "comprehensive in reach," and applies to "any election in which public issues are decided or public officials selected." *Rice*, 528 U.S. at 512, 523 (quoting *Terry v. Adams*, 345 U.S. 461, 468 (1953)).

Guam argues that the Fifteenth Amendment is inapplicable to the plebiscite because that vote will not *decide* a public issue. It notes that the 2000 Plebiscite Law requires Guam to transmit the results of the plebiscite to Congress, the President, and the United Nations but will not, itself, create any change in the political status of the Territory. That is so. But, despite its limited immediate impact, the results of the planned plebiscite commit the Guam government to take specified actions and thereby constitute a decision on a public issue for Fifteenth Amendment purposes.

We begin by noting that any suggestion that the Fifteenth Amendment be read restrictively should be viewed with skepticism. The right to vote is foundational in our democratic system. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Protecting the franchise is "preservative of all rights," because the opportunity to participate in the formation of government policies defines and enforces all other entitlements. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). For that reason, the Fifteenth Amendment is "comprehensive in reach." *Rice*, 528 U.S. at 512. The text of the Fifteenth Amendment states broadly that the right "to vote" shall not be denied. U.S. Const. amend. XV, § 1. It does not qualify the meaning of "vote" in any way. In light of the text and the unique importance of the Fifteenth Amendment, where there is any doubt about the Fifteenth Amendment's boundaries we err on the side of inclusiveness.

We have no need here to define the precise contours of what it means to "decide" a "public issue" under the Fifteenth Amendment. *See Rice*, 528 U.S. at 523. It is at least clear that the Amendment includes any government-held election in which the results commit a government to a particular course of action. That requirement is met here.

First, the issue the 2000 Plebiscite Law would decide is public in nature. A basic premise of our representative democracy is "the critical postulate that sovereignty is vested in the people." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 794 (1995). Because the government "derives all its powers directly or indirectly from the great body of the people," *The Federalist No. 39*, at 241 (James Madison) (Clinton Rossiter ed., 1961), the government necessarily exercises authority on behalf of the public when it acts. In that sense, its actions are of public concern.

The Supreme Court acknowledged this foundational principle in *Terry v. Adams*, which addressed a related question—whether an election held by a private organization constituted state action for purposes of the Fifteenth Amendment. *Terry* held that the Jaybird Democratic Association's primary elections, which functionally determined the Democratic Party's candidates for public office in a Texas county, violated the Fifteenth Amendment by excluding black voters. 345 U.S. at 470 (plurality opinion). The Court concluded that although the Jaybird primaries were private in the sense that they were conducted by a private entity, they served a public function because they chose candidates for public office. The Jaybird primaries were therefore covered by the Fifteenth Amendment. *Id*. at 469–70.

A plurality of the Court explained this conclusion as follows: "Clearly the [Fifteenth] Amendment includes any

election in which public issues are decided or public officials selected. Just as clearly the Amendment excludes social or business clubs." *Id.* at 468–69. Decades later, the *Rice* majority adopted the formulation of the *Terry* plurality—that the Fifteenth Amendment applies to "any election in which public issues are decided or public officials selected." 528 U.S. at 523 (quoting *Terry*, 345 U.S. at 468). This focus is confirmed by another passage in the *Terry* plurality opinion on which *Rice* relied. That passage specified that the Fifteenth Amendment establishes a right "not to be discriminated against as voters in elections to determine *public governmental policies* or to select public officials, national, state, or local." *Id.* at 514 (emphasis added) (quoting *Terry*, 528 U.S. at 467).

In this case, the 2000 Plebiscite Law prescribes that the Commission on Decolonization—a governmental body—will make an official transmission to Congress, the President, and the United Nations, and the results of the plebiscite will determine the content of the message transmitted. *See* 1 Guam Code Ann. § 2105. What a governmental body will communicate to other governmental entities is assuredly a "public issue"—a matter of "governmental polic[y]." *Terry*, 345 U.S. at 467–68.

Second, the election called for by the 2000 Plebiscite Law commits Guam to a particular course of action: A governmental commission with prescribed duties would be bound to transmit the result of the plebiscite to the federal government and to the United Nations. By requiring the transmission of the plebiscite results, the 2000 Plebiscite Law mandates that the Commission on Decolonization take a public stance in support of the result. 3 Guam Ann. Code § 21000 ("It is the purpose of this legislation to seek the desires to those peoples who were given citizenship in 1950

and to use this knowledge to further petition Congress and other entities to achieve the stated goals."). So, regardless of whether the result of the plebiscite ultimately affects the political status of Guam, the plebiscite will "decide" a public issue—what position a governmental entity will advocate before domestic and international bodies.

The plebiscite therefore will both concern a "public issue"—Guam's official communication with other governmental bodies—and "decide" it, in that it will commit a governmental body to communicate the position determined by the plebiscite. Given these two features, the election is, under *Rice*, subject to the Fifteenth Amendment's protection against racial restrictions on the right to vote.

Were this plebiscite not covered by the Fifteenth Amendment, the scope of the Amendment's prohibition on race-based voting restrictions in elections would be significantly narrowed. Elections regularly require a governmental body to take a stance on issues even though there may be no on-the-ground changes in policy. For example, state initiatives sometimes authorize permission to make a policy change, but the actual policy change is contingent on future occurrences. *See, e.g.*, Proposition 7, Assemb. B. 807, 2017–2018 Leg., Reg. Sess. (Cal. 2018) (allowing the state legislature to vote to change daylight savings time, if the change is allowed by the federal government).[5] Moreover, in presidential elections, political

---

[5] State statutory and constitutional limits govern what propositions can be the subject of state initiatives or referenda. *See, e.g.*, *Am. Fed'n of Labor v. Eu*, 36 Cal. 3d 687, 703 (1984) (holding that a state initiative requiring the legislature to enact a resolution which did not itself change California law exceeded scope of the initiative power under the California Constitution); *Harper v. Waltermire*, 213 Mont. 425, 428 (1984) (same with respect to Montana initiative under the Montana

parties in several states employ nonbinding primaries, in which primary voters may express their preference for a candidate but the delegates to a party's national convention are not, technically, bound by that preference. *See* Nathaniel Persily, *Candidates v. Parties: The Constitutional Constraints on Primary Ballot Access Laws*, 89 Geo. L.J. 2181, 2219 n.127 (2001).[6] Concluding that the Fifteenth Amendment only applies to elections triggering an immediate substantive action would exempt a broad category of elections from Fifteenth Amendment protection.

We hold that Guam's 2000 Plebiscite Law is subject to the requirements of the Fifteenth Amendment.

## III

We turn to the core of the Fifteenth Amendment issue: Does the 2000 Plebiscite Law deny citizens the right to vote "on account of race?" U.S. Const. amend. XV, § 1.[7]

---

Constitution). Those limits are distinct from the question of whether the Fifteenth Amendment applies if an initiative or referendum *is* held.

[6] We do not decide whether these elections are definitively subject to the requirements of the Fifteenth Amendment. We note them only as examples of the type of elections that might be affected if the Fifteenth Amendment applied only to elections that triggered immediate substantive outcomes.

[7] We address only the constitutionality of the plebiscite under Section 1 of the Fifteenth Amendment. Our opinion affects neither Congress's power under Section 2 to enact appropriate legislation enforcing the Amendment nor the analysis of voting restrictions under the Fourteenth Amendment, which may be subject to heightened scrutiny rather than an absolute bar. *See, e.g.*, *Harper*, 383 U.S. at 667 (holding that poll taxes in elections must be "carefully and meticulously scrutinized" under the Equal Protection Clause (citation omitted)).

The Fifteenth Amendment's prohibition on race-based voting restrictions is both fundamental and absolute. *See Shaw v. Reno*, 509 U.S. 630, 639 (1993). As "[t]here is *no room* under the Amendment for the concept that the right to vote in a particular election can be allocated based on race," the levels of scrutiny applied to other constitutional restrictions are not pertinent to a race-based franchise limitation. *Rice*, 528 U.S. at 523 (emphasis added). This clear-cut rule reflects the importance of the franchise as "the essence of a democratic society" and recognizes that "any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555.

Moreover, the Fifteenth Amendment applies with equal force regardless of the particular racial group targeted by the challenged law. Although originally enacted to guarantee emancipated slaves the right to vote after the Civil War, the generic language of the Fifteenth Amendment "transcend[s] the particular controversy which was the immediate impetus for its enactment." *Rice*, 528 U.S. at 512. The Amendment's prohibition on racial discrimination "grants protection to all persons, not just members of a particular race." *Id*. Its "mandate of neutrality" is thus straightforward and universal: "If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be" permitted to vote as well. *Id*. (quoting *United States v. Reese*, 92 U.S. 214, 218 (1875)).

Determining whether a law discriminates "on account of race" is not, however, always straightforward. Voting qualifications that, by their very terms, draw distinctions based on racial characteristics are of course prohibited. *See Nixon v. Herndon*, 273 U.S. 536 (1927); *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (collecting cases).

But "[t]he (Fifteenth) Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Gomillion v. Lightfoot*, 364 U.S. 339, 342 (1960) (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)). So, in addition to facial racial distinctions, classifications that are race neutral on their face but racial by design or application violate the Fifteenth Amendment.

The well-established hallmarks of such discrimination for constitutional purposes are discriminatory intent, *see Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997); *City of Mobile v. Bolden*, 446 U.S. 55, 62–63 (1980) (plurality opinion), and discriminatory implementation, *see Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 53 (1959) ("Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot.").

One category of facially neutral restrictions that runs afoul of the Fifteenth Amendment is a classification so closely intertwined with race that it is a "proxy for race," as the Supreme Court found to be the case in *Rice*, 528 U.S. at 514. *Rice* addressed a voting qualification in statewide elections for the trustees of the Office of Hawaiian Affairs, a state agency that administers programs for the benefit of descendants of Native Hawaiians. *Id.* at 498–99. The Hawaii Constitution limited voting in those elections to "Hawaiians," defined by statute as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." *Id.* at 509 (quoting Haw. Rev. Stat. § 10-2). *Rice* held that the Hawaiian voting restriction was racial "in purpose and operation." *Id.* at 516. It reasoned as follows:

Ancestry can be a proxy for race. It is that
proxy here. . . . For centuries Hawaii was
isolated from migration. The inhabitants
shared common physical characteristics, and
by 1778 they had a common culture. Indeed,
the drafters of the statutory definition in
question emphasized the "unique culture of
the ancient Hawaiians" in explaining their
work. The provisions before us reflect the
State's effort to preserve that commonality of
people to the present day. In the
interpretation of the Reconstruction era civil
rights laws we have observed that "racial
discrimination" is that which singles out
"identifiable classes of persons . . . solely
because of their ancestry or ethnic
characteristics." *Saint Francis Coll. v. Al-
Khazraji*, 481 U.S. 604, 613 (1987). The very
object of the statutory definition in question
and of its earlier congressional counterpart in
the Hawaiian Homes Commission Act is to
treat the early Hawaiians as a distinct people,
commanding their own recognition and
respect. The State, in enacting the legislation
before us, has used ancestry as a racial
definition and for a racial purpose.

*Id.* at 514–15 (second alteration in original) (citations
omitted).

To confirm its conclusion, *Rice* looked to the history of
the "Hawaiian" definition at issue and determined that
previously proposed versions of the qualification had
expressly referred to "Hawaiians" as a race. *Id.* at 515–516.
The Court concluded that removal of the "race" reference

did not change the classification of individuals allowed to vote in the election. The voter qualification therefore remained race-based although it no longer proclaimed as such. *Id*. at 516. *Rice* provides key guidance for determining whether the 2000 Plebiscite Law's restriction of the vote to "Native Inhabitants of Guam" is race-based.

## A

Our first inquiry is whether, as Davis maintains, *Rice* held *all* classifications based on ancestry to be impermissible proxies for race. It did not.

The Supreme Court selected its words carefully when it struck down the voting restrictions at issue in *Rice*. It stated that "[a]ncestry *can* be a proxy for race" in the context of the Fifteenth Amendment, not that it always is. *Id*. at 514 (emphasis added).

The Court's determination that the challenged voting qualification's use of ancestry "is that proxy here," *id*., rested on the historical and legislative context of the particular classification at issue, not on the categorical principle that all ancestral classifications are racial classifications. The Court focused specifically on the fact that in 1778, the individuals inhabiting the Hawaiian Islands were a "distinct people" with common physical characteristics and shared culture. *Id*. at 515. Limiting the franchise to descendants of that distinct people, the Court reasoned, singled out individuals for special treatment based on their "ethnic characteristics and cultural traditions." *Id*. at 515, 517. *Rice* buttressed that conclusion with evidence from the legislative history of the challenged statute, which referred to "Hawaiians" as a "race." *Id*. at 516. In other words, the Court recognized that ancestral tracing can be *a* characteristic of a racial classification, but is not itself always sufficient to identify

such a classification. And it concluded that the ancestral classification at issue was problematic because it operated as a race-based voting restriction. If the Court had meant to suggest that *all* classifications based on ancestry were impermissible, it would have had no need to examine the unique history of the descendants allowed to vote under the challenged law.

Davis contends that one sentence in *Rice* indicates otherwise—that all ancestry classifications are impermissible racial classifications: "'[R]acial discrimination' is that which singles out 'identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics.'" *Id*. at 515 (second alteration in original) (quoting *Saint Francis Coll.*, 481 U.S. at 613). But that interpretation wrenches the sentence in *Rice* from its context. *Rice* quoted *Saint Francis Coll.* to support its conclusion that the *specific* classification at issue in *Rice* was a racial classification.[8] After an exhaustive account of Hawaii's

---

[8] *Saint Francis Coll.* does not suggest that all ancestral classifications are racial ones either. That case addressed whether discrimination based specifically on "Arabian ancestry" constituted racial discrimination for purposes of 42 U.S.C. § 1981. 481 U.S. at 607. After recounting the legislative history of § 1981 and the understanding of race at the time the statute was passed in 1870, the Court concluded the following:

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory. [Section] 1981, at a minimum, reaches

history, the Court determined that the voter eligibility
classification singled out persons solely because of their
ancestral relationship to a culturally and ethnically distinct
population, and went on to conclude that "[a]ncestral tracing
*of this sort* achieves its purpose by creating a legal category
which employs the same mechanisms, and causes the same
injuries, as laws or statutes that use race by name." *Id*. at 517
(emphasis added). Nowhere did the Court suggest that
classification by ancestry alone was sufficient to render the
challenged classification a racial one.

## B

*Rice* did not go on to explain further the connection
between ancestry and race, or to explain what it meant by
"ethnic characteristics and cultural traditions." *Id*. And
modern courts have generally resisted defining with
precision the legal concept of race and more specifically, the
relationship between ancestry and the legal concept of race.

Racial categories were once thought to be grounded in
biological fact, but shifting understandings of which groups
constitute distinct races throughout history reveal such
categories to be "social construct[s]," the boundaries of
which are subject to contestation and revision. *Ho ex rel. Ho
v. S.F. Unified Sch. Dist.*, 147 F.3d 854, 863 (9th Cir. 1998);

---

discrimination against an individual because he or she
is genetically part of an ethnically and
physiognomically distinctive sub-grouping of *homo
sapiens*. It is clear from our holding, however, that a
distinctive physiognomy is not essential to qualify for
§ 1981 protection.

*Id*. at 613 (footnotes and internal quotation marks omitted).

*see also Saint Francis Coll.*, 481 U.S. at 610 n.4; *United States v. Nelson*, 277 F.3d 164, 176 n.12 (2d Cir. 2002).[9] Still, as a legal concept, a racial category is generally understood as a group, designated by itself or others, as socially distinct based on perceived common physical, ethnic, or cultural characteristics. So, for example, *Abdullahi v. Prada USA Corp.* stated that "[a] racial group as the term is generally used in the United States today is a group having a common ancestry and distinct physical traits," 520 F.3d 710, 712 (7th Cir. 2008), a definition also reflected in a federal statute outlawing genocide. *See* 18 U.S.C. § 1093(6) ("[T]he term 'racial group' means a set of individuals whose identity as such is distinctive in terms of physical characteristics or biological descent."). *Saint Francis Coll.* held that racial discrimination includes discrimination based on "ethnic characteristics," 481 U.S. at 612–613, and *Rice* emphasized that the "unique culture of the ancient Hawaiians," combined with their common ancestry—that is, biological descent—distinguished them as a race. 528 U.S.

---

[9] Examples of this contestation and revision have at times reached our highest court. In the early twentieth century, the Supreme Court decided a number of cases delineating who qualified as white and were therefore afforded its privileges. In *Ozawa v. United States*, 260 U.S. 178 (1922), the Court held that a man of the "Japanese race born in Japan" was not a "white person" and therefore was not qualified to be naturalized under the country's then-racially restrictive naturalization laws. It reasoned that the term "white person" was synonymous with the "Caucasian race." *Id.* at 189, 197–98. A year later, the Court, however, held that a man of South Asian descent born in India did not qualify as a "white person" despite acknowledging that many scientific authorities at the time considered South Asians to be members of the Caucasian race. *United States v. Thind*, 261 U.S. 204, 210–15 (1923); *see also Gong Lum v. Rice*, 275 U.S. 78 (1927) (upholding a state court ruling requiring an American citizen of Chinese descent to attend school for "colored" children and not for white children).

at 514–15.[10] These various concepts remain somewhat distinct, but all embrace the core concept of a group of people distinguished based on certain identifiable traits.

Just as race is a difficult concept to define, so is ancestry's precise relationship to race. Ancestry identifies individuals by biological descent. *See Ancestry*, *Black's Law Dictionary* (10th ed. 2014) ("A line of descent; collectively, a person's forebears; lineage."); *Ancestor*, *Oxford English Dictionary* (2d ed. 1989) ("One from whom a person is descended, either by the father or mother; a progenitor, a forefather."). Racial categories often *incorporate* biological descent, as the mechanism through which present day individuals viewed as a distinct group are thought to be connected to an earlier set of individuals with identifiable physical, ethnic, or cultural characteristics. For example, state laws mandating the enslavement and later segregation and subjugation of African Americans identified them by the percentage of blood they possessed from African American ancestors. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 5 n.4 (1967); *Plessy v. Ferguson*, 163 U.S. 537, 552 (1896); Neil Gotanda, *A Critique of "Our Constitution Is Color-Blind,"*

---

[10] *See also Hernandez v. State of Tex.*, 347 U.S. 475, 478 (1954) ("Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact."); D. Wendy Greene, *Title VII: What's Hair (and Other Race-Based Characteristics) Got to Do With It?*, 79 U. Colo. L. Rev. 1355, 1385 (2008) ("Race includes physical appearances and behaviors that society, historically and presently, commonly associates with a particular racial group, even when the physical appearances and behavior are not 'uniquely' or 'exclusively' 'performed' by, or attributed to a particular racial group.").

44 Stan. L. Rev. 1, 24 n.94 (1991). Until 1952, Congress imposed racial restrictions on who could be naturalized as citizens. *See* 8 U.S.C. § 703 (repealed 1952). Among those eligible for naturalization were "white persons, persons of African nativity or descent, and persons who are descendants of races indigenous to the continents of North or South America," as well as those with a "preponderance of blood" from those groups. *Id.* § 703(a)(1), (2). Race and ancestry thus frequently overlap or are treated as equivalents by courts. *See, e.g.*, *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection.").

But ancestry and race are not identical legal concepts. State and federal laws are replete with provisions that target individuals based on biological descent without reflecting racial classifications. These include laws of intestate succession, *see, e.g.*, Ariz. Rev. Stat. § 14-2103 (requiring passing of property based on lineage in the absence of a surviving spouse); Cal. Prob. Code §§ 240, 6402 (same); Unif. Prob. Code § 2-103 (Nat'l Conference of Comm'rs on Unif. State Laws 2010) (same); *see also Hodel v. Irving*, 481 U.S. 704, 716 (1987) ("In one form or another, the right to pass on property—to one's family in particular—has been part of the Anglo-American legal system since feudal times."); citizenship, *see, e.g.*, 8 U.S.C. §§ 1431, 1433 (conferring citizenship on children born outside the United States if at least one parent is a U.S. citizen); *id.* § 1153 (immigrant visa preferences for children of U.S. citizens and lawful permanent residents); and child custody laws, *see, e.g.*, Haw. Rev. Stat. § 571-46(7) (providing visitation

privileges for "parents, grandparents, and siblings" of child). As Justice Stevens observed in his dissent in *Rice*, "There would be nothing demeaning in a law that established a trust to manage Monticello and provided that the descendants of Thomas Jefferson should elect the trustees." 528 U.S. at 545 & n.16.[11]

Moreover, the Supreme Court has squarely rejected any categorical equivalence between ancestry and racial categorization. *Morton v. Mancari*, 417 U.S. 535 (1974), upheld a Bureau of Indian Affairs hiring preference for "Indians," defined as an individual possessing "one-fourth or more degree Indian blood and be a member of a Federally-recognized tribe." 417 U.S. at 553 n.24. Although the hiring preference classified individuals based on biological ancestry, the Supreme Court concluded that the classification was "political rather than racial in nature." *Id. Mancari* determined that the hiring preference treated "Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities," stressing the "unique legal status of Indian tribes under federal law and . . . the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes." *Id.* at 551, 554.

Since *Mancari*, the Supreme Court and our court have reaffirmed ancestral classifications related to American Indians without suggesting that they constitute racial classifications. *See Del. Tribal Bus. Comm. v. Weeks*,

---

[11] *See also* Sarah Krakoff, *They Were Here First: American Indian Tribes, Race, and the Constitutional Minimum*, 69 Stan. L. Rev. 491, 496 n.21 (2017) (collecting "laws [that] recognize and honor ancestry" outside the Indian law context).

430 U.S. 73, 79 n.13, 89 (1977); *United States v. Zepeda*, 792 F.3d 1103, 1110 (9th Cir. 2015) (en banc); *see also Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 851–52 (9th Cir. 2006) (en banc) (Fletcher, J., concurring) (listing federal laws concerning Indians that rely on ancestry); Krakoff, *supra*, at 501 (explaining that American Indian tribal status "assumes ancestral ties to peoples who preceded European (and then American) arrival"). This well-settled law regarding classifications of American Indians confirms that not all ancestral classifications are racial ones.

In sum, biological descent or ancestry is often a feature of a race classification, but an ancestral classification is not always a racial one.

## C

That ancestry is not always a proxy for race does not mean it never is.

We have previously outlined the contours of proxy discrimination when addressing statutory discrimination claims:

> Proxy discrimination is a form of facial discrimination. It arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group. For example, discriminating against individuals with gray hair is a proxy for age discrimination because "the 'fit' between age

and gray hair is sufficiently close." *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992).

*Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). The Supreme Court has recognized that "[a]ncestry can be a proxy for race" in the Fifteenth Amendment context. *Rice*, 528 U.S. at 514; *see Commonwealth Election Comm'n*, 844 F.3d at 1092. *Guinn v. United States*, for example, held that although an exemption to a voting literacy test did not expressly classify by race, "the standard itself inherently brings that result into existence." 238 U.S. 347, 364–65 (1915).[12] Although proxy discrimination does not involve express racial classifications, the fit between the classification at issue and the racial group it covers is so close that a classification on the basis of race can be inferred without more.[13] For that reason, proxy discrimination is "a form of facial discrimination." *Pac. Shores Props.*, 730 F.3d at 1160 n.23.

Notably, proxy discrimination does not require an exact match between the proxy category and the racial classification for which it is a proxy. "Simply because a class . . . does not include all members of the race does not suffice to make the classification race neutral." *Rice*, 528 U.S. at 516–17. In *Rice* the classification at issue—though not explicitly racial—was so closely intertwined with race, given the characteristics of Hawaii's population in 1778, that

---

[12] *See also* Stephen M. Rich, *Inferred Classifications*, 99 Va. L. Rev. 1525, 1532 (2013) (discussing how the Supreme Court has inferred facial racial classifications based on a "legislation's form and practical effect").

[13] We do not address whether ancestry can be a proxy for race in contexts beyond the scope of the Fifteenth Amendment.

the law was readily understood to be discriminatory in "purpose and operation." *Id*. at 516. At its core, *Rice* inferred the racial purpose of the Hawaii law from the terms of the classification combined with historical facts, concluding that Hawaii's racial voter qualification was "neither subtle nor indirect." *Id*. at 514.

Relying on *Rice*, we held in *Davis v. Commonwealth Election Comm'n* that an ancestry-based voting restriction in the Commonwealth of the Northern Mariana Islands ("CNMI") was a proxy for race discrimination in violation of the Fifteenth Amendment. 844 F.3d at 1093. *Commonwealth Election Commission* concerned a provision of the CNMI Constitution limiting voting in certain CNMI elections to U.S. citizens or nationals "who [are] of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood," a classification defined as someone who was "born or domiciled in the Northern Mariana Islands by 1950 and . . . a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth." *Id*. at 1090 (quoting N. Mar. I. Const. art XII, § 4). We concluded that "the *stated* intent of the provision [was] to make ethnic distinctions," even though the provision was technically tethered to an ancestor's residence in 1950, and even though there was "historical evidence that some persons who were not of Chamorro or Carolinian ancestry lived on the islands in 1950." *Id*. at 1093 (emphasis added). We reasoned that the voter qualification at issue "tie[d] voter eligibility to descent from an ethnic group;" the qualification "referenced blood quantum to determine descent" much like the Hawaiian law invalidated in *Rice*; and the statute implementing the classification referenced race. *Id*. As in *Rice*, the CNMI law left no reasonable explanation for the voting qualifications except that voter eligibility was race-based.

## D

Like the classifications invalidated in *Rice* and *Commonwealth Election Commission*, the classification "Native Inhabitants of Guam" in this case serves as a proxy for race, in violation of the Fifteenth Amendment. The 2000 Plebiscite Law limits voting to "Native Inhabitants of Guam," which it defines as "those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Organic Act of Guam and descendants of those persons." 3 Guam Code Ann. § 21001(e). The Organic Act granted U.S. citizenship to three categories of people and their descendants. In summary, those categories are:

> (1) Individuals born before April 11, 1899, who lived in Guam on that date as Spanish subjects, and who continued to reside in some part of the U.S. thereafter.

> (2) Individuals born in Guam before April 11, 1899, who lived in Guam on that date, and who continued to reside in some part of the U.S. thereafter.

> (3) Individuals born in Guam on or after April 11, 1899.

8 U.S.C. § 1407 (1952). This definition is so closely associated with the express racial classification "Chamorro" used in previously enacted statutes that it can only be

sensibly understood as a proxy for that same racial classification.**14**

The 2000 Plebiscite Law's immediate predecessors were not shy about using an express racial classification. The Registry Act established an official list of "Chamorro" people, defined according to the Organic Act, as inhabitants of Guam in 1899 who were Spanish subjects or were born in Guam before 1899, and the descendants of those individuals. Registry Act § 20001(a). In its legislative findings and statement of intent, the Registry Act provided: "The Guam Legislature recognizes that the indigenous people of Guam, the Chamorros, have endured as a population with a distinct language and culture despite suffering over three hundred years of colonial occupation by Spain, the United States of America, and Japan." *Id.* § 1. It further stated: "The Guam Legislature . . . endeavors to memorialize the indigenous Chamorro people . . . who continue to develop as one Chamorro people on their homeland, Guam." *Id.* Finally, the Registry Act recognized that "[t]he Legislature intends for this registry to assist in the process of heightening local awareness among the people of Guam of the current struggle for Commonwealth, of the identity of the indigenous Chamorro people of Guam, and of the role that Chamorros and succeeding generations play in the island's cultural survival and in Guam's political evolution towards self-government." *Id.* As part of those purposes, the law recognized that the registry may be used "for the future

---

**14** Guam acknowledged in the district court that the term "Chamorro" refers to a distinct racial category and does not seriously contest otherwise on appeal. We have similarly recognized "Chamorro" as a racial classification for Fifteenth Amendment purposes. *See Commonwealth Election Comm'n*, 844 F.3d at 1093 (treating "Northern Marianas Chamorro" as a racial classification).

exercise of self-determination by the indigenous Chamorro people of Guam." *Id*.

The Registry Act formally tied the definition of Chamorro to the race-neutral language of the Organic Act. But the enactment as a whole rested on the concept that the Chamorro were a "distinct people" with a "common culture," the very hallmarks of racial classification *Rice* relied upon in concluding that "Hawaiian" defined a racial group for Fifteenth Amendment purposes. *See* 528 U.S. at 514–15.

The 1997 Plebiscite Law, which the 2000 Plebiscite Law built directly upon, similarly employed express racial classifications. The 1997 law called for a plebiscite limited to the "Chamorro people of Guam," defined as "[a]ll inhabitants of Guam in 1898 and their descendants who have taken no affirmative steps to preserve or acquire foreign nationality." 1997 Plebiscite Law § 2(b). Like the Registry Act, the 1997 Plebiscite Law repeatedly employed the term "Chamorro" to note a distinct group and described that group as facing "colonial discrimination" and "long-standing injustice." *Id*. § 1.

Additionally, the Guam legislature has long defined the term "Native Chamorro" for purposes of the Chamorro Land Trust Commission to include "any person who became a U.S. citizen by virtue of the authority and enactment of the Organic Act of Guam or descendants of such person." Guam Pub. L. No. 15-118 (1980) (codified at 21 Guam Code Ann. § 75101(d)). The CLTC qualifies Native Chamorros to lease land the United States previously seized from Guam's inhabitants during and after World War II and later returned to the Guam government. After passage of the 2000 Plebiscite Law, the Guam legislature enacted a law providing that individuals who receive a lease or were

preapproved for one through the CLTC are automatically registered in the Guam Decolonization Registry, thereby qualifying them to vote in the plebiscite. 3 Guam Code Ann. § 21002.1.

Several similarities between the 2000 Plebiscite Law and its predecessors reveal that "Native Inhabitants of Guam" is a proxy for "Chamorro," and therefore for a racial classification. First, the 2000 Plebiscite Law's definition of "Native Inhabitants of Guam" is nearly indistinguishable from the definitions of "Chamorro" in the Registry Act, the 1997 Plebiscite Law, and the CLTC. "Native Inhabitants of Guam" incorporates all the citizenship provisions of the Organic Act, as does the definition of "Native Chamorro" in the CLTC; the Registry Act and the 1997 Plebiscite Law mirror the first two sections of those provisions. *Compare* 2000 Plebiscite Law § 21001(e); 21 Guam Code Ann. § 75101(d); Registry Act § 20001(a); 1997 Plebiscite Law § 2(b), *with* 8 U.S.C. § 1407 (1952).[15] That Guam applies

---

[15] The Registry Act's and the 1997 Plebiscite Law's definition of "Chamorro" do not incorporate the third citizenship provision of the Organic Act, which grants citizenship to individuals born in Guam on or after April 11, 1899. 8 U.S.C. § 1407(b) (1952). Because the INA replaced the citizenship provisions of the Organic Act in 1952, *see* Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 403(a)(42), 66 Stat. 163, 280, this third provision uniquely includes only individuals who were born in Guam between 1899 and 1952 but were not descendants of individuals residing in Guam before 1899. The inclusion of this third provision into the definition of "Native Inhabitants of Guam" does not meaningfully differentiate the term "Native Inhabitants of Guam" from the term "Chamorro." Even including the third citizenship provision of the Organic Act, it appears that as of 1950 98.6% of people who were non-citizen nationals, and thereby likely received citizenship pursuant to the Organic Act, were categorized as "Chamorro." *See* 1950 Census at 54-49 tbl. 38.

nearly identical definitions to the terms "Chamorro," a racial category, and "Native Inhabitants of Guam" indicates that these terms are interchangeable. The closeness of the association is sufficient to conclude that the term "Native Inhabitants of Guam" is a proxy for the "Chamorro" classification.

Second, the 2000 Plebiscite Law maintains nearly identically the features of the facially race-based Registry Act and the 1997 Plebiscite Law. This continuity confirms the 2000 Plebiscite Law's changes to the Chamorro classification were semantic and cosmetic, not substantive.[16]

The 2000 Plebiscite Law creates a "Guam Decolonization Registry" that mirrors the earlier Registry Act. The new registry is structured similarly to the earlier one, including requiring an affidavit to register, *compare* 2000 Plebiscite Law § 21002, *with* Registry Act § 20002; administering the registry through the Guam Election Commission, *compare* 2000 Plebiscite Law § 21001(d), *with* Registry Act § 20001(c); and criminalizing false registration, *compare* 2000 Plebiscite Law § 21009, *with* Registry Act § 20009.

The 2000 Plebiscite Law also amends the 1997 Plebiscite Law to eliminate references to "Chamorro" people, but otherwise retains the same features. *See* 2000 Plebiscite Law §§ 7, 9–11. Both statutes establish non-binding elections on

---

[16] The 2000 Plebiscite Law slightly changed the definition of "Chamorro" in the Registry Act to include individuals born in Guam prior to 1800 and their descendants. *See* 2000 Plebiscite Law § 12; *supra*, n.4. However, this post-hoc revision does not change the near identical resemblance between the definitions of "Native Inhabitants of Guam" in the 2000 Plebiscite Law and the original definition of "Chamorro" in the Registry Act.

Guam's future political status relationship with the United States, the results of which will be transmitted to the federal government and to the United Nations. *Compare* 2000 Plebiscite Law §§ 10–11, *with* 1997 Plebiscite Law §§ 5, 10. Given the similarity in the substantive provisions and in the definitions of "Chamorro" and of "Native Inhabitants of Guam," the substitution of terms does not erase the 1997 Plebiscite Law's premise for the voting restriction—to treat the Chamorro as a "distinct people." *Rice*, 528 U.S. at 515.

Finally, the timing of the 2000 Plebiscite Law's enactment confirms its racial basis. The 2000 Plebiscite Law was enacted on March 24, 2000, just one month after *Rice* was decided. In *Rice*, Hawaii had revised its definition of "Hawaiian" from an earlier version, by replacing the word "races" with "peoples." *Id.* at 515–16. The Supreme Court concluded based on the drafters' own admission that "any changes to the language were at most cosmetic." *Id.* at 516. Although we have no similar admission, the same is true here. After *Rice*, Guam's swift reenactment of essentially the same election law—albeit with a change in terms—indicates that the Guam legislature's intent was to apply cosmetic changes rather than substantively to alter the voting restrictions for the plebiscite.

Guam's primary argument to the contrary is that "Native Inhabitants of Guam" is not a racial category but a *political* one referring to "a colonized people with a unique political relationship to the United States because their U.S. citizenship was granted by the Guam Organic Act." It attempts to distinguish this case from *Rice* on the ground that the voter qualification here is tethered not to presence in the Territory at a particular date but to the passage of a specific law—the Organic Act—which altered the legal status of the group to which the ancestral inquiry is linked.

But indirect or tiered racial classifications, tethered to prior, race-based legislative enactments, are subject to the same Fifteenth Amendment proscription on race-based voting restrictions as are explicitly racial classifications. In *Guinn*, the Supreme Court invalidated an Oklahoma constitutional amendment that established a literacy requirement for voting eligibility but exempted the "lineal descendant[s]" of persons who were "on January 1, 1866, or at any time prior thereto, entitled to vote under any form of government, or who at that time resided in some foreign nation." 238 U.S. at 356–7. That classification, like the one at issue here, was facially tethered to specific laws—the voter eligibility laws in existence in 1866 before the Fifteenth Amendment was ratified. In that year, only eight northern states permitted African Americans to vote. *See* Benno C. Schmdit, Jr., *Principle and Prejudice: The Supreme Court and Race in the Progressive Era Part 3*, 82 Colum. L. Rev. 835, 862 (1982). *Guinn* held the challenged Oklahoma voting qualification incorporated—without acknowledging their racial character—a set of former race-based statutory restrictions. 238 U.S. at 364–65. In essence, the Court recognized that Oklahoma was reviving its earlier race-based voting restrictions, thereby violating the Fifteenth Amendment.

Nor is Guam's argument that the classification here is political supported by the Supreme Court's recognition that classifications based on American Indian ancestry are political in nature. Laws employing the American Indian classification targeted individuals "not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities." *Mancari*, 417 U.S. at 554; *see also Rice*, 528 U.S.

at 518–20; *United States v. Antelope*, 430 U.S. 641 (1977).[17] Both the Supreme Court and we have rejected the application of *Mancari* for Fifteenth Amendment purposes with respect to non-Indian indigenous groups, namely those in Hawaii and the CNMI respectively. *See Rice*, 528 U.S. at 518–20; *Commonwealth Election Comm'n*, 844 F.3d at 1094.[18] Nothing counsels a different result in this case.

Here, the parallels between the 2000 Plebiscite Law and previously enacted statutes expressly employing racial classifications are too glaring to brush aside. The near identity of the definitions for "Native Inhabitants of Guam" and "Chamorro," the lack of other substantive changes, and

---

[17] Although *Mancari*'s rationale was premised on the recognized quasi-sovereign tribal status of Indians, "the Supreme Court has not insisted on continuous tribal membership, or tribal membership at all, as a justification for special treatment of Indians," and neither has Congress. *Kamehameha Schs.*, 470 F.3d at 851 (Fletcher, J., concurring) (collecting cases and statutes).

[18] Because we affirm the district court on Fifteenth Amendment grounds, we reserve judgment on whether the *Mancari* exception may apply to the "Native Inhabitants of Guam" classification outside the Fifteenth Amendment context. *Rice*, which rejected the application of *Mancari* to Hawaiians for Fifteenth Amendment purposes, was careful to confine its analysis to voting rights under that amendment. It stated that "[t]he validity of the voting restriction is the only question before us," 528 U.S. at 521, and emphasized the unique character of voting rights under the Fifteenth Amendment. *Id.* at 512, 523–24; *cf. Commonwealth Election Comm'n*, 844 F.3d at 1095 ("[L]imits on who may own land are quite different—conceptually, politically, and legally—than limits on who may vote in elections to amend a constitution."); *Kamehameha Schs.*, 470 F.3d at 853 (Fletcher, J., concurring) (arguing that Native Hawaiians are a political—and not racial—classification for Fourteenth Amendment purposes because, in part, "[u]nlike *Rice*, the case before us does not involve preferential voting rights subject to challenge under the Fifteenth Amendment").

the timing of the 2000 Plebiscite Law's enactment all indicate that the Law rests on a disguised but evident racial classification.

* * * *

Concluding that the 2000 Plebiscite Law employs a proxy for race is not to equate Guam's stated purpose of "providing dignity in . . . allowing a starting point for a process of self-determination" to its native inhabitants with the racial animus motivating other laws that run afoul of the Fifteenth Amendment, *see, e.g.*, *Gomillion*, 364 U.S. at 347; *Guinn*, 238 U.S. at 364–65. Our decision makes no judgment about whether Guam's targeted interest in the self-determination of its indigenous people is genuine or compelling. Rather, our obligation is to apply established Fifteenth Amendment principles, which single out voting restrictions based on race as impermissible whatever their justification. Just as a law *excluding* the Native Inhabitants of Guam from a plebiscite on the future of the Territory could not pass constitutional muster, so the 2000 Plebiscite Law fails for the same reason.

## IV

We hold that Guam's limitation on the right to vote in its political status plebiscite to "Native Inhabitants of Guam" violates the Fifteenth Amendment and so **AFFIRM** the district court's summary judgement order.

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ▶ A material point of fact or law was overlooked in the decision;
  - ▶ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ▶ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

    ►    Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

    ►    The proceeding involves a question of exceptional importance; or

    ►    The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)    Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-2.

**(3)    Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4)    Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)

- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions

- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**           **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*